**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Mindee J. Reuben
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Tel: (215) 854-4060

*Counsel for Plaintiffs Karen Cornish-Adebiyi
and Luis Santiago and the Proposed Class*
(additional counsel on signature page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KAREN CORNISH-ADEBIYI and LUIS SANTIAGO, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CAESARS ENTERTAINMENT, INC., BOARDWALK REGENCY LLC d/b/a CAESARS ATLANTIC CITY HOTEL & CASINO, HARRAH'S ATLANTIC CITY OPERATING COMPANY, LLC d/b/a HARRAH'S RESORT ATLANTIC CITY HOTEL & CASINO, TROPICANA ATLANTIC CITY CORPORATION d/b/a TROPICANA CASINO AND RESORT ATLANTIC CITY, MGM RESORTS INTERNATIONAL, MARINA DISTRICT DEVELOPMENT COMPANY, LLC d/b/a BORGATA HOTEL CASINO & SPA, HARD ROCK INTERNATIONAL INC., SEMINOLE HARD ROCK SUPPORT SERVICES, LLC, BOARDWALK 1000, LLC d/b/a HARD ROCK HOTEL & CASINO ATLANTIC CITY, and CENDYN GROUP, LLC, <br><br> Defendants. | Civil Action No. 1:23-cv-02536 (KMW)(EAP) |

MONICA BLAIR-SMITH, individually and on behalf of all others similarly situated,

              Plaintiff,

      vs.

CAESARS ENTERTAINMENT, INC., BOARDWALK REGENCY LLC d/b/a CAESARS ATLANTIC CITY HOTEL & CASINO, HARD ROCK INTERNATIONAL INC., SEMINOLE HARD ROCK SUPPORT SERVICES, LLC, BOARDWALK 1000, LLC d/b/a HARD ROCK HOTEL & CASINO ATLANTIC CITY, HARRAH'S ATLANTIC CITY OPERATING COMPANY, LLC d/b/a HARRAH'S RESORT ATLANTIC CITY HOTEL & CASINO, MGM RESORTS INTERNATIONAL, MARINA DISTRICT DEVELOPMENT COMPANY, LLC d/b/a BORGATA HOTEL CASINO & SPA,TROPICANA ATLANTIC CITY CORPORATION d/b/a TROPICANA CASINO AND RESORT ATLANTIC CITY, and CENDYN GROUP, LLC,

              Defendants.

Civil Action No. 1:23-cv-06506

---

JACOB FABEL, individually and on behalf of all others similarly situated,

              Plaintiff,

      vs.

BOARDWALK 1000, LLC d/b/a HARD ROCK HOTEL & CASINO ATLANTIC CITY, BOARDWALK REGENCY LLC d/b/a CAESARS ATLANTIC CITY HOTEL & CASINO, CAESARS ENTERTAINMENT, INC., HARD ROCK INTERNATIONAL INC., HARRAH'S ATLANTIC CITY OPERATING COMPANY, LLC d/b/a HARRAH'S RESORT ATLANTIC CITY HOTEL & CASINO, MARINA DISTRICT DEVELOPMENT

Civil Action No. 1:23-cv-06576

COMPANY, LLC d/b/a BORGATA HOTEL
CASINO & SPA, MGM RESORTS
INTERNATIONAL, SEMINOLE HARD ROCK
SUPPORT SERVICES, LLC, TROPICANA
ATLANTIC CITY CORPORATION d/b/a
TROPICANA CASINO AND RESORT
ATLANTIC CITY, and CENDYN GROUP, LLC,

Defendants.

## Plaintiffs' Unopposed Motion To Consolidate

Pursuant to Federal Rule of Civil Procedure 42(a), Plaintiffs Karen Cornish-Adebiyi and

Luis Santiago, individually and on behalf of all others similarly situated ("*Cornish* Plaintiffs"),

move to consolidate the three above-captioned class actions pending in this district: (1) *Cornish-*

*Adebiyi, et al., v. Caesars Entertainment, Inc., et al.*, No. 23-cv-02536 ("*Cornish*"), (2) *Blair-Smith*

*v. Caesars Entertainment, Inc., et al.*, No. 23-cv-06506 ("*Blair-Smith*"), and (3) *Fabel v.*

*Boardwalk 1000, LLC, d/b/a Hard Rock Hotel & Casino Atlantic City, et. al*, No. 23-cv-06576

("*Fabel*"). All parties and both plaintiff and defense counsel in *Cornish*, *Blair-Smith*, and *Fabel*

consent to this motion.

## I. Background

*Cornish* is the first-filed of three related actions before the Court. The *Cornish* complaint

was filed on May 9, 2023, and amended on August 21, 2023, pursuant to the schedule in the Court's

August 1, 2023 Order (Dkt. No. 44).[1] The *Cornish* complaint alleges that Defendants are engaged

in an ongoing conspiracy to fix, raise, and stabilize the prices of casino-hotel guest rooms in

Atlantic City, New Jersey, in violation of Section 1 of the Sherman Act. Defendants are entities

that own and operate Atlantic City casino-hotels (the "Casino-Hotel Defendants") and the Cendyn

---

[1] The *Cornish* amended complaint substitutes the class representatives (who withdrew for personal
reasons) with two new plaintiffs. The original and amended complaints are otherwise substantively
identical.

Group, LLC ("Cendyn"). Cendyn sells and promotes a pricing algorithm platform ("Rainmaker Platform"), which all Casino-Hotel Defendants are alleged to use while knowing that all other Casino-Hotel Defendants do the same. The Rainmaker Platform allegedly enables these defendants to share, coordinate, and set supra-competitive prices for guest rooms. Plaintiffs are individuals who, during the class period of June 28, 2018 through the present, directly booked these rooms from one or more Casino-Hotel Defendants and allegedly paid supra-competitive prices for the rooms.

More than three months after *Cornish* was filed, the *Blair-Smith* and *Fabel* actions were each filed on August 21, 2023, by different plaintiffs and counsel unaffiliated with the *Cornish* Plaintiffs and their counsel. Neither of the recently-filed actions has been assigned to a judge yet. The *Blair-Smith* and *Fabel* complaints (attached as Exhibits 1 and 2, respectively) each make substantially similar factual allegations, bring the same cause of action, and seek the same relief on behalf of the same class against the same ten defendants, during virtually the same class period, as the *Cornish* complaint. Indeed, the following chart describes and cites the paragraphs of each complaint containing the same or similar allegations:

| Allegation Type | *Cornish* | *Blair-Smith* | *Fabel* |
|---|---|---|---|
| **Defendants** | (1) Caesars Entertainment, Inc.; (2) Boardwalk Regency LLC d/b/a Caesars Atlantic City Hotel & Casino; (3) Harrah's Atlantic City Operating Company, LLC d/b/a Harrah's Resort Atlantic City Hotel & Casino; (4) Tropicana Atlantic City Corporation d/b/a Tropicana Casino and Resort Atlantic City; (5) MGM Resorts International; (6) Marina District Development Company, LLC d/b/a Borgata Hotel Casino & Spa; (7) Hard Rock International Inc.; (8) Seminole Hard Rock Support Services, LLC; (9) Boardwalk 1000, LLC d/b/a Hard Rock Hotel & Casino Atlantic City; (10) Cendyn Group, LLC | | |
| **Class Definition and Period** | "All persons who have directly purchased a guest room for rent in Atlantic City, New Jersey, from one or | "All persons who have directly purchased a guestroom for rent in Atlantic City, New Jersey, from one or | "All persons who have directly purchased a guestroom for rent in Atlantic City, New Jersey, from one or |

| | more Casino-Hotel Defendants or co-conspirator casino-hotels, or from a division, subsidiary, predecessor, agent, or affiliate of such entity, from no later than **June 28, 2018**, until Defendants' unlawful conduct and its anticompetitive effects stop. Excluded from the class are federal and state governmental entities and judicial officers presiding over this case." *Cornish* Compl. ¶ 339 | more Casino-Hotel Defendants or co-conspirator casino-hotels, or from a division, subsidiary, predecessor, agent, or affiliate of such entity, from no later than **June 27, 2018**, until Defendants' unlawful conduct and its anticompetitive effects stop. Excluded from the class are federal and state governmental entities and judicial officers presiding over this case." *Blair-Smith* Compl. ¶ 197 | more Casino-Hotel Defendants or co-conspirator casino-hotels, or from a division, subsidiary, predecessor, agent, or affiliate of such entity, from no later than **June 28, 2018**, until Defendants' unlawful conduct and its anticompetitive effects stop. Excluded from the class are federal and state governmental entities and judicial officers presiding over this case." *Fabel* Compl. ¶ 184 |
|---|---|---|---|
| **Cause of Action:** Violation of Section 1 of the Sherman Act (15 U.S.C § 1) | *Cornish* Compl. ¶¶ 349-359 | *Blair-Smith* Compl. ¶¶ 206-217 | *Fabel* Compl. ¶¶ 193-204 |
| **Conduct:** Casino-Hotel Defendants' knowing and collective use of Defendant Cendyn's Rainmaker Platform to fix, stabilize, and artificially increase hotel room prices offered to class members in the Atlantic City market | *Cornish* Compl. ¶¶ 6-7, 120-176, 354 | *Blair-Smith* Compl. ¶¶ 88-110, 211 | *Fabel* Compl. ¶¶ 74-107, 198 |

**II. The Court Should Consolidate the *Cornish*, *Blair-Smith*, and *Fabel* Actions.**

"If actions before the court involve a common question of law or fact, the court may . . . consolidate the actions." FED. R. CIV. P. 42(a)(2). "[D]istrict courts have broad power to consolidate cases that share common questions of law or fact." *A.S. ex rel. Miller v. SmithKline*

*Beecham Corp.*, 769 F.3d 204, 212 (3d Cir. 2014) (internal citation and quotation marks omitted). "[A] court may consolidate cases if, in its discretion, consolidation would facilitate the administration of justice[.]" *Doug Brady, Inc. v. New Jersey Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 176 (D.N.J. 2008). "When exercising this discretion, a court should weigh the benefits of judicial economy against the potential for new delays, expense, confusion or prejudice." *Id.* "In the absence of an articulated basis to assert confusion or prejudice, consolidation is generally appropriate." A.*F.I.K. Holding SPRL v. Fass*, 216 F.R.D. 567, 570 (D.N.J. 2003).

Consolidating *Cornish*, *Fabel*, and *Blair-Smith* is appropriate under Rule 42. Not only do all three complaints share common allegations of law and fact, they are nearly identical. Indeed, these actions are brought on behalf of essentially the same proposed class against the same defendants based on the same factual allegations and legal theory. Furthermore, consolidating the actions would promote judicial economy: coordinated discovery, motion practice, and a single trial will save significant time and costs and yield greater efficiency and certainty for all involved.

While Defendants' response to the *Cornish* amended complaint is currently due September 5, 2023, consolidating all three cases now would be particularly appropriate: the *Cornish*, *Fabel*, and *Blair-Smith* Plaintiffs would file a single consolidated amended complaint through Court-appointed interim lead counsel; Defendants would need only respond once to that consolidated complaint; and the consolidated action may continue on through coordinated discovery and, ultimately, trial. No apparent confusion or prejudice would result. To the contrary, confusion and inconsistent outcomes are likely in the absence of consolidation.

This Court previously ruled that when "[t]he three complaints filed by plaintiffs virtually are identical . . . . in the interests of judicial efficiency, these actions should be consolidated." *Mugmuk v. Beyer*, No. 86 Civ. 3552, 1988 WL 80875, at *1 (D.N.J. Aug. 1, 1988) (noting plaintiffs

across the three complaints had experienced "the same treatment [by defendants], and now raise the same legal claims"). For the reasons discussed above, the same result should occur here.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs Karen Cornish-Adebiyi and Luis Santiago, individually and on behalf of all others similarly situated, respectfully request this Court to grant this Motion to Consolidate (1) *Cornish-Adebiyi, et al., v. Caesars Entertainment, Inc., et al.*, 23-cv-02536, (2) *Blair-Smith v. Caesars Entertainment, Inc.*, 23-cv-06506, and (3) *Fabel v. Boardwalk 1000, LLC, et. al*, 23-cv-06576, into the first-filed action, *Cornish-Adebiyi, et al., v. Caesars Entertainment, Inc., et al.*, 23-cv-02536, and to re-caption the consolidated matter as *Cornish-Adebiyi, et al., v. Caesars Entertainment, Inc., et al.*

Plaintiffs also request that the Stipulation and Order (Dkt. No. 44), setting out the current schedule for Defendants to respond to the above-referenced complaints, be suspended during the pendency of this motion, and hereby stipulate to a further extension of the applicable response deadlines pending the resolution of this motion. If the Motion to Consolidate is granted, the consolidated parties will confer and promptly propose to the Court a new schedule for filing a consolidated amended complaint and for Defendants to respond to that complaint.

Dated:  August 28, 2023                    Respectfully submitted,

                                           */s/ Mindee J. Reuben*
                                           Mindee J. Reuben
                                           LITE DEPALMA GREENBERG & AFANADOR, LLC
                                           1515 Market Street, Suite 1200
                                           Philadelphia, PA 19102
                                           Tel: (215) 854-4060
                                           mreuben@litedepalma.com

/s/ Joseph J. DePalma
Joseph J. DePalma
Catherine B. Derenze
LITE DEPALMA GREENBERG & AFANADOR, LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

Christopher J. Cormier (*pro hac vice*)
Spencer Cox (*pro hac vice*)
BURNS CHAREST LLP
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com
scox@burnscharest.com

Warren T. Burns (*pro hac vice*)
Daniel H. Charest (*pro hac vice*)
Matthew Tripolitsiotis (*pro hac vice*)
Hannah M. Crowe (*pro hac vice*)
Quinn Burns (*pro hac vice*)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
wburns@burnscharest.com
dcharest@burnscharest.com
mtripolitsiotis@burnscharest.com
hcrowe@burnscharest.com
qburns@burnscharest.com

Vineet Bhatia (*pro hac vice*)
Shawn L. Raymond (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com

Stephen E. Morrissey (*pro hac vice*)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 516-3880
smorrissey@susmangodfrey.com

Lisa X. Jing (*pro hac vice* forthcoming)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, Floor 32
New York, NY 10019
Tel: (212) 336-8330
ljing@susmangodfrey.com

*Counsel for Plaintiffs Karen Cornish-Adebiyi and*
*Luis Santiago and the Proposed Class*

# Exhibit 1

**Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, P.C.**
Stanley O. King
Eric G. Kahn
231 South Broad Street
Woodbury, NJ 08096
Tel: (856) 845-3001
Fax: (856) 845-3079
stan@kingslaw.com
EKahn@JaverbaumWurgaft.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONICA BLAIR-SMITH, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No.: 23-6506 |
| vs. | |
| CAESARS ENTERTAINMENT, INC.; BOARDWALK REGENCY LLC d/b/a CAESARS ATLANTIC CITY HOTEL & CASINO; HARD ROCK INTERNATIONAL INC.; SEMINOLE HARD ROCK SUPPORT SERVICES, LLC; BOARDWALK 1000, LLC d/b/a HARD ROCK HOTEL & CASINO ATLANTIC CITY; HARRAH'S ATLANTIC CITY OPERATING COMPANY, LLC d/b/a HARRAH'S RESORT ATLANTIC CITY HOTEL & CASINO; MGM RESORTS INTERNATIONAL; MARINA DISTRICT DEVELOPMENT COMPANY, LLC d/b/a BORGATA HOTEL CASINO & SPA; TROPICANA ATLANTIC CITY CORPORATION d/b/a TROPICANA CASINO AND RESORT ATLANTIC CITY; and CENDYN GROUP, LLC, | **CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

LOCAL CIVIL RULE 10.1 STATEMENT ...................................................................... iii

I.  NATURE OF THE ACTION ..................................................................... 1

II.  JURISDICTION AND VENUE ................................................................ 5

III.  THE PARTIES .......................................................................................... 6

  a.  Plaintiff ................................................................................................... 6

  b.  Defendants .............................................................................................. 7

IV.  GENERAL ALLEGATIONS ................................................................... 10

  A.  The Relevant Market is the Atlantic City Casino-Hotel Market. .............. 10

    i.  The Casino-Hotel Market is Dominated By the Casino-Hotel Defendants. ...... 11

    ii.  The Relevant Product Market is Casino-Hotel Rooms. ..................... 12

    iii.  The Relevant Geographic Market is Atlantic City. .......................... 13

  B.  This Market Has Characteristics That Make It Susceptible to Collusion. .................. 14

  C.  Casino-Hotel Defendants Previously Priced Rooms Based on Costs, Supply and Demand. ................................................................................. 16

  D.  Rainmaker is Utilized by Casino-Hotel Defendants. .............................. 17

    i.  Casino-Hotel Defendants Rely On Rainmaker's Platform to Set Rates. ........... 21

  E.  Defendants Conspire to Fix Prices Using Rainmaker. .............................. 26

  F.  There Are Multiple Forms of Conspiracy Evidence ................................. 27

    i.  Casino-Hotel Defendants Possessed the Motive to Conspire. .......................... 27

    ii.  Defendants' Anticompetitive Scheme Effects Guestroom Rates and Revenues. ................................................................... 29

    iii.  Casino-Hotel Defendants Undertook Actions Against Their Own Interests. ..... 33

    iv.  Defendants' Scheme Does Not Benefit the Market. ........................... 34

    v.  Traditional Conspiracy Evidence Is Also Present. ............................. 34

V.  FRAUDULENT CONCEALMENT ......................................................... 43

VI.     CLASS ALLEGATIONS ............................................................................ 45

VII.    CLAIMS FOR RELIEF ............................................................................ 48

PRAYER FOR RELIEF .................................................................................................. 50

JURY TRIAL DEMAND ................................................................................................. 51

## LOCAL CIVIL RULE 10.1 STATEMENT

Pursuant to Local Civil Rule 10.1(b), the required information for Plaintiff's counsel of record is provided above on the first page of the Complaint.

Pursuant to Local Civil Rule 10.1(a), the names and addresses of the Parties to this action are:

1.  Plaintiff Monica Blair-Smith resides at 1400 S. 24th St., Philadelphia, PA 19146.

2.  Defendant Boardwalk 1000, LLC d/b/a Hard Rock Hotel & Casino Atlantic City has its principal place of business at 1000 Boardwalk, Atlantic City, New Jersey 08401.

3.  Defendant Boardwalk Regency LLC d/b/a Caesars Atlantic City Hotel & Casino has its principal place of business at 2100 Pacific Avenue, Atlantic City, New Jersey 08401.

4.  Defendant Caesars Entertainment, Inc. has its principal place of business at 100 West Liberty Street, 12th Floor, Reno, Nevada 89501.

5.  Defendant Cendyn Group, LLC has its principal place of business at 980 N. Federal Highway, 2nd Floor, Boca Raton, Florida 33432.

6.  Defendant Hard Rock International Inc. has its principal place of business at 5701 Stirling Road, Davie, Florida 33314.

7.  Defendant Harrah's Atlantic City Operating Company, LLC d/b/a Harrah's Resort Atlantic City Hotel & Casino has its principal place of business at 777 Harrah's Boulevard, Atlantic City, New Jersey 08401.

8.  Defendant Marina District Development Company, LLC d/b/a Borgata Hotel Casino & Spa has its principal place of business at 1 Borgata Way, Atlantic City, New Jersey 08401.

9.  Defendant MGM Resorts International has its principal place of business at 3600 Las Vegas Boulevard South, Las Vegas, Nevada 89109.

10. Defendant Seminole Hard Rock Support Services, LLC has its principal place of business at 5701 Stirling Road, Davie, Florida 33314.

11. Defendant Tropicana Atlantic City Corporation d/b/a Tropicana Casino and Resort Atlantic City has its principal place of business at 2831 Boardwalk, Atlantic City, New Jersey 08401.

Plaintiff Monica Blair-Smith ("Plaintiff") brings this action individually and on behalf of a class of all others similarly situated against Defendants,[1] and alleges the following:

## I.    NATURE OF THE ACTION

1.    For years, Defendants have been conspiring to fix, raise and stabilize the prices of guestrooms in their Atlantic City casino-hotel properties. Coordinated use of Defendant Cendyn's Rainmaker platform has led to Plaintiffs and class members paying supra-competitive prices for guestrooms. Defendants' scheme is in violation of Section 1 of the Sherman Act and began no later than June 27, 2018 and continues to the present ("Class Period").

2.    Atlantic City, NJ is a tourist mecca for gambling, entertainment, and dining on the east coast. And while visitors have several lodging options available to them, casino-hotels are undoubtedly the most appealing. This is because, unlike traditional hotels and other types of lodging (i.e.: AirBnbs), casino-hotels provide guests with access to gambling, shows, concerts, award-winning dining, and more – all under one roof. Add to that Atlantic City's famous beach and boardwalk just steps away, and casino-hotels attract thousands of visitors each year.

3.    Most of the casino-hotel properties in Atlantic City are owned and operated by the Casino-Hotel Defendants, with many having been in Atlantic City for decades. In fact, the Casino-Hotel Defendants collectively possess at least a 72% market share of rentable rooms amongst casino-hotels in Atlantic City (the "Atlantic City Casino-Hotel Market ").

4.    For casino-hotel Defendants, higher occupancy rates translate to higher onsite

---

[1] "Defendants" collectively references Cendyn Group ("Cendyn") and predecessor The Rainmaker Group ("Rainmaker"), and the Casino-Hotel Defendants that use its pricing algorithm. References to Cendyn incorporate Rainmaker unless expressly noted otherwise or the context makes clear. "Casino-Hotel Defendants" references the corporate parent defendants, Caesars Entertainment, MGM Resorts and Hard Rock International, and their respective Atlantic City casino-hotels. The Caesars Entertainment casino-hotels are Caesars Atlantic City (including Caesars Suites Atlantic City), Harrah's Atlantic City, Tropicana Atlantic City and, for the first two and a half years of the Class Period, Bally's Atlantic City. The MGM Resorts casino-hotel is Borgata (including the Water Club at Borgata). The Hard Rock International casino-hotel is Hard Rock Atlantic City.

gambling revenues, which are the driving force of casino-hotels profitability. Thus, in an effort to draw in visitors and maximize gaming revenues, Casino-Hotel Defendants have traditionally competed for guests by offering competitive rates on guestrooms based on basic economic principles, supply, and demand.

5.     But this all changed when Rainmaker, later acquired by Defendant Cendyn, and began offering its hospitality clients a way to maximize profits derived from guestrooms – all without having to compete on rates. Rainmaker developed and marketed several pricing algorithm products ("Rainmaker platform") designed to help hospitality clients, including the Casino-Hotel Defendants, recapture "lost" guestroom revenues. First, each client inputs its current and non-public pricing and occupancy data. Next the Rainmaker platform collects, processes, and analyzes this information across all its hospitality clients in a given market in real time, then generates daily recommended guestroom rates to its clients. Clients, including Casino-Hotel Defendants, are *strongly* encouraged to implement the rates that the Rainmaker platform generates. The Rainmaker platform thus eliminates traditional competitive rate-setting, in favor of rate setting using aggregated non-public data across competitors.

6.     Rainmaker quickly gained popularity among casino-hotel operators and eventually became the self-proclaimed "market leader" in the space until industry giant Cendyn acquired it. Cendyn now calls the Rainmaker platform "the hotel revenue and profit optimization cloud."[2]

7.     Three products comprise the current Rainmaker platform: GuestREV, REVCaster, and GroupREV. GuestREV forecasts market demand and recommends optimal rates for hospitality clients to charge on individual rooms. GroupREV performs this same function for large group

---

[2] Press Release, Cendyn, *Cendyn announces acquisition of The Rainmaker Group* (Aug. 1, 2019), https://www.cendyn.com/news/cendyn-announces-acquisition-of-the-rainmaker-group/#:~:text=the%20hotel%20revenue%20and%20profit%20optimization%20cloud.

bookings. REVCaster, which Rainmaker acquired from a competitor in 2015, enables its users to monitor each other's room rates and "solve" the dilemma of guests' "competitor rate shopping."[3]

8.    Cendyn claims that "we have seen returns of up to 15%" by using the Rainmaker platform.[4] These increased revenues drive Cendyn's clients' adoption of the algorithm's recommended room rates. In fact, Cendyn boasts that clients adopt the algorithm's recommended room rates – of which clients like Casino-Hotel Defendants each receive hundreds of thousands per year – more than half of the time.

9.    Given these statistics, a manager from one Casino-Hotel Defendant's revenue management team stated that she "can't see getting by without [the Rainmaker platform]." Another manager claimed, "it's indispensable."[5]

10.    Casino-Hotel Defendants began using the Rainmaker platform at various times in the Atlantic City Casino-Hotel Market preceding the Class Period. By June 27, 2018, the Casino-Hotel Defendants, which were recovering from years of financial hardships, had the means, motive, and (importantly) the market power to fully utilize the Rainmaker platform to change their collective fortunes.

11.    Starting no later than June 2018, Casino-Hotel Defendants—with Rainmaker's (and later Cendyn's) active participation, promotion and coordination—knowingly used the Rainmaker platform to fix, stabilize, and artificially inflate guestroom rates. In doing so, Casino-Hotel Defendants successfully replaced a historically independent room pricing system in Atlantic City with a collusive one.  Room revenue data reported to the New Jersey Casino Control Commission

---

[3] Press Release, Rainmaker, *The Rainmaker Group Acquires Revcaster LLC* (Mar. 17, 2015), https://www.prweb.com/releases/2015/03/prweb12587845.htm.
[4] *Tom Walker Returns to The Rainmaker Group*, TRAVEL COMMUNICATION (Jan. 25, 2012), https://travelcommunication.net/people/tom-walker-returns-to-the-rainmaker-group/.
[5] Cendyn, *Borgata Hotel Casino & Spa's success with Guestrev* (Nov. 3, 2011), https://www.cendyn.com/customer-stories/borgata-hotel-success-rainmaker-guestrev/.

("NJCCC") during and before the Class Period show notable decreases in occupancy rates alongside substantial increases in room rates and revenues. Even more telling is that this same data reveals much lower increases in casino gaming revenues from the same period.

12.     The increased revenues are a result of Casino-Hotel Defendants' willful usage of the Rainmaker platform to facilitate charging supra-competitive room rates during the Class Period.

13.     High-level Rainmaker and Cendyn personnel encouraged wide-spread and coordinated use of the Rainmaker platform, and executives at Casino-Hotel Defendants were all too eager to participate in the scheme. Cendyn was able to assure each Casino-Hotel Defendant that its co-conspirators would not undercut their room rates to take share (i.e., what would have happened under normal competitive conditions).

14.     In fact, knowing that coordination is key, Cendyn outright instructed its clients to practice pricing discipline and "not [to] chas[e] after occupancy growth,"[6] while advocating that clients should "avoid the infamous 'race to the bottom' when competition inevitably becomes fierce within a market."[7]

15.     Beyond this direct evidence of collusion, there exists compelling circumstantial evidence which, when considered together with Defendants' parallel conduct, demonstrates anticompetitive conduct.

16.     First, the financial setbacks in the years leading up to the Class Period combined with the characteristics of the Atlantic City Casino-Hotel market motivated Defendants to

---

[6] Dan Skodol, *Science Based Hotel Revenue Management Surpasses Fiction of Rules Based Models*, REVENUE HUB (May 9, 2018), https://revenue-hub.com/hotel-revenue-management-models/.
[7] Dan Skodol, *Managing capacity constraints in a COVID-19 world*, HOSPITALITY NET (May 20, 2020), https://www.hospitalitynet.org/opinion/4098784.html.

conspire. Second, Casino-Hotel Defendants acted against their individual economic self-interests by implementing the Rainmaker platform's recommended guestroom rates. And finally, the following traditional conspiracy evidence tends to demonstrate a price-fixing conspiracy: a radical change in business practices; the adoption of a common course of action; opportunities to conspire during industry events and smaller bilateral meetings; and Casino-Hotel Defendants' exchange of competitively sensitive pricing and capacity data by and through Cendyn.

17.     The effects of Defendants' scheme are inevitable and familiar. A recent economic study confirmed that the use of a similar algorithm in concentrated markets "during boom" periods enabled users to increase prices more than non-users and concluded that such patterns are consistent with collusion.[8] And a former Federal Trade Commission Chair equated this conduct to a traditional "hub-and-spoke conspiracy."[9] This conduct produces clear anticompetitive effects and offers no procompetitive benefits.

18.     Plaintiff brings this suit on behalf of a class of all persons who directly rented hotel rooms from any Casino-Hotel Defendant or co-conspirator in Atlantic City during the Class Period to recover all damages and injunctive relief available under federal antitrust law.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

20.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and New Jersey's long-

---

[8] Sophie Calder-Wang & Gi Heung Kim, *Coordinated vs Efficient Prices: The Impact of Algorithmic Pricing on Multifamily Rental Markets* (Mar. 28, 2023), available at SSRN: https://ssrn.com/abstract=4403058.
[9] *Id.*

arm statute, N.J. CT. R. 4:4-4.

21.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the rental of casino-hotel rooms.

22.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the rental of casino-hotel rooms.

23.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendant maintains business facilities, has agents, transacts business, and is otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## III.     THE PARTIES

### a.     Plaintiff

24.     Monica Blair-Smith. Plaintiff Monica Blair-Smith ("Plaintiff") is a citizen and resident of the State of Pennsylvania. Plaintiff directly rented a room from one or more Casino-Hotel Defendants during the Class Period, including within the four years preceding the filing of this Complaint.

25.     For example, on or about March 20, 2023, Plaintiff reserved multiple guestrooms at the Tropicana Atlantic City Hotel and Casino, which she directly rented and paid for through Caesars Entertainment's online booking platform. Plaintiff stayed overnight in a guest room at Tropicana Atlantic City.

26.     Plaintiff paid higher prices for the casino-hotel rooms she rented directly from Casino-Hotel Defendants as a result of the antitrust violations alleged in this Complaint. In addition, Plaintiff may directly rent guest rooms in Atlantic City, New Jersey, operated by one or

more Casino-Hotel Defendants in the future.

      **b. Defendants**

27.    <u>**Caesars Entertainment Defendants.**</u> Defendant Caesars Entertainment, Inc. ("Caesars Entertainment") is a publicly traded Delaware corporation headquartered in Reno, Nevada.

28.    Caesars Entertainment, through wholly owned subsidiary Caesars Entertainment Operating Company, LLC, operates Defendant Boardwalk Regency LLC d/b/a Caesars Atlantic City Hotel & Casino ("Caesars Atlantic City"), Defendant Harrah's Atlantic City Operating Company, LLC d/b/a Harrah's Resort Atlantic City Hotel & Casino ("Harrah's Atlantic City"), and Defendant Tropicana Atlantic City Corporation d/b/a Tropicana Casino and Resort Atlantic City ("Tropicana Atlantic City"). Caesars Entertainment leases these casino-hotels' real estate from VICI Properties ("VICI").

29.    Defendant Caesars Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Caesars Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey during the Class Period. Caesars Atlantic City includes Caesars Suites Atlantic City, a property adjacent to Caesars Atlantic City that offers guests upscale suites and VIP amenities.

30.    Caesars Atlantic City and Caesars Suites Atlantic City are collectively referenced in this Complaint as "Caesars Atlantic City."

31.    Defendant Harrah's Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Harrah's Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

32.    Defendant Tropicana Atlantic City is a New Jersey corporation headquartered in

Atlantic City, New Jersey. Tropicana Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

33.     Caesars Entertainment and its Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City casino-hotels are clients of Cendyn and have used its Rainmaker platform during the Class Period.

34.     **Hard Rock Defendants**. Defendant Hard Rock International, Inc. ("Hard Rock International") is a Florida corporation headquartered in Davie, Florida. The Seminole Tribe of Florida has wholly owned Hard Rock International since 2006.

35.     Hard Rock International, through wholly owned subsidiary Hard Rock Tristate AC, LLC, owns and operates Defendant Boardwalk 1000, LLC d/b/a Hard Rock Hotel & Casino Atlantic City ("Hard Rock Atlantic City").

36.     Defendant Seminole Hard Rock Support Services, LLC ("Seminole Hard Rock") is a Florida limited liability company headquartered in Davie, Florida.

37.     Defendant Hard Rock Atlantic City is a New Jersey limited liability company headquartered in Atlantic City, New Jersey. Hard Rock Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

38.     Hard Rock International and its Hard Rock Atlantic City casino-hotel are clients of Cendyn and, with active assistance and coordination by Seminole Hard Rock, have used the Rainmaker platform during the Class Period.

39.     **MGM Resorts Defendants.** Defendant MGM Resorts International ("MGM Resorts") is a publicly traded Delaware corporation headquartered in Las Vegas, Nevada.

40.     MGM Resorts, through wholly owned subsidiary Marina District Development Holding Company LLC, operates Defendant Marina District Development Company, LLC d/b/a

Borgata Hotel Casino & Spa ("Borgata"), and leases this casino-hotel's real property from VICI.

41.     MGM Resorts acquired Boyd Gaming Corporation's ownership interest in Borgata in August 2016. That same fall, MGM Growth Properties acquired Borgata's real property from MGM Resorts and leased that property to the MGM Resorts subsidiary, Marina District Development Holding Company LLC, that would operate the property. In August 2021, VICI announced it would acquire MGM Growth Properties, including its Borgata real property holding. That acquisition closed in April 2022.

42.     Defendant Borgata includes The Water Club at Borgata, a hotel connected to Borgata that was built in 2008. On March 14, 2023, Borgata announced that The Water Club would be renamed MGM Tower, and that a corresponding renovation would be done by Memorial Day 2023.

43.     Defendant Borgata is a New Jersey corporation headquartered in Atlantic City, New Jersey. Borgata has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

44.     Borgata and The Water Club are collectively referenced herein as "Borgata."

45.     MGM Resorts and its Borgata casino-hotel are clients of Cendyn and have used the Rainmaker platform during the Class Period.

46.     **Cendyn.** Defendant Cendyn Group, LLC is a Delaware corporation headquartered in Boca Raton, Florida, with additional domestic offices in Las Vegas, Nevada, Alpharetta, Georgia, and San Diego, California.

47.     Cendyn acquired Rainmaker and its underlying hotel room pricing algorithm platform in August 2019 and subsequently operated it as a subsidiary called "Rainmaker, a Cendyn company" for a relatively short period of time before fully absorbing it.

48.     Various persons and entities known and unknown to Plaintiff and not presently named as defendants in this action have participated as co-conspirators with Defendants in the alleged anticompetitive conduct and have performed acts and made statements in furtherance thereof.

49.     The relevant antitrust market is the Atlantic City Casino-Hotel Market. The industry does not dispute its existence. Industry observers and participants, including Casino-Hotel Defendants themselves, share this position, and fundamental economic principles confirm it.

## IV.     GENERAL ALLEGATIONS

### A.  The Relevant Market is the Atlantic City Casino-Hotel Market.

50.     Since 1976, Atlantic City has held the exclusive right to operate casinos in New Jersey. Pursuant to authority granted them under the New Jersey Casino Control Act, the New Jersey Division of Gaming Enforcement ("NJDGE") and the NJCCC regulate the industry by overseeing the city's casino-hotels.

51.     The market definition alleged in this litigation has been recognized and used by New Jersey gaming regulators. For example, in July 2020, the NJCCC approved the Eldorado Resorts-Caesars Entertainment merger after Caesars Entertainment agreed to divest Bally's Atlantic City to "reduce[] concerns about 'undue economic concentration'" in the Atlantic City casino market.[10]

52.     In fact, during these proceedings, Caesars Entertainment's own expert economist applied the same market definition to analyze the effect of the proposed merger within the Atlantic

---

[10] Ken Ritter, *New Jersey regulators mulling Eldorado buyout of Caesars*, WASH. POST (Jul. 16, 2020), https://www.washingtonpost.com/business/new-jersey-regulators-mulling-eldorado-buyout-of-caesars/2020/07/16/7abd2168-c7ad-11ea-a825-8722004e4150_story.html.

City market.[11]

53.     Within the Atlantic City Casino-Hotel Market, the relevant product market is hotel rooms for rent in casino-hotels, and the relevant geographic market is Atlantic City.

### i. The Casino-Hotel Market is Dominated By the Casino-Hotel Defendants.

54.     Together Casino-Hotel Defendants possessed a dominant share of the rentable guestrooms amongst Atlantic City casino-hotel properties during the Class Period.

55.     Casino-Hotel Defendants possessed an 80% market share between June 27, 2018, and November 16, 2020. These dates correspond with the opening date of Hard Rock Atlantic City and the day preceding Caesars Entertainment's sale of Bally's Atlantic City, respectively. Since the latter date, Casino-Hotel Defendants have possessed a 72% market share.

56.     Statistics published by the NJDGE and the NJCCC show that, across Atlantic City's nine casino-hotel properties, there have been around 15,109 guestrooms available for rent during the Class Period.

57.     Defendant Borgata operates 2,767 rooms in the Atlantic-City Casino-Hotel Market, giving it an 18.3% market share during the Class Period.

58.     Hard Rock International's Atlantic City casino-hotel has 1,971 rooms, giving it a corresponding market share of 13.1% during the Class Period.

59.     Caesars Entertainment possesses the largest market share in casino-hotels across its properties in Atlantic City. Collectively its casino-hotels have had 4,939 guestrooms with a corresponding market-share of 48.3% between June 27, 2018, and November 16, 2020, and 6,0998

---

[11] Timothy Watts, *Economic Analysis of the Competitive Effects of the Proposed Merger of Caesars Entertainment Corp. with Eldorado Resorts, Inc. on Atlantic City Casino Operations: First Amendment to Analysis of September 6, 2019*, State of New Jersey Casino Control Commission (May 13, 2020).

guestrooms with a corresponding market share of 40.3% from November 17, 2020, through the present.

### ii.  The Relevant Product Market is Casino-Hotel Rooms.

60.  Casino-hotel rooms possess several characteristics that distinguish them from rooms in traditional hotels, resorts, and other forms of rental lodging (such as AirBnBs). Thus, they occupy their own product market.

61.  *First*, Guests stay at casino-hotels to take advantage of their full and varied gambling offerings; fine-dining restaurants, bars and nightclubs; entertainment options like concerts, shows, and athletic events; full-service gyms, pools and spas; a wide array of retail shops; and conference facilities capable of hosting meetings of any size and duration – all in a single location.

70.  Indeed, Casino-Hotel Defendants advertise these amenities as making them unique in the hospitality industry. MGM Resorts' Borgata calls itself a "Luxury Destination and market-leading casino resort, offering an unparalleled travel and entertainment experience" with (but not limited to) "2,000 luxurious hotel rooms and suites…900-seat Music Box theater; Premier nightclub… 11 retail boutiques; 13 fine dining and casual restaurants; Spa Toccare", all in one building.[12] Hard Rock similarly highlights the attractions of its Hard Rock Atlantic City venue, claiming "there's no shortage of variety" offering guests an experience "unlike any other:"[13]

62.  *Second*, Casino-Hotel Defendants consider their competition to be other casino-hotels, not traditional non-casino accommodation offerings. Caesars Entertainment's 2021 annual report discusses the competitive environment it faces within "the casino entertainment business,"

---

[12] About Borgata Hotel Casino & Spa, https://newsroom.mgmresorts.com/borgata-hotel-casino-spa-celebrates-momentous-20th-anniversary.htm#:~:text=About%20Borgata%20Hotel%20Casino%20%26%20Spa
[13] Hard Rock Atlantic City Hotel and Casino, https://www.hardrockhotelatlanticcity.com/hotel-and-casino.

adding that "[i]n most regions, we compete directly with other casino facilities operating in the immediate and surrounding areas."[14]

63.     Industry commentators and participants also consider casino-hotels to occupy their own relevant product market. One commentator noted, "[c]asino hotels, which combine lodging with gaming operations, are a particular sector in the lodging industry."[15] According to another commentator, this is because casino-hotels do not compete against non-casino lodging facilities. Instead, casino-hotels "exist to serve casino patrons and boost casino demand," thus casino-hotels' "primary competitors are other casino hotels."[16]

64.     Casino-hotels are even distinct entities in the eyes of the law. For one, the definition of "hotel" is codified under the Hotel and Multiple Dwelling Law, while "casino-hotel" carries a distinct and different definition under the Casino Control Act. One court held that "casino hotels are not conventional hotels" because "the nature of the casino business, even with overnight accommodations available, is vastly different from that of a conventional hotel." *Atlantic City v. Ace Gaming, LLC*, 23 N.J. Tax. 70, 88-89 (2006).

### iii.   The Relevant Geographic Market is Atlantic City.

65.     Industry analysts, courts, and Casino-Hotel Defendants themselves describe Atlantic City as an economically separate and distinct geographic area.

66.     According to New Jersey's state tourism division, "Atlantic City holds the distinction of being the East Coast's gaming and resort capital."[17]

67.     The American Gaming Association, whose "membership includes commercial and

---

[14] Caesars Entertainment, Inc., 2021 Annual Report (Form 10-K) (Feb. 24, 2022).
[15] Hyewon Youn & Zheng Gu, The Impact of the Recent Recession on U.S. Lodging Firms: An Examination Based on Ratio Analysis, 18 The Journal of Hospitality Financial Management (2010).
[16] James M.Klas, *Why Casino Hotels Work*, Klas Robinson QED (Oct. 1, 2018), http://www.klasrobinsonqed.com/wp-content/uploads/2019/03/IGMag201810_Klas.pdf.
[17] *Atlantic City Casino Resorts*, VISITNJ.ORG (2023), https://visitnj.org/article/atlantic-city-casino-resorts.

tribal casino operators" and "other key stakeholders in the gaming industry,"[18] identified Atlantic

City as the number two geographic market in the United States' "Top Casino Markets."[19]

68.     In a June 2022 press release, Caesars Entertainment announced a new investment

in "the Atlantic City market."[20]

69.     Atlantic City is recognized as a proper geographic market by New Jersey Courts.

New Jersey's state Tax Court uses "the Atlantic City casino-hotel market" and "other casino hotels

in Atlantic City" markets when analyzing property valuations. *Marina District Development Co.,*

*LLC v. Atlantic City*, 27 N.J. Tax. 469, 475-77, 484, 489, 504 (2013); *Ace Gaming, LLC*, 23 N.J.

Tax. at 127.

### B.  This Market Has Characteristics That Make It Susceptible to Collusion.

70.     The Atlantic City Casino-Hotel Market is susceptible to collusion.  It possesses

multiple factual enhancements or "plus factors" along with parallel pricing that allow for the

formation and implementation, of the conspiracy.

71.     First, The Atlantic City Casino-Hotel Market possesses structural characteristics

that are common in industries plagued by collusion: high entry barriers, high market

concentration, lack of reasonable substitutes, and product fungibility.

72.     There are significant barriers to entering the Atlantic City Casino-Hotel Market.

First, the amount of capital investment required to build and operate a casino-hotel is substantial,

to say the least. Land acquisition and construction alone can cost more than a billion dollars; the

---

[18] *About*, AMERICAN GAMING ASSOCIATION (2023), https://www.americangaming.org/about/.
[19] Press Release, American Gaming Association, 2022 Commercial Gaming Revenue Tops $60B (Feb. 15, 2023), https://www.americangaming.org/new/2022-commercial-gaming-revenue-tops-60b-breaking-annual-record-for-second-consecutive-year/.
[20] Press Release, Caesars Entertainment, *Caesars Entertainment Announces Additional Property Enhancements at Ceasars Atlantic City* (Jun. 7, 2022), https://www.caesars.com/meetings/press/caesarsentertainmentannouncesadditionalpropertyenhancementsatcac.

number and quality of the amenities necessary to make the property competitive drives these expenditures. Even acquiring an existing resort requires hundreds of millions of dollars to revamp and rebrand.

73. For example, the construction of the Trump Taj Mahal cost over $1 billion dollars over 30 years ago. And Hard Rock International invested more than $500 million renovating the property before re-opening it as the Hard Rock Atlantic City in 2018. Caesars Entertainment is set to spend approximately $400 million renovating Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City. And MGM Resorts spent $400 million building the Water Club at the Borgata in 2008 – this is after spending $1.1 billion to build the Borgata a mere five years earlier.

74. Building costs are not the only barrier. The NJCCC requires Atlantic City Casino-Hotel Market entrants to meet certain qualifications to receive authorization to open. "Applicants must establish, among other things, their financial stability, integrity, responsibility, business ability and experience necessary to establish and maintain a successful, efficient casino operation."[21]

75. And of course, casino-hotels incur substantial operating costs: paying hosts of staff and workers, licensing costs (both for occupancy and gaming), and state, local and federal taxes, and maintaining the property.

76. As previously discussed, the Atlantic City Casino-Hotel Market is highly concentrated. There are nine casino-hotels in the market, with Casino-Hotel Defendants owning between five and six of them during the Class Period. This means Casino-Hotel Defendants own between 72% and 80% of the rentable guestrooms in the Atlantic City Casino-Hotel Market.

---

[21] 2018 NJCCC Annual Report, https://www.nj.gov/casinos/about/reports/pdf/2018_ccc_annual_report.pdf.

77.     The demand for guestrooms in the Atlantic City Casino-Hotel Market is inelastic: the rate at which customers rent these rooms is relatively static, regardless of the price of those rooms. This is because, as discussed, casino-hotel guestrooms are not substitutable for other kinds of guestroom in Atlantic City. There are limited, if any, low-cost alternatives to guestrooms in casino-hotels due to the amenities that casino-hotels offer: guests do not have on-site access to world-class dining, spa facilities, or gambling facilities in traditional hotels, inns, or AirBnBs. Thus, even when Casino-Hotel Defendants increase room prices, the risk of losing a meaningful number of guests to other types of lodging is negligible. And this risk is certainly not significant enough to police the market or discourage anticompetitive behavior, such as the Casino-Hotel Defendants' price-fixing conspiracy.

78.     Although casino-hotels provide unique offerings, their guestrooms are generally substitutable as amongst each other. For example, a guest looking to rent a large room with two Queen-sized beds and access to in-house restaurants, penny slots, and dance clubs could stay at any of the Casino-Hotel Defendant properties.

### C.  Casino-Hotel Defendants Previously Priced Rooms Based on Costs, Supply and Demand.

79.     Historically, casino-hotels engaged in competitive pricing strategies. Guestrooms were priced based on each casino-hotels' own costs, supply and demand forecasts, and market assessment.

80.     Guest rooms are offered directly to guests via phone and through Casino-Hotel Defendants' respective online booking platforms. Typically, guests may book a room by visiting the casino-hotel's (or its parent company's) online booking platform, selecting the specific resort, desired date range, number of guests, and room type, and completing payment with a credit card or other digital payment mode.

81.     Guest rooms are also directly sold to guests through arrangements with online travel agencies ("OTAs") like Booking Holdings, Expedia Group, and TripAdvisor. OTAs use an agency model, whereby the guest using the OTA is sent to the casino-hotel's website to reserve the room at the rate set by the casino-hotel. The guest pays the casino-hotel directly at checkout. A commission based on the total value of the booking either at the time of booking or after an agreed-upon time period is paid to the OTA by the casino hotels.

82.     Class members (as defined *infra* ¶196) purchased rooms from one or more Casino-Hotel Defendants using one or both methods of direct purchase.

83.     The hospitality industry is a capital-intensive industry, and casino-hotels in particular require immense capital to build up their amenity heavy facilities. Because an empty hotel room is lost revenue, it follows that hotel and casino-hotels strive to maximize their occupancy rates. This is typically done by granting concessions, lowering prices, or offering incentives or deals to attract customers.

84.     Even further, an empty hotel room is also a loss of gambling revenue because most revenue and profits derive from casino-hotels' casino operations. Therefore, rational profit-maximizing firms seek to acquire as many rooms as possible so each guest can spend money on gaming. Therefore, casino-hotels in a competitive market have even more incentive than non-casino-hotels to maximize capacity to retain guest by offering significantly reduced or free rooms.

**D. Rainmaker is Utilized by Casino-Hotel Defendants.**

85.     The Rainmaker Group ("Rainmaker") was started in the late 1990s by Bruce Barfield and Tammy Farley. Rainmaker developed and sold pricing algorithm products to owners and operators in the apartment and hospitality industries, declaring itself the "market leader in

profit optimization solutions for the Gaming & Hospitality and Multifamily Housing industries."[22]

86. Rainmaker believed that the competitive room pricing model traditionally used by casino-hotels was not fully capturing potential revenues. In a 2017 press release ahead of an annual industry conference, Rainmaker pointed out that because casino-hotel revenues are driven by gambling and not room revenues, "casino hotels have traditionally left money on the table by over-discounting and comping rooms without the real-time data to back up those decisions."[23]

87. To address this, Rainmaker developed a "total revenue management approach" premised on "dynamic pricing" that did away with the traditional method of so-called "fixed pricing."[24] Rainmaker's aim was to allow operators like Casino-Hotel Defendants to extract uncaptured, additional revenue from their guests.

88. Each casino-hotel client continuously feeds the platform its current, non-public room pricing and occupancy data. The algorithm collects this data from its clients (and their competitors) and continuously processes and analyzes this information, along with other relevant supply and demand-related data. With this continuous flow of real-time data, the algorithm obtains a clear and complete picture of market supply and demand and competitive dynamics at any given time. Then the algorithm uses this information to generate and recommend "optimal" room rates to its clients. These recommendations are updated throughout a given day.

89. The Rainmaker platform consists of three separate but interrelated products: GuestREV, GroupREV, and REVCaster.

---

[22] Press Release, Rainmaker, *Dover Downs Hotel & Casino Selects Rainmaker revolution™ Profit Optimization Solution* (Mar. 20, 2012), https://www.hospitalitynet.org/news/4055368.html.
[23] Press Release, Rainmaker, *The Rainmaker Group to Present Total Revenue Management Approach for Casino Hotels at INFORMS 2017* (Mar. 29, 2017), https://www.hotel-online.com/press_releases/release/the-rainmaker-group-to-present-total-revenue-management-approach-for-casino/.
[24] *Id.*

90.     GuestREV[25] caters specifically to the casino-hotel sector and, according to Rainmaker, "is the market-leading revenue management and profit optimization solution for forecasting and pricing hotel rooms,"[26] GuestREV forecasts and recommends the guestroom rates for clients like Casino-Hotel Defendants by, among other activities, processing and analyzing the room rates that the specific client and each client-competitor charges.

91.     GuestREV "employs the most accurate valuation of [guests'] true revenue potential at the segment level."[27] According to Cendyn President and Chief Marketing Officer Michael Bennett, GuestREV uses "[c]ompetitor rates … to influence the final price recommendation so hotels don't leave money on the table by pricing too far below competitors[.]"[28]

92.     Casino-Hotel Defendants get optimal recommended room generated by GroupREV. It is an important tool for casino-hotels because group business can represent up to 40% or more of revenue potential for casino-hotels.

93.     GroupREV also forecasts demand for group-booking customers, i.e. individuals attending conferences or weddings, "by day and by group segment."[29]

94.     REVCaster, the third and final product in Rainmaker's price algorithm platform, is Rainmaker's solution to guests that engage in competitive room rate shopping. This product helps clients like Casino-Hotel Defendants by "collect[ing] market-specific hotel price information" from clients' competitors and "provide[ing] easy-to-use reports and data downloads that increase

---

[25] Rainmaker also released a mobile version of the GuestREV product in March 2015 which, "enables anywhere-anytime access to the complete GuestREV pricing functions and reports in real-time via smartphone or tablet."

[26] Press Release, Rainmaker, *Rainmaker Group Takes Gold in 16th Annual GGB Gaming & Technology Awards* (Sep. 29, 2016), https://www.hospitalitynet.org/news/4078527.html.

[27] https://www.cendyn.com/guestrev/.

[28] Andrea Victory, *Examing Trends in Rate and Revenue Management*, HOTELIER MAGAZINE (Jan. 3, 2020), https://www.hoteliermagazine.com/examining-trends-in-rate-and-revenue-management.

[29] *The Rainmaker Group introduces group forecasting,* HOTEL MANAGEMENT (Mar. 14, 2017), https://www.hotelmanagement.net/tech/rainmaker-group-introduces-group-forecasting.

revenue for clients."[30]

95.     GuestREV, GroupREV and REVCaster work together to significantly increase Rainmaker's users' guestroom revenues. As noted by then-Director of Sales for Gaming & Hospitality Tom Walker in January 2012, to an audience of existing and potential gaming clients that "Rainmaker boosts revenues up to 15%" for those using its platform.[31] And the acquisitions of REVCaster and GroupREV a few years later have only increased these numbers.

96.     Cendyn, acquired Rainmaker in August 2019.  The Cendyn-Rainmaker transaction closed in or around October 2019.

97.     At the time of the acquisition, Cendyn noted that Rainmaker "will enable [it] to drive performance across all aspects of the hotel business, now including revenue management" and "will enable thousands of hotels, resorts and casinos around the globe to work with one partner to power their marketing, sales and revenue performance in an integrated fashion."[32]

98.     Cendyn initially operated Rainmaker, as a subsidiary and then entirely absorbed it. With its global reach and client base (more than 30,000 properties, according to travel industry publisher Skift), Cendyn has continued to expand the adoption of the Rainmaker platform among hospitality clients, including casino-hotels.

99.     Throughout the years, both Rainmaker and Cendyn have boasted that the accuracy, precision and efficacy of the Rainmaker platform and its individual products have only improved, thus enabling clients to increase their guestroom revenues by even greater percentages. The

---

[30] Press Release, Rainmaker, *Rainmaker Group Acquires Revcaster LLC* (Mar. 16, 2015), https://www.costar.com/article/448134080/the-rainmaker-group-acquires-revcaster.
[31] Press Release, Rainmaker, *Tom Walker Returns to The Rainmaker Group to Help Drive Revenue and Profitability for Casino Hotel Operators* (Jan. 24, 2012), https://www.prweb.com/releases/therainmakergroup/directorofsales/prweb9130301.htm.
[32] Press Release, Cendyn, *Cendyn announces acquisition of The Rainmaker Group* (Aug. 1, 2019), https://www.cendyn.com/news/cendyn-announces-acquisition-of-the-rainmaker-group/.

collective use of these tools in a particular market, like the Atlantic City Casino-Hotel Market, boosts their guestroom revenues to an even higher degree.

100.     Rainmaker and Cendyn have strongly discouraged the lowering of room rates by Casino-Hotel Defendants to gain market share and grow overall revenue at their competitors' expense. In May 2018, Dan Skodol, former Cendyn VP of Data Science and Analytics and Rainmaker VP of Revenue Analytics, cautioned that "revenue managers must recognize the ultimate goal is not chasing after occupancy growth, but instead, maximizing profits across all revenue streams."[33] In other words, according to Skobol, "hotels avoid the infamous 'race to the bottom' when competition inevitably becomes fierce within a market."[34]

### i.  Casino-Hotel Defendants Rely On Rainmaker's Platform to Set Rates.

101.     Caesars Entertainment in or around late 2004, began using Rainmaker's products across its "entire domestic portfolio."[35] Caesars Entertainment at the time owned Caesars Atlantic City and Bally's Atlantic City. And no later than 2009, Caesars' Harrah's Atlantic City property started using Rainmaker. In a Rainmaker January 2009, press release Entertainment stated that "our 33 properties"—which then included Harrah's Atlantic City, Caesars Atlantic City, and Bally's Atlantic City— "continue to use [Rainmaker's] revenue management system today."[36]

102.     Rainmaker press releases and promotional materials in March 2012 and 2018,

---

[33] Dan Skodol, *Science Based Hotel Revenue Management Surpasses Fiction of Rules Based Models*, REVENUE HUB (May 9, 2018), https://revenue-hub.com/hotel-revenue-management-models/.
[34] Dan Skodol, *Managing capacity constraints in a COVID-19 world*, HOSPITALITY NET (May 20, 2020), https://www.hospitalitynet.org/opinion/4098784.html.
[35] *Revenue Management a Good Bet for Caesars Entertainment*, SUPPLY & DEMAND CHAIN EXECUTIVE (Aug. 3, 2004), https://www.sdcexec.com/sourcing-procurement/news/10354367/revenue-management-a-good-bet-for-caesars-entertainment.
[36] Press Release, Rainmaker, *Casino Hotels Rely on Service and Experience from Revenue Management Providers* (Jan. 7, 2009), https://www.prweb.com/releases/therainmakergroup/letitrain/prweb1826614.htm.

highlighted Caesars Entertainment as one of its "leading casino/hotel organization"[37] and "among the top brands that rely on Rainmaker solutions are Caesars Entertainment,"[38] respectively.

103.    Indeed, all of Caesars Entertainment's Atlantic City casino-hotels have continued to use Rainmaker products.[39] Shawn Cummings, Caesars Entertainment's Revenue Manager for Enterprise Analytics from 2008 to 2014, notes on LinkedIn that he "led yield management for four properties in a highly competitive Atlantic City market" and "optimized revenue from pricing decisions made using Rainmaker GuestRev curves."

104.    In late 2009, Borgata began using Rainmaker's products. On November 11, 2009, Rainmaker "announced today that it was selected by six new casino hotels to provide its 'revolutionTM Product Suite,'" (i.e.: GuestREV, GroupREV, and REVCaster) including "The Borgata Hotel Casino & Spa."[40]

105.    Former Borgata Vice President of Information Technology John Forelli stated: "We turned to Cendyn because we knew it was the market leader in casino hotel optimization and that its system was state-of-the-art" that generates "a balanced pricing structure" where, "[a]side from setting rate minimums and maximums, the team otherwise allows GuestRev to perform its mathematical magic." The profile also quoted Sue Daigle, Borgata's Director of Revenue Management until August 2020. Daigle raved that "GuestRev is literally my right hand" and that "I can't see getting by without it" in setting room prices. [41]

---

[37] Press Release, Rainmaker, *Rainmaker Profit Optimization Solution Chosen by Revel Entertainment Group, LLC* (Mar. 29, 2012), https://www.prweb.com/releases/therainmakergroup/revel/prweb9348766.htm.
[38] 2018 Exhibitor Media Kit, Rainmaker,
https://www.hftp.org/hitec/houston/i/downloads/Exhibitor_Media_Kit__Rainmaker.pdf.
[39] Bally's Atlantic City may have stopped using Rainmaker products on or around November 17, 2020, when Caesars Entertainment sold the casino-hotel to Bally's Corporation in order to receive state regulatory clearance for the Eldorado Resorts-Caesars Entertainment merger.
[40] https://www.hotel-online.com/News/PR2009_4th/Nov09_RainmakerSix.html
[41] Cendyn, *Borgata Hotel Casino & Spa's success with Guestrev*, https://www.cendyn.com/customer-stories/borgata-hotel-success-rainmaker-guestrev/.

106.    MGM Resorts, Borgata's corporate parent, used the Rainmaker products prior to when Borgata signed on, and continues to use the platform to date. A November 21, 2010, Hospitality Technology article noted that Rainmaker "provides revenue optimization services to companies that include . . . MGM Resorts."[42] In a press release from January 2012 and a 2018 Rainmaker "Media Kit" for example, Rainmaker highlighted MGM Resorts as one of its "leading casino/hotel organization" clients and "among the top brands that rely on Rainmaker solutions," respectively.[43]

107.    Tropicana Atlantic City began using Rainmaker products after reopening in March 2010. Gaming & Leisure Magazine's ("G&L") Fall 2015 edition, its earliest publicly available online edition, indicates that Tropicana was using Rainmaker products as of that date. Tropicana Atlantic City continued to use the Rainmaker products through the present, even though its acquisition by Eldorado Resorts in 2018 and the subsequent completion of the Eldorado Resorts-Caesars Entertainment merger on November 17, 2020.

108.    Hard Rock Atlantic City began using the Rainmaker platform almost as soon as it opened in June 2018.

109.    Borgata, Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City, and Hard Rock Atlantic City as "just a few . . . of the hotel casino brands we work with globally" to "drive profitability" through Cendyn's "integrated technology platform."[44]

110.    It was easy for a given Casino-Hotel Defendant to recognize that its competitor

---

[42] *Rainmaker Rev Mgmt System Snags Top Honors from Casino Enterprise Management*, HOSPITALITY TECHNOLOGY (Nov. 21, 2010), https://hospitalitytech.com/rainmaker-rev-mgmt-system-snags-top-honors-casino-enterprise-management.
[43] *Tom Walker Returns to The Rainmaker Group*, TRAVEL COMMUNICATION (Jan. 25, 2012), https://travelcommunication.net/people/tom-walker-returns-to-the-rainmaker-group/; *See also,* https://www.hftp.org/hitec/houston/i/downloads/Exhibitor_Media_Kit__Rainmaker.pdf at p 3.
[44] Cendyn, *Our Customers* (2023), https://www.cendyn.com/customers/.

casino-hotels were using the Rainmaker platform. Industry publications, Rainmaker and Cendyn marketing materials, attendance at Rainmaker and Cendyn-led sessions at industry events, and one-on-one meetings they had with Rainmaker and Cendyn where best pricing practices and strategies were discussed were all indications to the Casino-Hotel Defendants that their competitors were using (and, importantly, feeding) the Rainmaker platform.

111. A leading industry publication G&L listed the Casino-Hotel Defendants as users of the Rainmaker platform during the Class Period.[45]

112. In addition, industry events, which are well-attended by Casino-Hotel Defendants, served as opportunities for the Rainmaker and Cendyn personnel to market the Rainmaker platform, while also allowing Casino-Hotel Defendants to see which of its competitors were also using the platform.

113. For example, Rainmaker and Cendyn personnel and Casino-Hotel Defendants' employees regularly attended G&L Roundtable. In fact, Rainmaker not only sponsored the annual meeting but also organized and sponsored G&L's annual golf outing through late 2019.

114. Of G&L's events, Caesars Entertainment's Senior Vice President of Information Technology, Peter Broughton had this to say: "[w]hat other industry can say they gather together such a large percentage of gaming and hospitality management in one room to discuss current issues and solutions, and then allow us to network with all our vendors?" And Hard Rock Atlantic City's Vice President of Information Technology, Donald Kneisel praised "[w]ho could put a value on a meeting of all the IT leaders in our industry in one place? No politics. Just frank discussions.

---

[45] GAMING & LEISURE MAGAZINE (Fall 2015),
https://www.mydigitalpublication.com/publication/frame.php?i=275189.

Sharing thoughts, feelings, and insights. Wow!"[46]

115.    Defendants have also attended The Institute for Operations Research and the Management Sciences' ("INFORMS") annual Business Analytics Conference. At the 2017 conference, held at Las Vegas' Caesars Palace from April 2-4, Rainmaker's Farley was a keynote speaker. Rainmaker's (and later Cendyn's) Dobney hosted a "strategic session" where he "present[ed] a step-by-step approach to total revenue optimization for casino and gaming properties" …"detailing the data-driven methodology behind the total revenue management approach that has been successfully implemented by many casino properties in recent years."[47]

116.    Casino-Hotel Defendants met with Rainmaker and Cendyn representatives when they first began using the platform. During these meetings Rainmaker "share[d] industry best practices" with each Casino-Hotel Defendant while "advis[ing] of recommended business process shifts" and assisting them to "maximize the benefit of profit optimization" during platform system implementations.[48]

117.    Rainmaker also met with clients regularly to help them maximize their use of the platform.  In one press release, Rainmaker emphasized the "tight link between the companies that include[d] biweekly meetings" where a Casino-Hotel Defendant and Rainmaker "discuss[ed] ways to use the technology to meet the latest price optimization business challenges."[49]

118.    The evidence makes it clear that Casino-Hotel Defendants (with a collective 72%

---

[46] Gaming & Leisure, *2023 G&L Roundtable – October 8-9* (Jan. 23, 2022), https://mygamingandleisure.com/gl-roundtable/.
[47] Press Release, Rainmaker, *Rainmaker to Present Total Revenue Management Approach for Casino Hotels at INFORMS 2017* (Mar. 28, 2017), https://hospitalitytech.com/rainmaker-present-total-revenue-management-approach-casino-hotels-informs-2017.
[48] 2018 Exhibitor Media Kit, Rainmaker, https://www.hftp.org/hitec/houston/i/downloads/Exhibitor_Media_Kit__Rainmaker.pdf.
[49] Press Release, Rainmaker, *Casino Hotels Rely on Service and Experience from Revenue Management Providers* (Jan. 2009), https://www.hotel-online.com/News/PR2009_1st/Jan09_RainmakerHarrahs.html.

- 80% market share in the relevant market) have all used the Rainmaker products during the Class Period, knowing each other were doing the same.

### E. Defendants Conspire to Fix Prices Using Rainmaker.

119.    Although most Casino-Hotel Defendants were already using the Rainmaker pricing algorithm products by June 2018, the entry of a new casino-hotel operator kickstarted the conspiracy, as it firmly turned the tide and began to produce the desired results in a sustained fashion.

120.    Hard Rock Atlantic City opened on or around June 27, 2018, and immediately began using the Rainmaker platform, well aware that the other Casino-Hotel Defendants were also using the platform. Importantly, Hard Rock Atlantic City's entry into the market gave Casino-Hotel Defendants' 80% market share of rentable guestrooms in casino-hotels.

121.    The Rainmaker platform is most effective when its users knowingly make the same pricing decisions in a market in which they have combined monopoly power. That is what has occurred here: Casino-Hotel Defendants maximized their room revenues by using the Rainmaker platform and the data it collected to generate pricing.

122.    Defendants conspired to fix, raise and stabilize room rates through their willful shared use of the Rainmaker platform to empower Casino-Hotel Defendants to charge supra-competitive rates for guestrooms during the Class Period.

123.    Rainmaker and Cendyn played a central role in this anticompetitive scheme by: encouraging and coordinating Casino-Hotel Defendants' simultaneous use of the Rainmaker platform; urging Casino-Hotel Defendants to adopt the recommended "optimal" room rates and thereby facilitating charging supracompetitive guest room rates; ensured Casino-Hotel Defendants were aware of which market participants were also Rainmaker clients; shared Casino-Hotel

Defendants' non-public pricing and occupancy data through REVCaster and stressed the importance of adherence to the conspiracy and avoiding price-competition to gain market share.

124.    Casino-Hotel Defendants acted as spokes of this anticompetitive conspiracy by: using the Rainmaker platform, knowing that their co-conspirators were doing the same; feeding non-public, competitively sensitive pricing and occupancy data to the Rainmaker platform and knowing that their co-conspirators were doing the same; knowing that this data would be used to generate the same type of recommended room rates for each Hotel-Casino Defendant; accepting and implementing the recommended room rates, knowing that their co-conspirators were doing the same; and using REVCaster to monitor their co-conspirators' room rates to ensure discipline in the conspiracy.

125.    Attendance at industry events and conferences, organizational board meetings, and smaller and one-on-one meetings with Rainmaker and Cendyn allowed the Casino-Hotel Defendants to directly share information about room rate pricing strategies and practices with each other as a means to monitor compliance.

126.    Defendants' employees, including but not limited to executives and personnel involved in room pricing and technology implementation, furthered the anticompetitive pricing scheme through purposeful and coordinated use of the Rainmaker platform to set room rates and communicating amongst themselves.

### F.  There Are Multiple Forms of Conspiracy Evidence

#### i.  Casino-Hotel Defendants Possessed the Motive to Conspire.

127.    Casino-Hotel Defendants implemented this anticompetitive scheme after years of hardship in the Atlantic City Casino-Hotel Market and overall tourism industry.

27

128.     The Atlantic City Casino-Hotel Market's economic woes began during, and were largely caused by, the Great Recession of December 2007 to June 2009. During this time, visitors to Atlantic City casino-hotels sharply decreased, with the city having the second largest drop in gross gaming revenue of all casino markets. According to NJCCC statistics, Atlantic City casino-hotels revenues in 2009 were down 13% from 2008.[50] Casino-Hotel Defendants were not spared: Caesars Atlantic City reported gaming revenue losses of 15%, while Tropicana Atlantic City Harrah's Atlantic City, and Borgata reported 12%, 10% and 6% losses that year, respectively.[51]

129.     High ongoing debt obligations paired with low cash flow between late 2007 and 2009 caused Atlantic City Casino-Hotels to continue to struggle, even after the Great Recession ended. Even years later in 2014, the industry saw four casino-hotels shuttered, including Defendant Caesars Entertainment's' Showboat Atlantic City.

130.     In fact Caesars Entertainment's operating subsidiary, Caesars Entertainment Operating Company (CEOC), filed for bankruptcy the very next year. While "Caesars did manage to survive the recession with the help of extensive financial maneuvering and in 2012 completed a public offering of shares," it could not avoid filing for bankruptcy because "over $20 billion in debt still hung over the company and losses grew year after year."[52]And the driving force behind these losses stemmed from "regional gaming in places like Atlantic City[.]"[53]

131.     Atlantic City casino-hotels' combined total revenue remained relatively static between 2014 and 2017. There was a slight increase in revenues from 2016 to 2017, but that was

---

[50] Donald Wittkowski, *Atlantic City casino revenue off 13 percent in 2009, third straight year of decline*, THE PRESS OF ATLANTIC CITY (Jan. 11, 2010), https://pressofatlanticcity.com/news/breaking/atlantic-city-casino-revenue-off-13-percent-in-2009-third-straight-year-of-decline/article_19f64eaa-fee5-11de-9532-001cc4c002e0.html.
[51] 2009 NJCCC Annual Report, https://dspace.njstatelib.org/bitstream/handle/10929/16183/2009_ccc_annual_report.pdf.
[52] Travis Hoium, *Caesars Bankruptcy Ignites Battle Over Company*, THE MOTLEY FOOL (Jan. 16, 2015), https://www.fool.com/investing/general/2015/01/16/caesars-bankruptcy-ignites-battle-over-company.aspx.
[53] *Id.*

driven by gaming revenue. Room rates and revenues dropped in 2017.

132.     Thus, as 2018 approached, Casino-Hotel Defendants had been bleeding money for years and were eager to head in the opposite direction as quickly as possible.

### ii.  Defendants' Anticompetitive Scheme Effects Guestroom Rates and Revenues.

133.     In 2018 Casino-Hotel Defendants' financial performance on hotel room revenue caught up to and surpassed the gaming side. This was due to sudden, significant increases in room rates and corresponding revenue, particularly as the year progressed.

134.     *The Press of Atlantic City* article in 2018 pointed out that for the first half of 2018, "the casino hotel occupancy rate was 81.4 percent, which represents a 4.4 percent decrease from [2017's] 85.8 percent. In the second quarter of 2017, the occupancy rate was 90.3 percent, compared with [2018's] 84.8 percent." Despite depressed occupancy rates, however, "[t]hrough the first half of 2018, the average [rate per occupied room] was $129.23, while the average for the first six months of 2017 was $105.56" and in Q2 2018 "the average rate was $136.01 compared with…$107.43" in the second quarter of 2017.[54]

135.     Casino-Hotel Defendants' financial performance remained strong in 2019. This was particularly true for room rates and revenues, which resulted in hotel room revenue numbers proportionally outpacing casino revenue numbers to a significant degree, even though two casino-hotels entered the market in mid-2018.

136.     The Atlantic City Casino-Hotel Market was hit particularly hard by the coronavirus pandemic that surfaced in early 2020. As an April 2022 NJDGE press release noted: "In light of

---

[54] David Danzis, *Atlantic City 2018 casino profits still lag last year*, THE PRESS OF ATLANTIC CITY (Aug. 22, 2018), https://pressofatlanticcity.com/news/casinos_tourism/atlantic-city-2018-casino-profits-still-lag-last-year/article_7b52ed20-ff31-5124-9772-1396555ebd05.html.

the casino hotel closures beginning March 16, 2020, through July 2, 2020 due to the COVID-19 pandemic and subsequent operating restrictions, the Net Revenue, Gross Operating Profit and Hotel Statistics for calendar 2021 are not comparable to 2020."[55] Consequently, 2020 was an outlier year in terms of financial metrics in this market and must be viewed accordingly.

137.    The financial performance of the Atlantic City Casino-Hotel Market, including Casino-Hotel Defendants, picked back up in 2021. In fact total gross profits from 2021 eclipsed total gross profits from pre-pandemic 2019 by more than $170 million. Higher room rates and the resulting revenue continued to drive these returns.

138.    Casino-Hotel Defendants' overall performance improved into 2022. The December 2022 LIGHT Snapshot compiled statistics from NJDGE's quarterly reports and noted of the Atlantic City gaming market that "brick-and-mortar gaming revenues for December 2022 outperformed both December 2021 ($211.82 million) and December 2019 ($208.55 million) to deliver the strongest December brick-and-mortar revenue returns in 10 years." This data also showed that room revenues Q3 2022 had increased 6.1% over those of Q3 2021, with a 14.8% increase as of September 30, 2022, over the same date in 2021. The analysis continued, "[t]his may be an indicator that the industry has recovered to pre-pandemic levels of brick-and-mortar gaming activity".[56]

As the NJDGE's April 2022 press release noted, net revenue reached $3.3 billion, "increasing 9.3% from the comparable period last year," with gross operating profits of $731.2 million.[57]

---

[55] Press Release, NJDGE, *New Jersey Division of Gaming Enforcement Announces 2nd Quarter 2021 Results* (Aug. 23, 2021), https://www.njoag.gov/new-jersey-division-of-gaming-enforcement-announces-2nd-quarter-2021-results/.
[56] Stockton University, December 2022 LIGHT Snapshot, https://stockton.edu/light/snapshots/december_2022_snapshots.html.
[57] Press Release, NJDGE, *DGE Announces Quarterly and Year End Results* (Apr. 10, 2023), https://www.nj.gov/oag/ge/docs/Financials/QuarterlyFinRpt2022/4thQTR2022PressRelease.pdf.

**Table 1. Annual Aggregate Atlantic City Casino-Hotel Market Statistics**

| Year | Casino Revenue | Delta | Room Revenue | Delta | Occupancy | Revenue per Available Room |
|------|----------------|-------|--------------|-------|-----------|----------------------------|
| 2022 | $1.78B | 0% | $698M | 13% | 73% | $130.57 |
| 2021 | $1.78B | 44% | $618M | 93% | 68% | $116.87 |
| 2020[58] | $1.21B | -28% | $317M | -48% | 62% | $85.47 |
| 2019 | $1.76B | 8% | $605M | 13% | 79% | $112.12 |
| 2018 | $1.63B | 4% | $536M | 8% | 81% | $110.65 |
| 2017[59] | $1.57B $2.56B | 2% | $495M $391M | -4% | 87% | $94.16 |
| 2016 | $2.52B | 1% | $405M | 0% | 85% | Data not available |
| 2015 | $2.50B | 3% | $406M | 1% | 81% | Data not available |

139.    The data above shows that total average room rates and corresponding revenue significantly increased during the time that all Casino-Hotel Defendants were using the Rainmaker platform to set guestroom rates. Starting no later than 3rd Quarter 2018, room revenues markedly rose, as compared to those same revenues from the prior year and in relation to corresponding casino revenue trends. All this while occupancy levels trended downward. But the rise in average daily room rates (ADR) more than compensated for the lower occupancy rates, thus causing revenue per available room (RevPAR) to rise substantially year over year.

140.    Given the unique nature of the casino-hotel market, empty rooms ultimately translate to a loss of gambling income, Casino-Hotel Defendants' true money-making operation. Thus, economic principles (and common sense) indicate that at least some Casino-Hotel Defendants would have dropped room rates to increase occupancy rates during this period, which would have resulted in less upward pricing volatility and higher occupancy rates across operators. Those likely higher occupancy rates would have almost certainly have resulted in higher room and casino revenue

---

[58] As discussed above, 2020 represents an outlier due to the impact of the COVID-19 global pandemic.
[59] The top revenue values for 2017 conform to updated standards effective January 1, 2018.

due to the additional guests staying and gambling at their casino-hotels rather than their competitors'. But this did not happen.

141.     Instead, the Casino-Hotel Defendants abandoned rational economic principles in favor of their anticompetitive scheme. And a peculiar detail of the market further highlights this point: while most Casino-Hotel Defendants saw moderate occupancy increases between 2020 and 2022, Hard Rock Atlantic City saw a sharp increase in room occupancy *and* rates. One would expect competitors to undercut Hard Rock Atlantic City on room pricing, thereby increasing their respective occupancy rates, and forcing Hard Rock to do the same and return to its prior position. But despite Hard Rock's increased occupancy rates between 2020 and 2022 (and the resultant increases in room and casino revenues), no other Casino-Hotel Defendant reacted as expected – lowering prices to increase occupancy and compete with Hard Rock.

142.     This is because they were acting under the urging of Rainmaker and Cendyn personnel. Casino-Hotel Defendants exercised discipline and, heeding Cendyn and Rainmaker executive Dan Skobol's advice, resisted the "inevitable race to the bottom" on price as seen in competitive markets. This allowed Casino-Hotel Defendants to charge higher room rates and collect higher room revenues than would have been possible absent the conspiracy. The fact that Hard Rock Atlantic City's slight deviation on occupancy levels did not start a price war further reveals Casino-Hotel Defendants' market power and the price-fixing conspiracy's efficacy.

143.     Rainmaker lived up to its name and its promises: using GuestREV and GroupREV increased Casino-Hotel Defendants' revenues each year during the Class Period. And the REVCaster tool granted Casino-Hotel Defendants unprecedented access each other's current guestroom rates, ensuring that each co-conspirator was using Rainmaker's recommended rates.

144.     The rates Class members have paid to rent guestrooms at Casino-Hotel Defendant

properties since June 27, 2018, have been purposefully artificially inflated by the Defendants. With Cendyn's active encouragement, Casino-Hotel Defendants coordinated their use of the Rainmaker platform to set guestroom rates. These actions had the intended purpose and effect of reducing legitimate competition in the Atlantic City Casino-Hotel Market.

### iii. Casino-Hotel Defendants Undertook Actions Against Their Own Interests.

145. Fundamental principles of economics state that in a but-for world, where a minority of Casino-Hotel Defendant properties used Rainmaker's pricing algorithms and charged artificially high room prices in Atlantic City, the number of non-Rainmaker casino-hotels who continued to set their prices independently would have undercut the Rainmaker properties on room rates, filled a proportionately higher share of their rooms, attracted additional gaming revenue from their increased volume of guests, and received greater overall revenue than the Rainmaker-affiliated competitors. This is how a rational competitive market would have worked but for Defendants' conspiracy.

146. But by adhering to the Rainmaker platform's pricing recommendations, Casino-Hotel Defendants and their co-conspirators abandoned this principle and took actions that would have been against their individual economic self-interests in the absence of coordination. One would have expected a sector that had experienced years of financial depression to strive to increase occupancy by competing on price to fill guestrooms. Not only would the competing casino-hotels have received more income from the rental of their rooms, but they also would have obtained a proportionately greater amount of revenue from their casinos due to the additional guests staying at their hotels.

147. But the data clearly shows that this type of competition did not happen. Instead, room rates increased while occupancy rates either fell or remained stagnant. This type of behavior

is clearly against the independent interest of each Casino-Hotel Defendant. It makes no sense *unless they were engaged in a cartel to fix guestroom prices.*

148. Additionally, there are no market factors, like rising costs or increased demand, that sufficiently can explain the kind of increase in room rates and corresponding revenue that Casino-Hotel Defendants each have obtained during the Class Period.

### iv. Defendants' Scheme Does Not Benefit the Market.

149. Defendants' anticompetitive actions have not benefitted competition or produced pro-competitive effects in the Atlantic City Casino-Hotel Market.

150. Defendants' misconduct has benefitted Defendants by increasing their revenues and profits and caused consumers to pay artificially inflated prices.

151. While Defendants' misconduct has increased Defendants' operational efficiencies by saving them time, labor costs, and other resources. It has also made it more difficult and time-consuming for consumers to identify and secure meaningfully cheaper rates for comparable rooms offered by their co-conspirators.

### v. Traditional Conspiracy Evidence Is Also Present.

152. There are several additional facts that tend to show collusion: (a) a radical change in business practices by the Casino-Hotel Defendants; (b) the conspirators' adoption of a common course of action; (c) opportunities for the conspirators to conspire; and (d) exchange of competitively sensitive information among Casino-Hotel Defendants.

153. Casino-hotels traditionally have attracted customers by offering substantial savings on guestrooms. And until relatively recently, the Atlantic City Casino-Hotel Market was no exception. But as soon as they gained market power, Casino-Hotel Defendants abandoned decades of traditional *competitive* guestroom pricing practices and took up coordinated use of the

Rainmaker platform instead.

154.    This change in strategy came after years of financial struggle. By collectively using the Rainmaker platform to "optimize" each property's room rates and make "rate shopping" a futile endeavor, Casino-Hotel Defendants engaged in a successful anticompetitive cartel.

155.    They risked that any single Casino-Hotel Defendant would either continue to offer cheaper room rates or substantially cheat after joining the conspiracy by cutting rates to increase occupancy rates. Either outcome would render the conspiracy ineffective. The most reasonable explanation for this turn of events and resulting impact on the market is collusion.

156.    Casino-Hotel Defendants, with Rainmaker's and Cendyn's knowledge and full support, engaged in identical anticompetitive conduct; that is, they all the Rainmaker platform to set pricing for their guestrooms during the Class Period.

157.    And Rainmaker and Cendyn ensured that Casino-Hotel Defendants knew what their purported competitors were up to (not competing) by using marketing materials and industry publications read by Casino-Hotel Defendants and events widely attended by Casino-Hotel Defendant executives, Rainmaker and Cendyn. Certain Casino-Hotel Defendants also openly touted their use of the Rainmaker pricing algorithms through customer testimonials that Rainmaker and Cendyn would then use to market to other casino-hotels.

158.    And Casino-Hotel Defendants had multiple ways to ensure the effectiveness of their scheme. Each regularly filed financial reports throughout the calendar year with the NJDGE; and because these filings are public, each Casino-Hotel Defendant accessed, reviewed, and monitored each other's reports and data. Further, the NJCCC's annual industry reports also gave them valuable insights into the guestroom rates, occupancy levels, and revenues of their co-conspirators. It was easy for the Defendants to assemble a clear picture of their co-conspirators' room pricing and ensure

the success of the price-fixing conspiracy.

159.    There was no shortage of opportunities to conspire during the Class Period. Industry events, where the Rainmaker platform was often being discussed or presented, provided key Rainmaker, Cendyn, and Casino-Hotel Defendant employees the chance to conspire or discuss the scheme. Meetings of the city's casino trade association, The Casino Association of New Jersey ("CANJ"), provided a private setting for its members (which includes all the Casino-Hotel Defendants) to discuss pricing practices and revenue and profitability concerns and strategies.[60] Furthermore, Rainmaker and Cendyn regularly discussed pricing strategies with individual Casino-Hotel Defendants.

160.    The Rainmaker platform, pricing strategies, and revenue optimization were frequently discussed at industry conferences attended by Defendants.

161.    Rainmaker hosted annual user conferences and summits which allowed casino-hoteliers (including Casino-Hotel Defendants) to be "in the room with colleagues and like-minded individuals with varying degrees of revenue management experience and who have similar goals and challenges." According to Pavan Kapur, Caesars Entertainment's Senior VP of Commercial Operations (and formerly its VP of Revenue Management), a Rainmaker event "was a great experience."[61]

162.    Rainmaker's "OPTIMIZE2016" Summit "convened more than 300 people for three days of substantive sessions addressing the state of the industry and solutions that move beyond

---

[60] The Casino Association of New Jersey, https://casinosnj.org/.
[61] Press Release, Rainmaker, *GuestREV® Mobile, New GroupREV® Functionality, and Market/Business Intelligence 'Steal Show' at Rainmaker Client Summit* (Mar. 27, 2015), https://www.prweb.com/releases/2015/03/prweb12611855.htm.

revenue management to profit optimization."[62] According to an early March 2016 article, "OPTIMIZE2016 delivered a lively debate between Rainmaker co-founders Bruce Barfield and Tammy Farley on macroeconomic trends" and "town hall-style meetings that offered visitors a walk-through of Rainmaker products." "OPTIMIZE2016 was our most ambitious and well-attended conference yet," said Farley.[63]

163. Attendees of Rainmaker's 2019 Summit praised GuestREV. According to one client, "15 month[s] after our implementation, we've seen revenue increases upwards of 6 percent," while another lauded "we were able to improve our rate and our profitability year over year."[64]

164. G&L's Roundtable event, discussed above, "shapes the gaming and hospitality industry landscape each year by bringing together in one forum the very people who can foster change and innovation as comprised on the G&L Board and their invited Colleagues." This "open and enjoyable two-day forum" allows "industry thought leaders to collaborate, learn, and share best practices while meeting new peers and solidifying old friendships."[65]

165. G&L also hosts golf outings, which are well-attended by Defendants' high-level employees. In fact, Rainmaker's Farley and Barfield served as "Partner Co-Hosts of the Roundtable" and ran the organization's golf invitational for "many years."[66]

---

[62] Press Release, Rainmaker, *Rainmaker's OPTIMIZE2016 User Conference Delivers Insight, Instruction and Impetus to 'Make Revenue Optimization Great Again'* (Mar. 2, 2016). https://www.hotel-online.com/press_releases/release/rainmakers-optimize2016-user-conference-delivers-insight-instruction/.

[63] *Rainmaker's OPTIMIZE2016 User Conference Delivers Insight, Instruction and Impetus to 'Make Revenue Optimization Great Again'*, RESORT TRADES (Mar. 3, 2016), https://web.archive.org/web/20160330015939/https://resorttrades.com/rainmakers-optimize2016-conference-make-revenue-optimization-great-again/.

[64] Cendyn, *Guestrev Success Stories* (2023), https://www.cendyn.com/customer-stories/?csp=guestrev.

[65] Gaming & Leisure, *2023 G&L Roundtable – October 8-9* (2023), https://mygamingandleisure.com/gl-roundtable.

[66] *The 2019 G&L Roundtable,* GAMING & LEISURE MAGAZINE (Winter 2019), https://www.bluetoad.com/publication/?i=638719&article_id=3548450&view=articleBrowser.

166.    After Cendyn acquired Rainmaker, its key personnel regularly attended G&L Roundtable events. For example, Senior VP for Commercial-Customer Relationship Management Robert Magliozzi and VP of Enterprise Sales for Gaming and Casinos Angie Dobney attended various G&L Roundtable-sponsored golf outings.

167.    Attendees at the G&L Roundtable conference have included Casino-Hotel Defendant management personnel with responsibilities related to their companies' implementation and maintenance of the Rainmaker platform, including representatives from Caesars Entertainment, MGM Resorts, and Hard Rock Atlantic City.

168.    And Caesars Entertainment's Senior VP of Information Technology Peter Broughton, MGM Resorts' VP of Operations Craig Jacobs and Corporate Information Technology Lead Product Manager Fran Moore, and Hard Rock Atlantic City's VP of Information Technology Don Kneisel all sit on G&L's Board.

169.    G&L Board members also communicate privately during in-person gatherings including those noted above as well as through a "private group for G&L Board Members only" on LinkedIn. G&L CEO Jeannie Caruso "created this private, no cost, easy to navigate group for our Board so that you can communicate freely on questions, best practices, and strategy etc." This group, Caruso told board members, "is your private forum to work with peer G&L Board Members to garner insights and collaborate together."[67] Throughout the Class Period, G&L Board members have included executives from MGM Resorts, Seminal Hard Rock, Caesar's Entertainment, and Hard Rock Casino, Atlantic City.

170.    The annual Hospitality Sales and Marketing Association International Revenue Optimization Conferences ("HSMAI ROC") offers Defendants another opportunity to conspire.

---

[67] https://www.linkedin.com/groups/12395008/

"HSMAI's ROC has delivered the most compelling and comprehensive event for the hotel revenue optimization discipline,"[68] one publication noted. "ROC convenes leaders of revenue optimization and pricing . . . who want to learn new ways of thinking about today's challenges, and gain insights into the short- and long-term trends that will impact hotel revenue optimization."[69]

171.    Rainmaker and Cendyn personnel certainly feel the same. Both have had prominent sponsorship roles at HSMAI events over the years. Both companies were Platinum Partners for the 2019 HSMAI ROC held June 18-19, 2019, in Minneapolis, Minnesota.[70]

172.    Following the 2019 acquisition of Rainmaker, Cendyn continued to have a formidable presence along with Casino-Hotel Defendants at the annual HSMAI ROC. Various management personnel from Cendyn, Hard Rock International, and MGM Resorts attended the 2022 conference.

173.    And Defendants don't just attend HSMAI conferences. In fact, while he was MGM Resorts' Executive Director of Revenue Optimization and Revenue Strategy (and importantly, during the Class Period), Michael Klein sat on HSMAI's Revenue Management Advisory Board. Currently, Caesar Entertainment's Senior VP of Commercial Operations Pavan Kapur and MGM Resorts' Chief Sales Officer and Senior VP Stephanie Glanzer serve as HSMAI Americas Board

---

[68] Events in America, *HSMAI - Hospitality Sales And Marketing Association International-ROC 2023 - Revenue Optimization Conference* (2023), https://eventsinamerica.com/events/hsmai-hospitality-sales-and-marketing-association-international-roc-2023-revenue-optimization-conference/business/marketing-publishing#:~:text=HSMAI%E2%80%99s%20ROC%20has%20delivered%20the%20most%20compelling%20and%20comprehensive%20event%20for%20the%20hotel%20revenue%20optimization%20discipline.

[69] HSMAI, *HSMAI ROC* (2019), https://commercial.hsmai.org/schedules/roc/#:~:text=ROC%C2%A0convenes%20leaders,hotel%20revenue%20optimization.

[70] *Hotel Revenue Leaders to Convene at HSMAI's ROC Americas in Minneapolis*, GLOBAL TRAVEL MEDIA (Apr. 30, 2019), https://eglobaltravelmedia.com.au/2019/04/30/hotel-revenue-leaders-to-convene-at-hsmais-roc-americas-in-minneapolis.

members alongside Michael Klein.

174.    Atlantic City-based Casino-Hotel Defendants belong to and fund the city's casino-hotel trade association, CANJ. CANJ "is a trade organization that provides a collective voice for the Atlantic City casino industry by facilitating the exchange of information and ideas between our industry, small businesses, Atlantic City stakeholders and the general public."[71]

175.    CANJ's membership consists of the city's nine casino-hotels, including each Atlantic-City-based Casino-Hotel Defendant and is funded by undisclosed membership fees.

176.    CANJ is housed at one of its Casino-Hotel Defendant member's properties. According to the Chamber of Commerce of Southern New Jersey, the organization's address is "c/o Caesars Atlantic City, 2100 Pacific Avenue, Atlantic City, NJ 08401."[72]

177.    CANJ's membership elects its President from the pool of leaders representing its member casino-hotels. Past Presidents of the group include senior executives from Hard Rock Atlantic City, Caesars Entertainment, and Borgata.

178.    CANJ's "Media Releases" demonstrate that members regularly discuss issues like revenue trends. CANJ's January 17, 2023 Media Release "reacted to the December 2022 Division of Gaming Enforcement (DGE) gaming revenue results report, which showed that 2022 was a year of rebuilding and recovery for the Atlantic City casino industry."[73] In its December 17, 2021 Media

---

[71] The Casino Association of New Jersey, https://casinosnj.org/page/2/about-canj#:~:text=is%20a%20trade%20organization%20that%20provides%20a%20collective%20voice%20for%20the%20Atlantic%20City%20%20casino%20industry%20by%20facilitating%20the%20exchange%20of%20information%20and%20ideas%20between%20our%20industry%2C%20small%20businesses%2C%20Atlantic%20City%20stakeholders%20and%20the%20general%20public (last visited July 20, 2023).

[72] Chamber of Commerce Southern New Jersey, https://business.chambersnj.com/directory/Details/casino-association-of-new-jersey-891105#:~:text=c/o%20Caesars,08401 (last visited July 20, 2023).

[73] Press Release, The Casino Ass'n of NJ, *As 2022 Marks a Year of Rebuilding for Atlantic City, Casinos are Making Significant Investments in Resort City in Year Ahead* (Jan. 17, 2023), https://casinosnj.org/news.show&nid=597#:~:text=reacted%20to%20the%20December%202022%20Division%20of%20Gaming%20Enforcement%20(DGE)%20gaming%20revenue%20results%20report%2C%20which%20showed%20that%202022%20was%20a%20year%20of%20rebuilding%20and%20recovery%20for%20the%20Atlantic%20City%20casino%20industry.

Release, CANJ provided a "statement regarding the November 2021 Gaming Results"[74] that discussed total casino-hotel revenue for that month and compared to the same month from an earlier year.

179.     Casino-Hotel Defendants' membership and control over this organization provides them with additional opportunities to exchange competitively sensitive information and strategies and agree on common courses of anticompetitive conduct behind closed doors.

180.     Cendyn facilitated this anticompetitive scheme by encouraging Casino-Hotel Defendants to feed the Rainmaker platform non-public and sensitive pricing data; sharing this pricing data as well as strategies with should-be competing Casino-Hotel Defendants; and encouraging Casino-Hotel Defendants to pursue coordinated pricing strategies through their use of the Rainmaker platform.

181.     Casino-Hotel Defendants feed their current non-public pricing and occupancy data to the Rainmaker platform, it uses this data and additional information to recommend "optimal" guestroom pricing to each Casino-Hotel Defendant. This improper information sharing disadvantages both members of the Class (defined *infra* in ¶ 196) and competition in the entire Atlantic City Casino-Hotel Market.

182.     As discussed above, Cendyn also led discussions at industry events attended by personnel from Casino-Hotel Defendants on the most effective ways to maximize room revenue and avoid price wars. Of course, central to theses discussion was encouraging use of the Rainmaker platform.

---

[74] Press Release, The Casino Ass'n of NJ, *Casino Association of New Jersey Statement on November 2021 Gaming Results* (Dec. 17, 2021), https://casinosnj.org/news.show&nid=552#:~:text=statement%20regarding%20the%20November%202021%20Gaming%20Results.

183.   Cendyn met with Casino-Hotel Defendants individually as part of pitching the Rainmaker platform and the initial set-up and implementation. Cendyn touted "best practices" and pricing strategies during these one-on-one periodic meetings.

184.   Undoubtedly, Cendyn used non-public information gleaned from communications with one casino-hotelier in conversations with another. This type information exchange is anticompetitive and has directly resulted in artificially inflated guestroom rates at Casino-Hotel Defendant properties during the Class Period.

185.   Experts in the antitrust field agree that when competitors use a shared pricing algorithm to set prices, anticompetitive effects of the same type observed in the Atlantic City Casino-Hotel Market will occur.

186.   In their May 2017 paper titled *Algorithmic Collusion: Problems and Counter-Measures*, Competition law professors Ariel Ezrachi and Maurice Stucke wrote: "An industry-wide use of a single algorithm, which competitors use to determine the market price or react to market changes, would result in de-facto hub-and-spoke structure, as the market behavior of the competitors aligns due to the use of a similar 'brain' to determine their price strategy. These effects intensify when sellers use the same data pool and are privy to vast volumes of data."[75]

187.   And in 2017, Maureen Ohlhausen, the then-acting Chair of the Federal Trade Commission explained: "Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy

---

[75] Ariel Ezrachi & Maurice Stucke, *Algorithmic Collusion: Problems and Counter-Measures*, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT (May 31, 2017), https://one.oecd.org/document/DAF/COMP/WD%282017%2925/En/pdf.

information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. Again, this is fairly familiar territory for antitrust lawyers, and we even have an old-fashioned term for it, the hub-and-spoke conspiracy."[76]

188. In a March 2021 paper titled *Autonomous Algorithmic Collusion: Economic Research and Policy Implications*, a team of economists discussed the anticompetitive consequences of competitors using the same third-party algorithm to set prices: "Algorithmic pricing can also affect competition if a single intermediary software provider sells their product to multiple competitors. Such adoption could lead to hub-and-spoke (where the provider acts as the hub of the sellers, Ezrachi and Stucke 2015) or parallel-use scenarios, with competitors coordinating to higher prices by delegating choices or relaying information to the same third party."[77]

## V. FRAUDULENT CONCEALMENT

189. Defendants engaged in an illegal scheme to fix prices in violation of the federal antitrust laws. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

190. Defendants actively and purposely concealed their anticompetitive scheme by covertly submitting guestroom pricing and occupancy data to the Rainmaker platform; discussing pricing strategies, the Rainmaker platform, and optimizing guestroom revenues at private industry

---

[76] Maureen K. Ohlhausen, Chairman, U.S. Federal Trade Commission, *Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing* (May 23, 2017).

[77] Stephanie Assad et al, *Autonomous algorithmic collusion: economic research and policy implications*, 37 OXFORD REVIEW OF ECONOMIC POLICY, 459-478 (2021).

conferences, including those run by Cendyn; and discussing pricing strategies, the Rainmaker platform, and optimizing guestroom revenues during one-on-one meetings between Casino-Hotel Defendants personnel and Cendyn employees.

191.    Casino-Hotel Defendants intentionally concealed their use of a shared third-party pricing algorithm that utilized their own current pricing and supply data and solved the "problem" of guest price-shopping to set guestroom rates from Plaintiff and the other Class members.

192.    Casino-hotel Defendants have made intentionally misleading statements about offering competitive room rates in their marketing materials and on their booking websites. They have also omitted their coordinated use of the Rainmaker platform to set guestroom rates. This allowed Casino-Hotel Defendants to be able to conceal their anticompetitive scheme from customers.

193.    In fact, Borgata personnel admitted that "guests who use the hotel's website to book a stay see only the optimized recommended rate" while "[t]he mathematics behind the rate is imperceptible."[78]

194.    Defendants' misrepresentations regarding their pricing methods and public statements about the competitiveness of their guestroom rates were intended to, and did, lull Plaintiff and the Class into thinking the prices on casino-hotel rooms in Atlantic City were the result of genuine competitive rate-setting. Thus, Plaintiff and the other Class members were at an information disadvantage and had no reason to investigate guestroom pricing among Casino-Hotel Defendants.

195.    Although Plaintiff exercised reasonable diligence, such diligence would not have,

---

[78] Customer Story, *Borgata Hotel Casino & Spa's success with Guestrev*, https://www.cendyn.com/customer-stories/borgata-hotel-success-rainmaker-guestrev/.

and indeed did not, reveal Defendants' scheme. This is because the Defendants, through their misleading, deceptive, false and fraudulent statements and material omissions, sought to conceal their conspiracy from Plaintiff and the Class.

196.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiff and the Class as a result of Defendants' anticompetitive and unlawful conduct. Plaintiff and the other members of the Class were unaware of Defendants' unlawful conduct and did not know they were paying supra-competitive prices for guestrooms at Casino-Hotel properties during the Class Period. For these reasons, Plaintiffs claims are timely under the federal laws identified herein.

## VI.    CLASS ALLEGATIONS

197.    Plaintiff brings this action on behalf of herself, as representative of the class defined below, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> All persons who have directly purchased a guestroom for rent in Atlantic City, New Jersey, from one or more Casino-Hotel Defendants or co-conspirator casino-hotels, or from a division, subsidiary, predecessor, agent, or affiliate of such entity, from no later than June 27, 2018, until Defendants' unlawful conduct and its anticompetitive effects stop. Excluded from the class are federal and state governmental entities and judicial officers presiding over this case.

198.    The Class is so numerous that joinder of all members in this action is impracticable. There are tens if not hundreds of thousands of geographically dispersed Class members.

199.    The Class members, moreover, can be readily identified and notified in an administratively feasible manner using, among other information, the electronic transactional records of Casino-Hotel Defendants.

200.    Plaintiff's claims are typical of those of the Class. Plaintiff and all members of the

Class allege that Defendants' alleged misconduct violates Section 1 of the Sherman Act. Plaintiff and all Class members also allege and will show that they were injured by the same anticompetitive and unlawful conduct that resulted in them paying more for hotel rooms in the Atlantic City Casino-Hotel market than they otherwise would have paid in the absence of their collusive conduct.

201.    Plaintiff fairly and adequately will protect and represent the interests of Class members. The interests of Plaintiff and Plaintiff's counsel are fully aligned with, and not antagonistic to, the interests of the Class members. Plaintiff is willing and able to dispatch the duties incumbent upon a class representative to protect the interests of all Class members. In addition, Plaintiff's counsel have significant experience successfully prosecuting complex antitrust class actions and possesses the necessary resources to vigorously litigate the case on behalf of the Class.

202.    There are multiple questions of law and fact that are common to the Class, including:

a.    Whether Defendants entered into a formal or informal agreement, combination, conspiracy, or common understanding in which Casino-Hotel Defendants artificially raised prices for or artificially suppressed the supply of hotel rooms in the Atlantic City Casino-Hotel Market;

b.    Whether Defendants' alleged misconduct constitutes a *per se* violation of Section 1 of the Sherman Act;

c.    Whether Defendants' alleged misconduct, in the alternative, constitutes a violation of Section 1 of the Sherman Act pursuant to a quick look analysis or a rule of reason analysis;

d.    Whether Defendants' alleged misconduct in fact caused Class members to

pay artificially high hotel room prices to Casino-Hotel Defendants in the Atlantic City Casino-Hotel Market;

e. The proper measure of Class-wide damages;

f. The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendants' alleged conduct going forward; and

g. Whether Defendants fraudulently concealed the existence of the alleged conspiracy such that the statute of limitations is tolled.

203. Questions of law and fact common to the members of the Class will predominate over any individualized questions of law or fact. Defendants have acted and refused to act on grounds generally applicable to the Class.

204. In cases like this one that allege price-fixing among competitors, including those with a hub-and-spoke component, the common question of law and fact regarding the existence of the alleged conspiracy by itself has been held to predominate over any possible individualized issues, thus warranting certification. The same holds true here.

205. Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow the scores of Class members to prosecute their common claims, and for Defendants to defend themselves against these claims, in front of a single court simultaneously and efficiently before ultimately reaching resolution without unnecessary duplication of effort and expense that separate actions would present. The benefits of proceeding with this procedural mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## VII.   CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### FOR AGREEMENT IN RESTRAINT OF TRADE 15 U.S.C. § 1

206.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

207.   Beginning at least as early as June 27, 2018, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

208.   The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants for Casino-Hotel Defendants to knowingly and collectively use the Rainmaker platform and engage in other related types of reinforcing conduct to fix, stabilize, and artificially increase the price of rooms rented directly to guests.

209.   This conspiracy caused Plaintiff and the other Class members to pay artificially inflated prices directly to Casino-Hotel Defendants and their co-conspirators for room rentals in the Atlantic City Casino-Hotel Market during the Class Period.

210.   As detailed above, the contract, combination, or conspiracy alleged herein has taken the form of a hub-and-spoke conspiracy in which Rainmaker, and later Cendyn, served as the hub and the individual Casino-Hotel Defendants served as spokes.

211.   In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including the acts discussed above and those that follow:

> h.    Casino-Hotel Defendants provided current internal pricing and supply data to a single third-party (first Rainmaker and then Cendyn) for use in the Rainmaker platform;

48

    i.      Rainmaker, and later Cendyn, sold and operated the Rainmaker platform that provided room pricing recommendations to Casino-Hotel Defendants;

    j.      Casino-Hotel Defendants knowingly used the same pricing algorithm platform that incorporated pricing and supply data from other Casino-Hotel Defendants in recommending optimal room rates for each Casino-Hotel Defendant to charge guests;

    k.      Casino-Hotel Defendants priced their rooms pursuant to the optimal rates the Rainmaker platform recommended;

    l.      Defendants exchanged competitively sensitive pricing and supply information with each other, including through use of the Rainmaker platform; and

    m.      Defendants engaged in various forms and methods of bilateral and multilateral communication across various settings and venues concerning room pricing, supply and revenue, including their use of the Rainmaker platform to set and monitor room rates, that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

212.    Casino-Hotel Defendants possess market power in the relevant antitrust market: the Atlantic City Casino-Hotel Market. The relevant product market is the market for the rental of guest rooms in casino-hotels, and the relevant geographic market is Atlantic City, New Jersey.

213.    Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of supra-competitive prices Plaintiff and the other Class members have paid directly to Casino-Hotel Defendants for room rentals in the Atlantic City Casino-Hotel Market.

214.    As a direct and proximate result of Defendants' past and continuing violation of

Section 1 of the Sherman Act, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for hotel rooms than they would have paid in the absence of the conspiracy.

215. Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act. In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Act under either a quick look or rule of reason analysis.

216. There are no procompetitive justifications for Defendants' conspiracy, and any proffered procompetitive justifications could have been achieved through less restrictive means.

217. Plaintiff seeks monetary and injunctive relief on behalf of herself and all other members of the Class under Section 4 of the Clayton Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and a Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

A. The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B. The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate of Section 1 of the Sherman Act;

C. Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiff and the

members of the Class be entered against Defendants in an amount to be trebled under applicable law;

D.  Defendants, their affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.  Plaintiff and the members of the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law;

F.  Plaintiff and the members of the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law; and Plaintiff and the members of the Class be awarded any other relief as the case may require and the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

**DATED:** August 21, 2023                    /s/ *Stanley O. King*

Stanley O. King (SBN #03413-1996)
Eric G. Kahn (SBN #02103-1993)
**JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS, P.C.**
231 South Broad Street
Woodbury, NJ 08096
Tel: (856) 845-3001
stan@kingslaw.com
EKahn@JaverbaumWurgaft.com

**SPECTOR ROSEMAN & KODROFF, P.C.**
William G. Caldes (SBN #00062-1995)
Jeffrey L. Spector (SBN #03375-2007)
Icee N. Etheridge (SBN #20256-2016)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
bcaldes@srkattorneys.com
jspector@srkattorneys.com
ietheridge@srkattorneys.com

**FREED KANNER LONDON AND MILLEN, LLC**
Jonathan M. Jagher*
*Pro Hac Vice Forthcoming*
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6486
jjagher@fklmlaw.com

**FREED KANNER LONDON AND MILLEN, LLC**
Michael E. Moskovitz*
*Pro Hac Vice Forthcoming*
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
mmoskovitz@fklmlaw.com

**MCLAFFERTY LAW FIRM, P.C.**
David P. McLafferty*
*Pro Hac Vice Forthcoming*
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000
dmclafferty@mclaffertylaw.com

*Attorneys for Plaintiff*

52

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

MONICA BLAIR-SMITH, individually and on behalf of all others similarly situated,

**DEFENDANTS**

CAESARS ENTERTAINMENT, Inc., et al.

**(b)** County of Residence of First Listed Plaintiff    Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Washoe
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS, P.C.,
231 S. Broad St., Woodbury, NJ 08096; 856-845-3001

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product     Product Liability | |     28 USC 157 |     3729(a)) |
| [ ] 140 Negotiable Instrument |     Liability   [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel &     Pharmaceutical | | **PROPERTY RIGHTS** | [X] 410 Antitrust |
|     & Enforcement of Judgment |     Slander     Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'     Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted |     Liability   [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
|     Student Loans | [ ] 340 Marine     Injury Product | |     New Drug Application | [ ] 470 Racketeer Influenced and |
|     (Excludes Veterans) | [ ] 345 Marine Product     Liability | | [ ] 840 Trademark |     Corrupt Organizations |
| [ ] 153 Recovery of Overpayment |     Liability   **PERSONAL PROPERTY** | | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
|     of Veteran's Benefits | [ ] 350 Motor Vehicle   [ ] 370 Other Fraud | **LABOR** |     Act of 2016 |     (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle   [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract |     Product Liability   [ ] 380 Other Personal |     Act | **SOCIAL SECURITY** |     Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal     Property Damage | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise |     Injury   [ ] 385 Property Damage |     Relations | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury -     Product Liability | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) |     Exchange |
| |     Medical Malpractice | [ ] 751 Family and Medical | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** |     Leave Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights   **Habeas Corpus:** | [ ] 790 Other Labor Litigation | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting   [ ] 463 Alien Detainee | [ ] 791 Employee Retirement | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 510 Motions to Vacate |     Income Security Act | [ ] 870 Taxes (U.S. Plaintiff |     Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/     Sentence | |     or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability |     Accommodations   [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -   [ ] 535 Death Penalty | **IMMIGRATION** |     26 USC 7609 |     Act/Review or Appeal of |
| |     Employment   **Other:** | [ ] 462 Naturalization Application | |     Agency Decision |
| | [ ] 446 Amer. w/Disabilities -   [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| |     Other   [ ] 550 Civil Rights |     Actions | |     State Statutes |
| | [ ] 448 Education   [ ] 555 Prison Condition | | | |
| |   [ ] 560 Civil Detainee - | | | |
| |     Conditions of | | | |
| |     Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C § 1

Brief description of cause:
Sherman Antitrust Act

## VII. REQUESTED IN COMPLAINT:

[X] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE   The Hon. Karen M. Williams    DOCKET NUMBER   1:23-cv-02536-KMW-EAP

DATE   August 21, 2023

SIGNATURE OF ATTORNEY OF RECORD   /s/ Stanley O. King

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**  **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**  **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.**  Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**  **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**  **Requested in Complaint.**  Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

Exhibit 2

**SCHNADER HARRISON SEGAL & LEWIS LLP**
Lisa J. Rodriguez
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ 08002
Phone: 856-482-5222
lrodriguez@schnader.com

**SCHNADER HARRISON SEGAL & LEWIS LLP**
Ira Richards (pro hac vice to be filed)
1600 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:  215-751-2503
irichards@schnader.com

*Counsel for Plaintiff and the Proposed Class*
(additional counsel on signature page)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Jacob Fabel individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BOARDWALK 1000, LLC d/b/a HARD ROCK HOTEL & CASINO ATLANTIC CITY, BOARDWALK REGENCY LLC d/b/a CAESARS ATLANTIC CITY HOTEL & CASINO, CAESARS ENTERTAINMENT, INC., HARD ROCK INTERNATIONAL INC., HARRAH'S ATLANTIC CITY OPERATING COMPANY, LLC d/b/a HARRAH'S RESORT ATLANTIC CITY HOTEL & CASINO, MARINA DISTRICT DEVELOPMENT COMPANY, LLC d/b/a BORGATA HOTEL CASINO & SPA, MGM RESORTS INTERNATIONAL, SEMINOLE HARD ROCK SUPPORT SERVICES, LLC, TROPICANA ATLANTIC CITY CORPORATION d/b/a TROPICANA CASINO AND RESORT ATLANTIC CITY, and CENDYN GROUP, LLC,<br><br>Defendants. | Civil Action No.:<br><br><br><br>**Class Action Complaint**<br><br>Demand for Jury Trial |

# <u>TABLE OF CONTENTS</u>

LOCAL CIVIL RULE 10.1 STATEMENT ............................................................................... ii

I.      NATURE OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................... 5

III.    THE PARTIES .................................................................................................... 6

   1.    Plaintiff ............................................................................................................... 6

   2.    Defendants ........................................................................................................... 7

   3.    Co-Conspirators ................................................................................................. 10

IV.    FACTUAL ALLEGATIONS ............................................................................ 11

   A.   The Atlantic City Casino-Hotel Market is the Relevant Antitrust Market............................. 11

      i.   Atlantic City Is the Relevant Geographic Market........................................ 11

      ii.   The Relevant Product Market is Casino-Hotel Rooms. ..................................... 12

      iii.  Casino-Hotel Defendants Possess a Dominant Share of the Relevant Antitrust Market. ... 13

   B.   Historically, the Casino-Hotel Defendants Priced Rooms Pursuant to Competitive Economic Principles.................................................................................................... 14

   C.   Prior to the Class Period, Casino-Hotel Defendants Start to Migrate to Using the Rainmaker Platform to Price Guest Rooms. ............................................................... 15

   D.   Defendants Use the Rainmaker Platform to Facilitate a Guestroom Price-Fixing Conspiracy at Casino-Hotel Defendant Properties. ....................................................... 19

      i.   As the Rainmaker Platform is Used by Casino-Hotel Defendants, their Financial Performance Dramatically Improved. ....................................................... 19

      ii.   Casino-Hotel Defendants Use the Rainmaker Platform to Set and Charge Artificially Inflated Prices for Guest-Rooms. .................................................... 24

   E.   "Plus Factors" Indicate the Market for Hotel Rooms in the Atlantic City Hotel Market is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel. ................................. 32

      i.   Defendants had a Motive to Conspire.......................................................... 32

      ii.   The Casino-Hotel Defendants Acted Against Their Own Interests. .................................. 35

   F.   There are Additional Indicia of Defendants' Entrance into and Participation in the Conspiracy.......................................................................................................... 36

   G.   Defendants' Conduct Has No Pro-Competitive Benefits.................................................... 44

V.     FRAUDULENT CONCEALMENT AND TOLLING ....................................... 44

VI.    CLASS ALLEGATIONS................................................................................... 46

VII.   CLAIMS FOR RELIEF .................................................................................... 49

PRAYER FOR RELIEF ............................................................................................... 52

JURY TRIAL DEMAND ............................................................................................. 53

## LOCAL CIVIL RULE 10.1 STATEMENT

Pursuant to Local Civil Rule 10.1(b), the required information for Plaintiff's counsel of record is provided above on the first page of the Complaint.

Pursuant to Local Civil Rule 10.1(a), the names and addresses of the Parties to this action are:

1.   Plaintiff Jacob Fabel resides in Hoboken, New Jersey.

2.   Defendant Boardwalk 1000, LLC d/b/a Hard Rock Hotel & Casino Atlantic City has its principal place of business at 1000 Boardwalk, Atlantic City, New Jersey 08401.

3.   Defendant Boardwalk Regency LLC d/b/a Caesars Atlantic City Hotel & Casino has its principal place of business at 2100 Pacific Avenue, Atlantic City, New Jersey 08401.

4.   Defendant Caesars Entertainment, Inc. has its principal place of business at 100 West Liberty Street, 12th Floor, Reno, Nevada 89501.

5.   Defendant Cendyn Group, LLC has its principal place of business at 980 N. Federal Highway, 2nd Floor, Boca Raton, Florida 33432.

6.   Defendant Hard Rock International Inc. has its principal place of business at 5701 Stirling Road, Davie, Florida 33314.

7.   Defendant Harrah's Atlantic City Operating Company, LLC d/b/a Harrah's Resort Atlantic City Hotel & Casino has its principal place of business at 777 Harrah's Boulevard, Atlantic City, New Jersey 08401.

8.   Defendant Marina District Development Company, LLC d/b/a Borgata Hotel Casino & Spa has its principal place of business at 1 Borgata Way, Atlantic City, New Jersey 08401.

9.   Defendant MGM Resorts International has its principal place of business at 3600 Las Vegas Boulevard South, Las Vegas, Nevada 89109.

10.   Defendant Seminole Hard Rock Support Services, LLC has its principal place of business at 5701 Stirling Road, Davie, Florida 33314.

11.   Defendant Tropicana Atlantic City Corporation d/b/a Tropicana Casino and Resort Atlantic City has its principal place of business at 2831 Boardwalk, Atlantic City, New Jersey 08401.

Plaintiff Jacob Fabel ("Plaintiff") brings this action individually and on behalf of a class of all others similarly situated against Defendants,[1] and alleges the following:

## I.      NATURE OF THE ACTION

1.      Atlantic City has been an iconic tourist destination for more than 100 years.    In the late 1970s, the New Jersey voters passed the Casino Gambling Referendum, giving Atlantic City a monopoly on casino gambling in New Jersey.   Instantly, Atlantic City became the nation's second largest gambling casino market, and people flocked from around the country to Atlantic City to stay in hotels and gamble in the attached casinos.

2.       Casino-Hotel guests understood and accepted that the odds of winning money at a casino game were stacked against them and in favor of the casino-hotel.  However, these guests were not aware that Defendants' conspiracy had also stacked the odds against them in pricing guest rooms at Atlantic City Casino-Hotels.

3.      Defendants engaged in a conspiracy in violation of the Sherman Act, 15 U.S.C. § 1, to fix, raise, maintain and stabilize inflate the price of casino-hotel guest rooms in Atlantic City, New Jersey. (the "Atlantic City Casino-Hotel Market").  Defendants each caused substantial damages to Plaintiff and members of the Class, who paid supra-competitive rental

---

[1] "Defendants" collectively references Cendyn Group ("Cendyn") and predecessor The Rainmaker Group ("Rainmaker"), and the Casino-Hotel Defendants (defined below) , each of whom uses Cendyn's pricing algorithm. References to Cendyn incorporate Rainmaker unless expressly noted otherwise or the context makes clear.

"Casino-Hotel Defendants" references the corporate parent defendants, Caesars Entertainment, MGM Resorts and Hard Rock International, and their respective Atlantic City casino-hotels. The Caesars Entertainment casino-hotels are Caesars Atlantic City (including Caesars Suites Atlantic City), Harrah's Atlantic City, Tropicana Atlantic City and, for the first two and a half years of the Class Period, Bally's Atlantic City. The MGM Resorts casino-hotel is Borgata (including the Water Club at Borgata). The Hard Rock International casino-hotel is Hard Rock Atlantic City.

prices directly to Casino-Hotel Defendants for guest rooms.

4.      Casino-Hotel guests generate multiple revenue streams for the Casino-Hotel including the price paid to rent the guestroom and the money lost at gaming.

5.      Gambling revenue is the largest of the revenue streams, and so casino-hotels historically adopted a "Heads on the Bed" model, in which the casino-hotel sought to maximize its occupancy rate so as to drive up its gambling revenue.  As a result, competitive dynamics forced casino-hotels to offer relatively low prices to rent guestrooms.

6.      However, that dynamic was replaced by an anticompetitive model in which each Casino-Hotel Defendant input its commercially sensitive data on pricing and occupancy into a pricing algorithm created, marketed and sold by Rainmaker (the "Rainmaker platform"), and in return, received "recommended" optimal prices for the rental of guestrooms  while discouraging them from maximizing occupancy of those rooms (i.e., supply), based on the collective date submitted by all Casino-Hotel Defendants.  The anticompetitive nature of this conspiracy was explained by Defendant Cendyn's admonition to Casino-Hotel Defendants "not [to] chas[e] after occupancy growth,"[2] and "avoid the infamous 'race to the bottom' when competition inevitably becomes fierce within a market."[3]

7.      As a result of this anticompetitive scheme, Plaintiff and class members paid artificially inflated prices for guest rooms rented directly from Casino-Hotel Defendants or their co-conspirators from June 27, 2018 to the present ("Class Period").  Plaintiff brings this suit on behalf of a class of all persons who directly rented hotel rooms from any Casino-Hotel

---

[2] Dan Skodol, *Science Based Hotel Revenue Management Surpasses Fiction of Rules Based Models*, REVENUE HUB (May 9, 2018), https://revenue-hub.com/hotel-revenue-management-models/.

[3] Dan Skodol, *Managing capacity constraints in a COVID-19 world*, HOSPITALITY NET (May 20, 2020), https://www.hospitalitynet.org/opinion/4098784.html.

Defendant or co-conspirator in Atlantic City during the Class Period to recover all damages and injunctive relief available under federal antitrust law.

8.    Rainmaker, which was acquired by Defendant Cendyn in 2019, was founded to help hospitality clients, like the Casino-Hotel Defendants, capture room revenue they believed was being lost as a result of competing for guests. Rainmaker had been adopted by many casino-hotel operators and was the self-proclaimed "market leader" when industry giant Cendyn acquired it.

9.    Cendyn claims that the Rainmaker platform can increase casino-hotel clients' revenues by up to 15%,[4] and Cendyn boasts that clients adopt the algorithm's recommended room rates – of which clients like Casino-Hotel Defendants each receive hundreds of thousands per year[5] – 90% of the time.

10.    Casino-Hotel Defendants began using the Rainmaker platform in the Atlantic City Casino-Hotel Market preceding the Class Period. In doing so, Casino-Hotel Defendants successfully replaced a competitive room pricing system in Atlantic City with a collusive one in which the Casino-Hotel Defendants, with Rainmaker and Cendyn's active participation and coordination, knowingly used the Rainmaker platform to artificially increase the prices paid by guests to rent guestrooms from Casino-Hotel defendants.

11.    Cendyn knew that a coordinated use of and adherence to the Rainmaker platform

---

[4] *Tom Walker Returns to The Rainmaker Group*, TRAVEL COMMUNICATION (Jan. 25, 2012), https://travelcommunication.net/people/tom-walker-returns-to-the-rainmaker-group/.
[5] Overall, Cendyn delivers more than 4 million pricing recommendations each day – more than 1.5 billion each year.
https://www.hospitalitynet.org/news/4094606.html#:~:text=delivering%20over%201.5%20billion%20data%2Ddriven%2C%20personalized%20communications%20on%20behalf%20of%20their%20customers%20every%20year

"recommended" pricing was necessary for the success of the conspiracy. Cendyn personnel delivered this common messaging to "help hoteliers see the importance of a disciplined group revenue solution."[6] This adherence to the recommended pricing allowed Casino-Hotel defendants to charge an artificially inflated price for rooms and assured that their erstwhile "competitors" would not compete by lowering their room rates to increase market share, as would occur in a competitive environment.

12. Defendants' anticompetitive scheme has been effective. Room revenue reported to the New Jersey Casino Control Commission ("NJCCC") by Casino-Hotel Defendants shows substantial increases during the Class Period despite significant decreases in occupancy rates and much lower increases in casino gaming revenues from the same period. These increased revenues are a direct result of Casino-Hotel Defendants' participation in the conspiracy.

13. In addition to this direct evidence of collusion, there is substantial circumstantial evidence that also supports an antitrust violation. There is substantial evidence of Defendants' motive to conspire and actions against unilateral self-interest, as well as various forms of traditional conspiracy evidence.

14. The financial hardships resulting from the Great Recession provided a motive for Defendants to conspire, and the structural features of the market enabled the conspiracy to be effective.

15. Casino-Hotel Defendants acted in ways that would have been against their individual economic self-interests in the absence of coordination by forgoing the "Heads on the Bed" competitive model.

---

[6] Press Release, Rainmaker, *Rainmaker, a Cendyn company, has VP Lead Session on Measuring the Success of Group Business at Hotel Data Conference* (Aug. 13, 2019), https://www.hospitalitynet.org/news/4094606.html.

16.     Finally, various forms of traditional conspiracy evidence support the existence of a conspiracy.  Casino-Hotel Defendants radically changed their business practices through the adoption of a common course of action. Defendants had regular and frequent opportunities to conspire during industry events and smaller bilateral meetings.  And Casino-Hotel Defendants used the Rainmaker platform to exchange competitively sensitive pricing and capacity data.  This circumstantial evidence considered together with Defendants' parallel conduct demonstrates anticompetitive conduct.

17.     The anticompetitive effects of Defendants' scheme are known and foreseeable. A recent empirical analysis of algorithmic pricing in the U.S. multi-family housing rental market confirmed that the use of a similar algorithm in concentrated markets "during boom" periods enabled users to increase prices more than non-users (yet still raising prices among all firms), before concluding that such patterns are consistent with collusion.[7]

18.     Similarly, a former Federal Trade Commission Chair equated Defendants' conduct to a traditional "hub-and-spoke conspiracy," which creates anticompetitive effects and offers no procompetitive benefits. [8]

19.     Defendants' conduct is facially anticompetitive and illegal per se. Alternatively, and as discussed below, the anticompetitive effects vastly outweigh any competitive benefits and so Defendants' conduct is also illegal under a rule of reason analysis.

## II.     JURISDICTION AND VENUE

---

[7] Sophie Calder-Wang & Gi Heung Kim, *Coordinated vs Efficient Prices: The Impact of Algorithmic Pricing on Multifamily Rental Markets* (Mar. 28, 2023), available at SSRN: https://ssrn.com/abstract=4403058.

[8] Maureen K. Ohlhausen, Chairman, U.S. Federal Trade Commission, *Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing* (May 23, 2017).

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

21.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and New Jersey's long-arm statute, N.J. CT. R. 4:4-4.

22.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the rental of casino-hotel rooms.

23.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the rental of casino-hotel rooms.

24.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendant maintains business facilities, has agents, transacts business, and is otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## III.     THE PARTIES

### 1.  Plaintiff

25.     Plaintiff Jacob Fabel ("Plaintiff") is a citizen and resident of the State of New Jersey.  Plaintiff directly rented a room from one or more Casino-Hotel Defendants during the Class Period, including within the four years preceding the filing of this Complaint. For example, Plaintiff reserved a guestroom at Caesar's Atlantic City, which he directly rented and paid for through Caesars Entertainment's online booking platform. Plaintiff stayed for two nights in a

guest room at Caesar's Atlantic City, starting on June 4, 2021.  Plaintiff paid higher prices for the casino-hotel rooms directly to a co-conspirator by reason of the violations alleged herein. Plaintiff may directly rent guest rooms in Atlantic City, operated by one or more Casino-Hotel Defendants in the future.

### 2. Defendants

26. **Caesars Entertainment Defendants.** Defendant Caesars Entertainment, Inc. ("Caesars Entertainment") is a publicly traded Delaware corporation headquartered in Reno, Nevada. Caesars Entertainment claims that it "is the largest casino-entertainment company in the U.S." and "the global leader in gaming and hospitality," "boasting many of the world's most prestigious gaming brands" including "Caesars," "Harrah's," and "Tropicana."[9]

27. Caesars Entertainment, through wholly owned subsidiary Caesars Entertainment Operating Company, LLC, operates Defendant Boardwalk Regency LLC d/b/a Caesars Atlantic City Hotel & Casino ("Caesars Atlantic City"), Defendant Harrah's Atlantic City Operating Company, LLC d/b/a Harrah's Resort Atlantic City Hotel & Casino ("Harrah's Atlantic City"), and Defendant Tropicana Atlantic City Corporation d/b/a Tropicana Casino and Resort Atlantic City ("Tropicana Atlantic City").  Caesars Entertainment leases these casino-hotels' real estate from VICI Properties ("VICI").

28. Defendant Caesars Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Caesars Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey during the Class Period. Caesars Atlantic City includes Caesars Suites Atlantic City, a property adjacent to Caesars Atlantic City that offers guests upscale suites and VIP amenities.

---

[9] Caesars, *Who We Are* (2023), https://www.caesars.com/corporate.

29.     Caesars Atlantic City and Caesars Suites Atlantic City are collectively referenced in this Complaint as "Caesars Atlantic City."

30.     Defendant Harrah's Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Harrah's Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

31.     Defendant Tropicana Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Tropicana Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

32.     Caesars Entertainment and its Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City casino-hotels are clients of Cendyn and have used its Rainmaker pricing algorithm platform during the Class Period.

33.     **MGM Resorts Defendants.** Defendant MGM Resorts International ("MGM Resorts") is a publicly-traded Delaware corporation headquartered in Las Vegas, Nevada. MGM Resorts, according to its investor relations materials, "is an S&P 500® global entertainment company with national and international locations featuring best-in-class hotels and casinos."[10]

34.     MGM Resorts, through wholly-owned subsidiary Marina District Development Holding Company LLC, operates Defendant Marina District Development Company, LLC d/b/a Borgata Hotel Casino & Spa ("Borgata"), and leases this casino-hotel's real property from VICI.

35.     MGM Resorts acquired Boyd Gaming Corporation's ownership interest in Borgata in August 2016. Soon thereafter, MGM Growth Properties acquired Borgata's real property from MGM Resorts and leased that property to a MGM Resorts subsidiary, Marina District Development Holding Company LLC, that would operate the property. In April 2022, it

_____

[10] MGM Resorts, *About MGM Resorts* (2023), https://www.mgmresorts.com/en/company.html.

was disclosed that VICI acquired MGM Growth Properties, including its Borgata real property holding.

36.     Defendant Borgata is a New Jersey corporation headquartered in Atlantic City, New Jersey. Borgata has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

37.     Defendant Borgata includes The Water Club at Borgata. The Water Club was built in 2008 and is a hotel connected to Borgata; Borgata refers to the two venues as "an integrated casino, hotel and entertainment resort."[11] On March 14, 2023, Borgata announced that The Water Club would be renamed MGM Tower.

38.     Borgata and The Water Club are collectively referenced herein as "Borgata."

39.     MGM Resorts and its Borgata casino-hotel are clients of Cendyn and have used the Rainmaker pricing algorithm platform during the Class Period.

40.     **Hard Rock Defendants**. Defendant Hard Rock International, Inc. ("Hard Rock International") is a Florida corporation headquartered in Davie, Florida. The Seminole Tribe of Florida has wholly owned Hard Rock International since 2006. According to its website, "Hard Rock International is one of the most globally recognized companies with venues in over 70 countries spanning 265 locations that include owned/licensed or managed . . . Casinos[.]"[12]

41.     Hard Rock International, through wholly owned subsidiary Hard Rock Tristate AC, LLC, owns and operates Defendant Boardwalk 1000, LLC d/b/a Hard Rock Hotel & Casino Atlantic City ("Hard Rock Atlantic City").

---

[11] MGM Resorts International, 2021 Annual Report (Form 10-K) (Feb. 25, 2022).
[12] Press Release, Hard Rock International, *Hard Rock International Earns Acclaimed Placement in Forbes as One of America's Best Large Employers in 2023* (Feb. 20, 2023), https://www.hardrockhotels.com/news/hard-rock-international-earns-acclaimed-placement-in-forbes-as-one-of-americas-best-large-employers-in-2023/.

42.     Defendant Seminole Hard Rock Support Services, LLC ("Seminole Hard Rock") is a Florida limited liability company headquartered in Davie, Florida. This entity "was established in" 2017 "to consolidate and coordinate multiple staff functions of Hard Rock International and Seminole Gaming," [13] and coordinates Hard Rock-branded casino-hotels' use of IT and revenue management systems including the Rainmaker pricing algorithm platform.

43.     Defendant Hard Rock Atlantic City is a New Jersey limited liability company headquartered in Atlantic City, New Jersey. Hard Rock Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

44.     Hard Rock International and its Hard Rock Atlantic City casino-hotel are clients of Cendyn and, with active assistance and coordination by Seminole Hard Rock, have used the Rainmaker pricing algorithm platform during the Class Period.

45.     **Cendyn.** Defendant Cendyn Group, LLC is a Delaware corporation headquartered in Boca Raton, Florida, with additional domestic offices in Las Vegas, Nevada, Alpharetta, Georgia, and San Diego, California.

46.     Cendyn acquired Rainmaker and its underlying hotel room pricing algorithm platform in August 2019 and subsequently operated it as a subsidiary called "Rainmaker, a Cendyn company" for a relatively short period of time before fully absorbing it.

### 3.  Co-Conspirators

47.     Various persons and entities, including Casino-Hotels and other industry participants, known and unknown to Plaintiff and not named as defendants in this action, have participated as co-conspirators with Cendyn and the Casino-Hotel Defendants in the offenses alleged herein and

---

[13] Press Release, Hard Rock International, *Tracy Bradford Promoted to President of Seminole Hard Rock Support Services* (Jun. 2, 2022), https://www.prnewswire.com/news-releases/tracy-bradford-promoted-to-president-of-seminole-hard-rock-support-services-301560538.html.

have performed acts and made statements in furtherance of the cartel.

## IV. FACTUAL ALLEGATIONS

### A. The Atlantic City Casino-Hotel Market is the Relevant Antitrust Market.

48. The relevant antitrust market is the Atlantic City Casino-Hotel Market. Neither the industry nor Casino-Hotel Defendants dispute its existence and fundamental economic principles confirm it.

49. This market definition has been recognized and used by New Jersey gaming regulators. For example, in July 2020, the NJCCC approved the Eldorado Resorts-Caesars Entertainment merger after Caesars Entertainment agreed to divest Bally's Atlantic City to "reduce[] concerns about 'undue economic concentration'" in the Atlantic City casino market.[14]

50. During those proceedings, Defendant Caesars Entertainment's expert economist applied the same market definition to analyze the effect of the proposed merger within the Atlantic City market.[15]

51. Within the Atlantic City Casino-Hotel Market, the relevant geographic market is Atlantic City, and the relevant product market is hotel rooms for rent in casino-hotels.

### i. Atlantic City Is the Relevant Geographic Market.

52. Atlantic City is economically separate and distinct from other areas that offer a comparable casino-hotel resort experience.

---

[14] Ken Ritter, *New Jersey regulators mulling Eldorado buyout of Caesars*, WASH. POST (Jul. 16, 2020), https://www.washingtonpost.com/business/new-jersey-regulators-mulling-eldorado-buyout-of-caesars/2020/07/16/7abd2168-c7ad-11ea-a825-8722004e4150_story.html.

[15] Timothy Watts, *Economic Analysis of the Competitive Effects of the Proposed Merger of Caesars Entertainment Corp. with Eldorado Resorts, Inc. on Atlantic City Casino Operations: First Amendment to Analysis of September 6, 2019*, State of New Jersey Casino Control Commission (May 13, 2020).

53.     The American Gaming Association, whose membership includes Casino-Hotel Defendants,[16] identifies separate geographic casino markets across the nation, including Atlantic City.[17]

54.     According to New Jersey's state tourism division, "Atlantic City holds the distinction of being the East Coast's gaming and resort capital."[18]

55.     In a June 2022 press release, Caesars Entertainment announced a new investment in "the Atlantic City market."[19]

56.     New Jersey courts also consider Atlantic City an appropriate geographic market. See *Marina District Development Co., LLC v. Atlantic City*, 27 N.J. Tax. 469, 475-77, 484, 489, 504 (2013) (court considered "the Atlantic City casino-hotel market" and "other casino hotels in Atlantic City." See also, Ace *Gaming, LLC*, 23 N.J. Tax. at 127.

### ii.  The Relevant Product Market is Casino-Hotel Rooms.

57.     Casino-hotel rooms are economically separate and distinct from rooms in other forms of rental lodging such non-casino hotels, motels or resorts.

58.     Guests stay at casino-hotels to take advantage of their gambling opportunities as well as other amenities such as restaurants, nightclubs; concerts, shows, athletic events, spas,

---

[16] *About*, AMERICAN GAMING ASSOCIATION (2023), https://www.americangaming.org/about/.
[17] Press Release, American Gaming Association, 2022 Commercial Gaming Revenue Tops $60B (Feb. 15, 2023), https://www.americangaming.org/new/2022-commercial-gaming-revenue-tops-60b-breaking-annual-record-for-second-consecutive-year/.
[18] *Atlantic City Casino Resorts*, VISITNJ.ORG (2023), https://visitnj.org/article/atlantic-city-casino-resorts.
[19] Press Release, Ceasars Entertainment, *Caesars Entertainment Announces Additional Property Enhancements at Ceasars Atlantic City* (Jun. 7, 2022), https://www.caesars.com/meetings/press/caesarsentertainmentannouncesadditionalpropertyenhancementsatcac.

work out facilities, high-end retail shops and expansive conference facilities.

59.     Casino-Hotel Defendants consider their competitors to be other casino-hotels, not non-casino hotels, resorts or motels.

60.     This view is supported by other members of the casino-hotel industry.  One commentator noted, "[c]asino hotels, which combine lodging with gaming operations, are a particular sector in the lodging industry."[20] This is because casino-hotels "exist to serve casino patrons and boost casino demand," thus casino-hotels' "primary competitors are other casino hotels."[21]

61.     The unique nature of casino-hotels has been recognized under the law.  The Casino Control Act specifically defines "casino hotel." NJ Rev Stat § 5:12-19 (2022), and New Jersey courts have noted a similar distinction.: "[C]asino hotels are not conventional hotels" because "the nature of the casino business, even with overnight accommodations available, is vastly different from that of a conventional hotel." *Atlantic City v. Ace Gaming, LLC*, 23 N.J. Tax. 70, 88-89 (2006).

### iii.     Casino-Hotel Defendants Possess a Dominant Share of the Relevant Antitrust Market.

62.     During the Class Period, Casino-Hotel Defendants possessed a dominant share of the Atlantic City Casino-Hotel Market.

63.     Defendants had a market share of 80% from the beginning of the Class Period

---

[20] Hyewon Youn & Zheng Gu, The Impact of the Recent Recession on U.S. Lodging Firms: An Examination Based on Ratio Analysis, 18 The Journal of Hospitality Financial Management (2010).
[21] James M.Klas, *Why Casino Hotels Work*, Klas Robinson QED (Oct. 1, 2018), http://www.klasrobinsonqed.com/wp-content/uploads/2019/03/IGMag201810_Klas.pdf.

until November 16, 2020, and a 72% market shar after the sale of Bally's casino-hotel.

64.     Caesars Entertainment possesses the largest market share in casino-hotels across its properties in Atlantic City.  It had a market-share of 48.3% between June 28, 2018, and November 16, 2020,[22] and a market share of 40.3% from November 17, 2020 through the present.

65.     Defendant Borgata had 18.3% market share during the Class Period.

66.     Defendant Hard Rock International's Atlantic City casino-hotel had a market share of 13.1% during the Class Period.

### B. Historically, the Casino-Hotel Defendants Priced Rooms Pursuant to Competitive Economic Principles.

67.     Prior to using Rainmaker, the Casino-Hotel Defendants priced guestrooms using the traditional economic factors of supply, demand and costs.  Casino-hotels were incentivized to set pricing on rooms to increase occupancy resulting in additional revenue from gambling, thereby gaining significant additional revenue from guests.

68.     Typically, Casino-Hotel Defendants sell rooms directly to guests through their respective online booking platforms or, less frequently, telephonically. Casino-Hotel Defendants also use online travel agencies ("OTAs") such as Expedia or Travelocity to sell rooms to guests. A guest who purchases a room through an OTA is sent to the casino-hotel's website to reserve the room at the rate set by the casino-hotel. The guest pays the casino-hotel directly at checkout, and the casino-hotel pays the OTA a commission based on the total value of the booking.

69.     The hospitality industry is a capital-intensive industry, and casino-hotels in particular invest significant amounts of capital to maintain and operate their amenity-laden

---

[22] On November 17, 2020, Caesars Entertainment sold Bally's Atlantic City to an outside company.

facilities. Historically, casino-hotels strive to maximize their occupancy rates by lowering prices to attract guests, because an empty hotel room is lost revenue. This is summarized by an industry term of art, "heads on beds," which recognizes that because fixed costs are a hotel's largest cost component, having high occupancy rates is critical to the casino-hotel's financial performance.[23]

70.     An empty hotel room is a loss of revenue because a significant portion of revenue and profits derive from casino-hotels' casino operations. Casino-hotels operating in a competitive market have even more incentive than non-casino-hotels to rent all their rooms and disincentivize guests from gambling at competing casino-hotels by decreasing the price of guest rooms or offering other benefits.

71.     Therefore, in accordance with supply and demand fundamentals, in a competitive environment hotel operators would attempt to maximize occupancy of their properties. These basic economic dynamics characterized the pricing of guest rooms in the Atlantic City Casino-Hotel Market before the Rainmaker Platform was introduced.

### C. Prior to the Class Period, Casino-Hotel Defendants Start to Migrate to Using the Rainmaker Platform to Price Guest Rooms.

72.     The Rainmaker Group ("Rainmaker") was a revenue management software company that developed and sold pricing algorithm products to property owners in the apartment and hospitality industries.

73.     Rainmaker sought to displace exiting pricing models through an algorithmic system that would maximize revenue. Rainmaker developed a "total revenue management approach" premised on "dynamic pricing" to replace the competitive "fixed pricing" model.

---

[23] See, e.g., https://valueinvestingnow.com/2014/10/heads-on-beds-hotel-management

74. The Rainmaker platform consists of three separate but interrelated products: GuestREV, GroupREV, and REVCaster. Each casino-hotel client continuously feeds Rainmaker's platform its current, non-public room pricing and occupancy data. The algorithm analyzes the data provided by each Casino-Hotel Defendant , along with other relevant supply and demand-related data. to recommend "optimal" room rates to its clients. These recommendations are updated constantly.

75. **GuestREV:** GuestREV is the market-leading revenue management and profit optimization tool for pricing hotel rooms, as Rainmaker claimed in June 2016.[24] One key set of data the GuestREV algorithm analyzes are the contemporaneous room rates charged by each participating competitor. According to Cendyn President and Chief Marketing Officer Michael Bennett, GuestREV uses "[c]ompetitor rates … to influence the final price recommendation so hotels don't leave money on the table by pricing too far below competitors[.]"[25]

76. GuestREV "employs the most accurate valuation of [guests'] true revenue potential at the segment level."[26] GuestREV uses this information to recommend optimal rates to charge guests in real time on a real-time basis for clients like Casino-Hotel Defendants.

77. **GroupREV**: GroupREV generates optimal recommended room rates for clients including Casino-Hotel Defendants to charge groups of guests. It is a vital tool for casino-hotels because group business can represent up to 40% or more of revenue potential for casino-hotels.

---

[24] Press Release, Rainmaker, *Rainmaker Group Takes Gold in 16th Annual GGB Gaming & Technology Awards* (Sep. 29, 2016), https://www.hospitalitynet.org/news/4078527.html.
[25] Andrea Victory, *Examing Trends in Rate and Revenue Management*, HOTELIER MAGAZINE (Jan. 3, 2020), https://www.hoteliermagazine.com/examining-trends-in-rate-and-revenue-management.
[26] https://www.cendyn.com/guestrev/.

78.   GroupREV allows clients to forecast detailed demand, "by day and by group segment," for group-booking customers such as conference or wedding guests. [27]

79.   **REVCaster:** REVCaster  "collects market-specific hotel price information from hundreds of branded sites and online travel agencies" and generates "easy-to-use reports and data downloads that increase revenue for clients."[28]  A Rainmaker executive claimed that no other hotel revenue management solutions provide a "competitor rate shopping solution."[29]

80.   GuestREV, GroupREV and REVCaster were designed to significantly increase Rainmaker's users' guestroom revenues. As early as  2012, Rainmaker, claimed that "Rainmaker boosts revenues up to 15%,"[30] and the subsequent acquisitions of REVCaster and GroupREV would increase that percentage.

81.   Cendyn acquired Rainmaker in fall, 2019.  Cendyn noted that Rainmaker "will enable [it] to drive performance across all aspects of the hotel business, now including revenue management" and "will enable thousands of hotels, resorts and casinos around the globe to work with one partner to power their marketing, sales and revenue performance in an integrated fashion."[31]  The newly acquired company became a subsidiary for a short period before Cendyn absorbed it entirely.

---

[27] *The Rainmaker Group introduces group forecasting,* HOTEL MANAGEMENT (Mar. 14, 2017), https://www.hotelmanagement.net/tech/rainmaker-group-introduces-group-forecasting.
[28] Press Release, Rainmaker, *Rainmaker Group Acquires Revcaster LLC* (Mar. 16, 2015), https://www.costar.com/article/448134080/the-rainmaker-group-acquires-revcaster.
[29] Id.
[30] Press Release, Rainmaker, *Tom Walker Returns to The Rainmaker Group to Help Drive Revenue and Profitability for Casino Hotel Operators* (Jan. 24, 2012), https://www.prweb.com/releases/therainmakergroup/directorofsales/prweb9130301.htm.
[31] Press Release, Cendyn, *Cendyn announces acquisition of The Rainmaker Group* (Aug. 1, 2019), https://www.cendyn.com/news/cendyn-announces-acquisition-of-the-rainmaker-group/.

82.     According to Rainmaker and Cendyn, the accuracy, precision and efficacy of the Rainmaker platform has improved over time so that clients can increase guest room revenues by ever-increasing percentages. The collective use of these tools in a specific geographic market will increase Casino-Hotel guest room revenues to a greater degree.

83.     Caesars Entertainment began using Rainmaker's products across its "entire domestic portfolio in late 2004,"[32] including Caesars Atlantic City and Bally's Atlantic City. By 2009, Harrah's Atlantic City, another Caesars' Casino-Hotel, was using Rainmaker's products.

84.     Rainmaker promotional materials in March 2012 and 2018 highlighted Caesars Entertainment as "among the top brands that rely on Rainmaker solutions are Caesars Entertainment."[33] Caesars Entertainment's Atlantic City casino-hotels have continued to use Rainmaker products.[34]

85.     Borgata began using Rainmaker's products in 2009.[35]  Former Borgata Vice President of Information Technology John Forelli stated: "We turned to Cendyn because we knew it was the market leader in casino hotel optimization and that its system was state-of-the-art" that generates "a balanced pricing structure" where, "[a]side from setting rate minimums and maximums, the team otherwise allows GuestRev to perform its mathematical magic." The profile also quoted Sue Daigle, Borgata's Director of Revenue Management until August 2020. Daigle

---

[32] *Revenue Management a Good Bet for Caesars Entertainment*, SUPPLY & DEMAND CHAIN EXECUTIVE (Aug. 3, 2004), https://www.sdcexec.com/sourcing-procurement/news/10354367/revenue-management-a-good-bet-for-caesars-entertainment.
[33] 2018 Exhibitor Media Kit, Rainmaker, https://www.hftp.org/hitec/houston/i/downloads/Exhibitor_Media_Kit__Rainmaker.pdf.
[34] Bally's Atlantic City may have stopped using Rainmaker products on or around November 17, 2020, when Caesars Entertainment sold the casino-hotel to Bally's Corporation in order to receive state regulatory clearance for the Eldorado Resorts-Caesars Entertainment merger.
[35] https://www.hotel-online.com/News/PR2009_4th/Nov09_RainmakerSix.html.

raved that "GuestRev is literally my right hand" and that "I can't see getting by without it" in setting room prices. [36]

86.     MGM Resorts was using the Rainmaker platform as early as 2009 and continues to use the platform to date. In press releases from January 2012 and 2018, for example, Rainmaker highlighted MGM Resorts as one of its "leading casino/hotel organization" clients and "among the top brands that rely on Rainmaker solutions," respectively.

87.     Tropicana Atlantic City began using Rainmaker at least as early as 2015. Gaming & Leisure Magazine's ("G&L") Fall 2015 edition, its earliest publicly available online edition, indicates that Tropicana was using the Rainmaker platform.[37] Tropicana Atlantic City continues to use the Rainmaker platform to this day.

88.     In or around late June 2018, Hard Rock Atlantic City started using the Rainmaker pricing algorithm platform. G&L's Spring 2019 edition shows that the resort, which is part of the "Hard Rock Hotel & Casino" brand, was using these products.[38]

**D.  Defendants Use the Rainmaker Platform to Facilitate a Guestroom Price-Fixing Conspiracy at Casino-Hotel Defendant Properties.**

**i.  As the Rainmaker Platform is Used by Casino-Hotel Defendants, their Financial Performance Dramatically Improved.**

89.     As the effects of the Great Recession continued to wane, Hard Rock Atlantic City opened on June 27, 2018. On or around that date, it joined the other Casino-Hotel Defendants in using the shared Rainmaker pricing algorithm platform, with the active

---

[36] Cendyn, *Borgata Hotel Casino & Spa's success with Guestrev*, https://www.cendyn.com/customer-stories/borgata-hotel-success-rainmaker-guestrev/.
[37] Gaming & Leisure Fall 2015 (mydigitalpublication.com)
[38] 005ebbba720fb0f115a2530e50cbc2bf90333611.pdf (coverstand.com)

coordination and support of Rainmaker. Hard Rock Atlantic City's entry into market and the anticompetitive scheme increased Casino-Hotel Defendants' market share rose to 80%.

90. In the first half of 2018, "the casino hotel occupancy rate was 81.4 percent, which represents a 4.4 percent decrease from [2017's] 85.8 percent. In the second quarter of 2017, the occupancy rate was 90.3 percent, compared with [2018's] 84.8 percent." Despite depressed occupancy rates, however, "[t]hrough the first half of 2018, the average [rate per occupied room] was $129.23, while the average for the first six months of 2017 was $105.56" and in Q2 2018 "the average rate was $136.01 compared with…$107.43" in the second quarter of 2017.[39]

91. Casino-Hotel Defendants' financial performance remained strong in 2019. This was particularly true for room rates and revenues, which resulted in hotel room revenue numbers proportionally outpacing casino revenue numbers to a significant degree, even though two casino-hotels entered the market in mid-2018.

92. The coronavirus pandemic had a significant impact on the 2020 financial results for the Casino-Hotel Defendants, which were closed for more than three months.[40] Consequently, 2020 was an outlier year in terms of financial metrics in this market and must be viewed accordingly.

93. The financial performance of the Atlantic City Casino-Hotel Market, including Casino-Hotel Defendants, picked back up in 2021. Total gross profits from 2021 exceeded total

---

[39] David Danzis, *Atlantic City 2018 casino profits still lag last year*, THE PRESS OF ATLANTIC CITY (Aug. 22, 2018), https://pressofatlanticcity.com/news/casinos_tourism/atlantic-city-2018-casino-profits-still-lag-last-year/article_7b52ed20-ff31-5124-9772-1396555ebd05.html.
[40] Press Release, NJDGE, *New Jersey Division of Gaming Enforcement Announces 2nd Quarter 2021 Results* (Aug. 23, 2021), https://www.njoag.gov/new-jersey-division-of-gaming-enforcement-announces-2nd-quarter-2021-results/.

gross profits from pre-pandemic 2019 by more than $170 million. Higher room rates and the resulting revenue continued to drive these returns.

94.     Casino-Hotel Defendants' overall performance continued to improve in 2022. The December 2022 LIGHT Snapshot compiled statistics from NJDGE's quarterly reports and found that "brick-and-mortar gaming revenues for December 2022 outperformed both December 2021 ($211.82 million) and December 2019 ($208.55 million) to deliver the strongest December brick-and-mortar revenue returns in 10 years." In addition, room revenues from the third quarter of 2022 had increased 6.1% over those of 2021, with a 14.8% increase as of September 30, 2022 over the same date in 2021. The analysis concluded that "[t]his may be an indicator that the industry has recovered to pre-pandemic levels of brick-and-mortar gaming activity."[41]

95.     Casino net revenues in 2022 climbed more than 9% to $3.3 billion.[42]

96.     Atlantic City Casino-Hotel Market aggregate statistics show that the city's casino-hotels collectively rented 5% fewer rooms but charged 25% more for those rooms in 2022 compared to 2019. This resulted in the casino-hotels receiving $18 more, or an additional 16.4%, for each rented room in 2022 than in 2019. The casino-hotels' gaming revenue for 2022, on the other hand, was virtually the same as 2019.

Table 1. Annual Aggregate Atlantic City Casino-Hotel Market Statistics

| Year | Casino Revenue | Delta | Room Revenue | Delta | Occupancy | Revenue per Available Room |
|------|---------------|-------|--------------|-------|-----------|---------------------------|
| 2022 | $1.78B | 0% | $698M | 13% | 73% | $130.57 |

[41] Stockton University, December 2022 LIGHT Snapshot, https://stockton.edu/light/snapshots/december_2022_snapshots.html.

[42] https://www.nj.gov/oag/ge/docs/Financials/QuarterlyFinRpt2022/4thQTR2022PressRelease.pdf

| 2021 | $1.78B | 44% | $618M | 93% | 68% | $116.87 |
|---|---|---|---|---|---|---|
| 2020[43] | $1.21B | -28% | $317M | -48% | 62% | $85.47 |
| 2019 | $1.76B | 8% | $605M | 13% | 79% | $112.12 |
| 2018 | $1.63B | 4% | $536M | 8% | 81% | $110.65 |
| 2017[44] | $1.57B $2.56B | 2% | $495M $391M | -4% | 87% | $94.16 |
| 2016 | $2.52B | 1% | $405M | 0% | 85% | Data not available |
| 2015 | $2.50B | 3% | $406M | 1% | 81% | Data not available |

97.     The data above shows that total average room rates and corresponding revenue significantly increased during the time that all Casino-Hotel Defendants were using the Rainmaker pricing algorithm platform to set guestroom rates. Starting no later than 3rd Quarter 2018, room revenues markedly rose, as compared to those same revenues from the prior year and in relation to corresponding casino revenue trends. All this while occupancy levels trended downward. But the rise in average daily room rates (ADR) more than compensated for the lower occupancy rates, thus causing revenue per available room (RevPAR) to rise substantially year over year.

98.     Empty rooms ultimately translate to a loss of gambling income, a significant revenue stream for Casino-Hotel Defendants.  Casino-Hotels acting in an economically rational manner would have decreased room rates so as to increase occupancy rates during this period, which would have resulted in higher occupancy rates across operators. Those higher occupancy rates would have resulted in higher room and casino revenue due to the additional guests staying and gambling at their casino-hotels rather than their competitors'.

---

[43]As discussed above, 2020 represents an outlier due to the impact of the COVID-19 global pandemic.
[44] The top revenue values for 2017 conform to updated standards effective January 1, 2018.

99.     But this did not happen.  In this conspiracy, Rainmaker and Cendyn discouraged casino-hotel clients from lowering room rates to gain market share and grow overall revenue at their competitors' expense.   For example, Dan Skodol, former Cendyn VP of Data Science and Analytics and Rainmaker VP of Revenue Analytics, warned that "revenue managers must recognize the ultimate goal is not chasing after occupancy growth, but instead, maximizing profits across all revenue streams."[45] Skodol also warned that "hotels avoid the infamous 'race to the bottom' when competition inevitably becomes fierce within a market."[46]

100.    The Casino-Hotel Defendants listened to what Cendyn was telling them.  For example, while most Casino-Hotel Defendants saw moderate occupancy increases between 2020 and 2022, Hard Rock Atlantic City saw a sharp increase in room occupancy *and* rates. One would expect competitors to undercut Hard Rock Atlantic City on room pricing, forcing Hard Rock to do the same and return to its prior position. But no other Casino-Hotel Defendant lowered prices to increase occupancy and compete with Hard Rock.

101.    As a result of the Casino-Hotels Defendants adherence to Rainmaker and Cendyn's call for pricing discipline, the Rainmaker pricing algorithm platform delivered for Casino-Hotel Defendants. Through GuestREV, the individual room rate tool, Casino-Hotel Defendants increased their revenues year-over-year during the Class Period by "up to 12%." Through GroupREV, the group room rate tool, Casino-Hotel Defendants "improve[d] Group Room Revenue by up to 8.4% or more." And through REVCaster, Casino-Hotel Defendants used

---

[45] Dan Skodol, *Science Based Hotel Revenue Management Surpasses Fiction of Rules Based Models*, REVENUE HUB (May 9, 2018), https://revenue-hub.com/hotel-revenue-management-models/.
[46] Dan Skodol, *Managing capacity constraints in a COVID-19 world*, HOSPITALITY NET (May 20, 2020), https://www.hospitalitynet.org/opinion/4098784.html.

the unparalleled visibility into each other's current rates to further adhere to the algorithm's "optimal" room rates while monitoring one another's pricing.

102.    Casino-Hotel Defendants' knowing shared use of the Rainmaker pricing algorithm platform to set optimal room rates, with the coordination and support of Cendyn, has produced anticompetitive effects in the Atlantic City Casino-Hotel Market by causing class members to pay artificially inflated prices for rooms rented directly from Casino-Hotel Defendants.

### ii. Casino-Hotel Defendants Use the Rainmaker Platform to Set and Charge Artificially Inflated Prices for Guest-Rooms.

103.    Each Casino-Hotel Defendant uses the Rainmaker platform to set room rates in Atlantic City.

104.    The Rainmaker platform is most effective when its users knowingly take the same approach to pricing— collectively using the same mechanism that relies on the same type of data to generate the same type of optimal pricing for each hotel room—in a market over which they have collective power.  Though this approach is inconsistent with a competitive market, Casino-Hotel Defendants took exactly such an approach.

105.    Defendants, through high-ranking employees, formed, maintained and operated a hub-and-spoke conspiracy[47] to fix, raise and stabilize room rates through their knowing shared use of the Rainmaker platform and related reinforcing conduct with the purpose and effect of enabling Casino-Hotel Defendants to charge guests supra-competitive prices for room rentals during the Class Period.

---

[47] See Stephanie Assad et al, *Autonomous algorithmic collusion: economic research and policy implications*, 37 OXFORD REVIEW OF ECONOMIC POLICY, 459-478 (2021).

106.    Each Casino-Hotel Defendant knew that its competitors were using the Rainmaker platform to set their room rates in Atlantic City. Each Casino-Hotel Defendant knew, therefore, that the prices recommended by the Rainmaker platform were based on the collective pricing and supply data submitted by their competitors to the Rainmaker platform.

107.    Each Casino-Hotel Defendant's knowledge of other erstwhile competitor Casino-Hotel Defendants' use of the same pricing algorithm is shown by a variety of means, including industry publications read by Casino-Hotel Defendants' relevant personnel, such as Gaming & Leisure Magazine, published by G&L

108.    <u>Gaming & Leisure Magazine</u> holds itself out as "the leading industry management periodical released seasonally reaching CXOs to end users in every business segment of a gaming and hospitality property." [48]

109.    G&L which lists Casino-Hotels that used the Rainmaker platform for the given time frame. Each edition of G&L included a section titled "G&L Community" which listed the clients for specific industry vendors, including. Rainmaker (and Cendyn following the acquisition).   Each Casino-Hotel Defendant was included in that list.[49]

110.    In addition, industry events served as opportunities for the Rainmaker and Cendyn personnel to market and sell the Rainmaker pricing algorithm platform, while also allowing Casino-Hotel Defendants to see which of its competitors were also using the platform. These gatherings included Rainmaker's own conferences as well as conferences that Rainmaker attended and sponsored.

---

[48] About Gaming & Leisure - More than just a magazine (mygamingandleisure.com)
[49] See, e.g., GAMING & LEISURE MAGAZINE (Summer 2021),
https://cdn.coverstand.com/38164/709863/789b6398427bfc825d83ae878404a0532f238909.2.pdf
at 8.

111.    For example, Dan Skodol led a session at an industry event in which he observed that "Group Business is a key piece in revenue management strategy but is often not assessed the same way as transient and that can leave revenue on the table; I believe sharing these cases will help hoteliers see the importance of a disciplined group revenue solution."[50]

112.    Rainmaker and Cendyn personnel and Casino-Hotel Defendants' employees regularly attended G&L Roundtable. G&L marketed its Roundtable as "host to the most gaming CIOs in one private forum in North America. For over two decades, the G&L Roundtable has become the preeminent private forum for CXOs in the gaming and hospitality industry to unite and collaborate individually and collectively with a select small grouping of G&L Business Partner Sponsors."[51]

113.    Defendants have also attended The Institute for Operations Research and the Management Sciences' ("INFORMS") annual Business Analytics Conference. At the 2017 conference, Rainmaker's Farley was a keynote speaker, Rainmaker's (and later Cendyn's) Dobney hosted a "strategic session" where he "present[ed] a step-by-step approach to total revenue optimization for casino and gaming properties" that detailed "the data-driven methodology behind the total revenue management approach that has been successfully implemented by many casino properties in recent years."[52]

114.    Finally, during the installation of the Rainmaker platform, representatives of Casino-Hotel Defendants and Rainmaker (and later, Cendyn) "share[d] industry best practices"

---

[50] https://www.hospitalitynet.org/news/4094606.html
[51] About Gaming & Leisure - More than just a magazine (mygamingandleisure.com)
[52] Press Release, Rainmaker, *Rainmaker to Present Total Revenue Management Approach for Casino Hotels at INFORMS 2017* (Mar. 28, 2017), https://hospitalitytech.com/rainmaker-present-total-revenue-management-approach-casino-hotels-informs-2017.

with each Casino-Hotel Defendant while "advis[ing] of recommended business process shifts" and helping them "maximize the benefit of profit optimization" during platform system implementations.[53]

115.    These allegations show that each Casino-Hotel Defendants used the Rainmaker platform to recommend prices products during the Class Period, while knowing that their competitors were using the same Rainmaker platform for the same purpose.

116.    Although pricing algorithms are a recent development, antitrust experts have found that competitors' collective use of an algorithm to set prices results is akin to a traditional hub-and-spoke price fixing conspiracy.

117.    For example, two law professors who authored paper a titled *Algorithmic Collusion: Problems and Counter-Measures*, noted that the "industry-wide use of a single algorithm, which competitors use to determine the market price or react to market changes, would result in de-facto hub-and-spoke structure, as the market behavior of the competitors aligns due to the use of a similar 'brain' to determine their price strategy. These effects intensify when sellers use the same data pool and are privy to vast volumes of data."[54]

118.    In 2017, Maureen Ohlhausen, the then-acting Chair of the Federal Trade Commission, explained that competitors using a third-party to set prices is just as anticompetitive as a prototypical price-fixing conspiracy: "Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its

---

[53] 2018 Exhibitor Media Kit, Rainmaker,
https://www.hftp.org/hitec/houston/i/downloads/Exhibitor_Media_Kit__Rainmaker.pdf.
[54] Ariel Ezrachi & Maurice Stucke, *Algorithmic Collusion: Problems and Counter-Measures*, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT (May 31, 2017), https://one.oecd.org/document/DAF/COMP/WD%282017%2925/En/pdf.

algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. Again, ***this is fairly familiar territory for antitrust lawyers, and we even have an old-fashioned term for it, the hub-and-spoke conspiracy***."[55]

119.     In a March 2021 paper titled *Autonomous Algorithmic Collusion: Economic Research and* Policy *Implications*, a team of economists discussed the anticompetitive consequences of competitors using the same third-party algorithm to set prices: "Algorithmic pricing can also affect competition if a single intermediary software provider sells their product to multiple competitors. Such adoption could lead to hub-and-spoke (where the provider acts as the hub of the sellers, Ezrachi and Stucke 2015) or parallel-use scenarios, with competitors coordinating to higher prices by delegating choices or relaying information to the same third party."[56]

120.     Here, Rainmaker and Cendyn acted as the "hub" of this hub-and-spoke conspiracy through at least the following acts:

a.     They created, marketed, and coordinated Casino-Hotel Defendants' knowing and shared use of a pricing algorithm platform that utilized

---

[55] Maureen K. Ohlhausen, Chairman, U.S. Federal Trade Commission, *Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing* (May 23, 2017) (emphasis added).
[56] Stephanie Assad et al, *Autonomous algorithmic collusion: economic research and policy implications*, 37 OXFORD REVIEW OF ECONOMIC POLICY, 459-478 (2021).

Casino-Hotel Defendants' real-time pricing and supply data to recommend artificially inflated room rates to charge guests;

b.    They promoted artificially inflated room rates for guestrooms and encouraged Casino-Hotel Defendants to accept the platform's recommended optimal room rates;

c.    They communicated each Casino-Hotel Defendants' use of the Rainmaker platform to the other Casino-Hotel Defendants;

d.    They used REVCaster to share each Casino-Hotel Defendants' competitively sensitive information on pricing and occupancy with the other Casino-Hotel Defendants;

e.    During their meetings with individual Casino-Hotel Defendants, they shared other Casino-Hotel Defendants' competitively sensitive information and under the guise of "best practices" and "pricing strategies"; and

f.    They encouraged Casino-Hotel Defendants to collectively exercise discipline and avoid a "race to the bottom" to capture share.

121.    The Casino-Hotel Defendants acted as the "spokes" of this hub-and-spoke conspiracy by engaging in various acts related to the Rainmaker platform, including the following:

a.    They knowingly submitted current non-public pricing and occupancy data to the same Rainmaker platform to which their co-Casino-Hotel Defendants were submitting their respective current non-public pricing and occupancy data;

b. They knowingly received the same type of recommended room rates from the Rainmaker platform that their co-Casino-Hotel Defendants received;

c. They understood that the recommended room rates received from the Rainmaker platform were based on the current non-public pricing and occupancy data they and their co-Hotel-Casio Defendants provided to the Rainmaker platform;

d. They understood that the other co-Casino-Hotel Defendants also knew that the recommended room rates they received from the Rainmaker platform were derived from the same type of current non-public pricing and occupancy data they and their co-Defendants each provided to the Rainmaker platform;

e. They knowingly set their room rates based on the same type of recommended room rates that their co-Casino-Hotel Defendants were received;

f. They understood that their co-Casino-Hotel Defendants also knowingly their room rates based on the same type of recommended room rates that they received;

g. They used real-time data provided by the Rainmaker platform to monitor the room rates offered by each co-Casino-Hotel Defendant; and

h. They understood that their co-Casino-Hotel Defendants used real-time data provided by the Rainmaker platform to  monitor the room rates offered by other co-Casino-Hotel Defendants.

122. The Casino-Hotel Defendants also acted as spokes of this hub-and-spoke conspiracy by engaging in acts that monitored and reinforced the conspiracy, including the following:

    a. They knowingly shared competitively sensitive information, including current room pricing and occupancy data, with each other through their shared use of the Rainmaker pricing algorithm platform, to which they submitted their respective current room rate and occupancy data, and received and monitored their co-defendants' current room rate data from REVCaster, and they each knew that the others were doing the same;

    b. During meetings with Rainmaker and Cendyn, Casino-Hotel Defendants discussed competitively sensitive information such as pricing practices and strategies of other Casino-Hotel Defendants; and

    c. During industry events, Casino-Hotel Defendants discussed with each other competitively sensitive information such as pricing strategies and best practices on revenue management and room rate setting with Rainmaker, Cendyn and other Casino-Hotel Defendants.

123. Conspirators' ability to monitor each other's adherence price-fixing conspiracy is vital to its long-terms viability. The collective use of algorithms simplifies this aspect of a conspiracy. This was recognized by the U.S. antitrust agencies as early as 2010.[57]

---

[57] Terrell McSweeny and Brian O'Dea. The Implications of Algorithmic Pricing for Coordinated Effects Analysis and Price Discrimination Markets in Antitrust Enforcement   ABA Antitrust Magazine (Fall 2017) at
75  https://www.ftc.gov/system/files/documents/public_statements/1286183/mcsweeny_and_odea_-_implications_of_algorithmic_pricing_antitrust_fall_2017_0.pdf.

E. **"Plus Factors" Indicate the Market for Hotel Rooms in the Atlantic City Hotel Market is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel.**

124.    Defendants' actions, coupled with "plus factors" demonstrate concerted action in violation of federal antitrust laws.  Defendants had a motive to enter into a price fixing conspiracy; Defendants acted contrary to their own self-interests; and there is additional evidence supporting the existence of a traditional conspiracy.

i.    **Defendants had a Motive to Conspire.**

125.    The structure of the Atlantic City Casino-Hotel Market, combined with the financial pressures in that market prior to the Class Period, provided Defendants with a motive to conspire in violation of federal antitrust laws.

126.    The Atlantic City Casino-Hotel Market has structural characteristics found in collusive markets: high barriers to entry by competitors; the Market is highly concentrated; the Casino-Hotel Defendants' guest rooms are fungible; and there are no there are no reasonable substitutes for those guest rooms.

127.    **High Entry Barriers.** Prospective entrants to the Atlantic City Casino-Hotel Market face significant barriers. The most prohibitive one is the enormous amount of money and resources it takes to open and maintain such a property.

128.    Entering the casino-hotel market requires a significant amount of capital to acquire suitable real property and construct a casino-hotel with sufficient amenities to compete with existing properties.  For example, MGM Resorts spent $1.1 billion to build Borgata in 2003 and another $400 million to build the Water Club at Borgata in 2008.  It is not much cheaper for a new operator to renovate a dated casino-hotel.  Renovations often cost hundreds of millions of dollars.  Defendant Caesars Entertainment announced in 2022 that it would spend $200 million on property enhancements at Caesars Atlantic City and another $200 million in improvements at

Harrah's Atlantic City and Tropicana Atlantic City. Defendant Hard Rock International spent more than $500 million renovating the Trump Taj Mahal before re-opening as Hard Rock Atlantic City in 2018.

129. There are costs beyond acquiring or building a casino-hotel. New casino operators must pass a rigorous governmental approval process and receive authorization from the NJCCC. "Applicants must establish, among other things, their financial stability, integrity, responsibility, business ability and experience necessary to establish and maintain a successful, efficient casino operation."[58]

130. After the substantial initial outlay of capital, casino-hotels face significant ongoing costs, paying large workforces that operate the facilities and amenities, maintain the property, and paying taxes to local, state, and federal governments.

131. **High Market Concentration.** As previously discussed, the Atlantic City Casino-Hotel Market is highly concentrated, with Casino-Hotel Defendants collectively possessing and controlling a dominant share of the market during the Class Period.

132. The three corporate parent Casino-Hotel Defendants have owned and operated the majority of the casino-hotels in the market, controlling 72%-80% of the guest rooms in the relevant market.

133. **Lack of Reasonable Substitutes.** There are no reasonable substitutes to consumers in the Atlantic City Casino-Hotel Market, thus making the demand for guest rooms in Atlantic City casino-hotels relatively inelastic. "Inelastic demand" means that consumers' buying habits for a product remain relatively unchanged in the face of change to the product's price. Here, casino-hotel

---

[58] 2018 NJCCC Annual Report,
https://www.nj.gov/casinos/about/reports/pdf/2018_ccc_annual_report.pdf.

guests in Atlantic City have limited, if any, low-cost alternatives to renting rooms from Casino-Hotel Defendants or other casino-hotels that offer the on-site amenities and ambiance offered by casino-hotels in Atlantic City. Thus, Casino-Hotel Defendants can increase room prices by a small yet significant amount without losing a meaningful number of guests. Consequently, no reasonable substitutes exist to effectively discipline Casino-Hotel Defendants' conspiracy.

134.   **Product Fungibility.**  Although casino-hotels may offer differing amenities, their guestrooms are relatively substitutable for each other.  Hotel-casino guestrooms are relatively fungible when controlling for key room characteristics across such as size and amenities, the relevant product is relatively fungible. Guests choose to stay at casino-hotels that provide comparable offerings within these general categories, so a person looking for a room with a king-size bed, a large outdoor area for lounging by a pool, a variety of upscale retailers and restaurants can rent that room from any Casino-Hotel property.

135.   In addition to the above-described structural characteristics, Defendants were motivated to conspire as a result of financial pressures.  Casino-Hotel Defendants implemented this anticompetitive scheme after years of hardship in the Atlantic City Casino-Hotel Market and overall tourism industry.  During this time, visitors to Atlantic City casino-hotels sharply decreased, with the city having the second largest drop in gross gaming revenue of all casino markets. According to NJCCC statistics, Atlantic City casino-hotels revenues in 2009 were down 13% from 2008.[59]

---

[59] Donald Wittkowski, *Atlantic City casino revenue off 13 percent in 2009, third straight year of decline*, THE PRESS OF ATLANTIC CITY (Jan. 11, 2010), https://pressofatlanticcity.com/news/breaking/atlantic-city-casino-revenue-off-13-percent-in-2009-third-straight-year-of-decline/article_19f64eaa-fee5-11de-9532-001cc4c002e0.html.

136.    The impact of the Great Recession wreaked havoc on the Atlantic City Casino-Hotel Market.  The Casino-Hotel Defendants suffered a significant loss of guests, resulting in decreased room and gambling revenues.

137.    The end of the Great Recession did not immediately impact the Atlantic City Casino-Hotel Market.  In fact, in 2014, four Atlantic City casino-hotels closed: Revel Atlantic City; Atlantic Club Casino Hotel; Trump Plaza Hotel and Casino; and Showboat Atlantic City.

138.    2015 was not much better.  An operating subsidiary of Caesars Entertainment filed for bankruptcy in 2015.

139.    Atlantic City casino-hotels' collective total revenue remained essentially flat between 2014 and 2017. While 2017 revenue increased very slightly compared to 2016, that was driven by slightly higher gaming revenue, as hotel room revenue took a step back that year.

140.    Atlantic City casino-hotels' financial performance remained essentially flat in 2017: while the market's total gaming revenue and gross profit slightly exceeded its 2016 numbers, room rates and revenues dropped in 2017.

141.    As 2018 approached, Casino-Hotel Defendants had weathered a decade of financial hardship and stem the resulting losses.

        **ii.    The Casino-Hotel Defendants Acted Against Their Own Interests.**

142.    In a competitive Atlantic City Casino-Hotel Market, casino-hotels would not adhere to the Rainmaker platform's pricing recommendations. Rather, they would seek to put "heads on beds" to increase room and gaming revenue.

143.    This did not happen during the Class Period. Instead, room rates increased while occupancy rates either fell or remained stagnant. This type of behavior is clearly against the economic self-interest of each Casino-Hotel Defendant, and makes no sense unless they were

35

engaged in a cartel to fix guestroom prices.  By adhering to the Rainmaker platform's pricing

recommendations, Casino-Hotel Defendants filled fewer guest rooms, received less gaming

revenue, and less revenue overall.

144.    The increase in room rates charged by Casino-Hotel Defendants cannot be

explained by external market conditions, such as rising costs or increased demand.

### F.  There are Additional Indicia of Defendants' Entrance into and Participation in the Conspiracy.

145.    Several sets of additional facts further demonstrate collusion among Defendants:

(a) regular and frequent opportunities for the conspirators to conspire; (b) an exchange of

competitively sensitive information among and between Casino-Hotel Defendants; (c) a radical

change in business practices by the Casino-Hotel Defendants; and finally, (d) the adoption of a

common course of conduct.

146.    **Opportunities to Conspire.** Defendants had numerous and frequent opportunities

to conspire during the Class Period. Rainmaker and Cendyn sponsored events at which their key

employees discussed the use of the Rainmaker platform with employees of the Casino-Hotel

Defendants.  Rainmaker and Cendyn employees had one-on-one meetings with individual

Casino-Hotel Defendants at which they discussed pricing and occupancy strategies and revenue

practices. Finally, Casino-Hotel Defendants' Atlantic City resorts are members of the city's

casino trade association (The Casino Association of New Jersey ("CANJ")), where Casino-Hotel

Defendants could discuss pricing, occupancy and profitability issues in private.

147.    Defendants regularly attended industry events where the benefits of the

Rainmaker platform were discussed. These events include Rainmaker's annual user conference,

G&L Roundtable events, Hospitality Sales and Marketing Association International ("HSMAI")

Revenue Optimization Conferences ("ROC"), INFORMS Business Analytics Conferences, and Business Interactive Trade Alliances and Conferences ("BITAC") Casino Resorts Conferences.

148.    For example, Rainmaker's "OPTIMIZE2016" Summit "convened more than 300 people for three days of substantive sessions addressing the state of the industry and solutions that move beyond revenue management to profit optimization."[60]

149.    Rainmaker hosted annual user conferences and summits which allowed Casino-Hotel Defendants to be "in the room with colleagues and like-minded individuals with varying degrees of revenue management experience and who have similar goals and challenges."  According to Pavan Kapur, Caesars Entertainment's Senior VP of Commercial Operations (and formerly its VP of Revenue Management), a Rainmaker event "was a great experience," and  "[t]he Rainmaker team is a great partner who supports and helps us achieve our goals through the kind of investment and innovation we saw this week,"[61]

150.    G&L's Roundtable event "shapes the gaming and hospitality industry landscape each year by bringing together in one forum the very people who can foster change and innovation as comprised on the G&L Board and their invited Colleagues." This "open and enjoyable two-day forum" allows "industry thought leaders to collaborate, learn, and share best practices while meeting new peers and solidifying old friendships."[62]

---

[60] Press Release, Rainmaker, *Rainmaker's OPTIMIZE2016 User Conference Delivers Insight, Instruction and Impetus to 'Make Revenue Optimization Great Again'* (Mar. 2, 2016). https://www.hotel-online.com/press_releases/release/rainmakers-optimize2016-user-conference-delivers-insight-instruction/.

[61] Press Release, Rainmaker, *GuestREV® Mobile, New GroupREV® Functionality, and Market/Business Intelligence 'Steal Show' at Rainmaker Client Summit* (Mar. 27, 2015), https://www.prweb.com/releases/2015/03/prweb12611855.htm.

[62] Gaming & Leisure, *2023 G&L Roundtable – October 8-9* (2023), https://mygamingandleisure.com/gl-roundtable.

151. Indeed G&L promoted opportunities for its members to interact for the benefit of the industry. "We provide industry leadership and the unique opportunity to solidify industry relationships."[63] G&L recognized the power represented by its members. "The Gaming & Leisure Community is an unparalleled collective of industry thought leaders and this group is the epicenter of the gaming and hospitality industry. In fact, the G&L Community represents a vast majority of gaming and hospitality spend domestically." [64]

152. After Cendyn acquired Rainmaker, its key personnel continued to regularly attended G&L Roundtable events. For example, Senior VP for Commercial-Customer Relationship Management Robert Magliozzi and VP of Enterprise Sales for Gaming and Casinos Angie Dobney attended various G&L Roundtable-sponsored golf outings.

153. Attendees at the G&L Roundtable conference included Casino-Hotel Defendant management personnel with responsibilities related to their companies' implementation and maintenance of the Rainmaker platform, including representatives from Defendants Caesars Entertainment, MGM Resorts, and Hard Rock Atlantic City. After Cendyn acquired Rainmaker, its key personnel regularly attended G&L Roundtable events. For example, Senior VP for Commercial-Customer Relationship Management Robert Magliozzi and VP of Enterprise Sales for Gaming and Casinos Angie Dobney attended various G&L Roundtable-sponsored golf outings.

154. Casino-Hotel Defendants appreciated the opportunity at G&L meetings to share "frank discussions" with their competitors. Hard Rock Atlantic City's Vice President of

---

[63] About Gaming & Leisure - More than just a magazine (mygamingandleisure.com)
[64] Id.

Information Technology Donald Kneisel praised "[w]ho could put a value on a meeting of all the IT leaders in our industry in one place? No politics. Just frank discussions. Sharing thoughts, feelings, and insights. Wow!"[65]  Caesars Entertainment's Senior Vice President of Information Technology Peter Broughton had a similar reaction: "[w]hat other industry can say they gather together such a large percentage of gaming and hospitality management in one room to discuss current issues and solutions, and then allow us to network with all our vendors?"

155.    G&L Board Members also communicate privately during in-person gatherings including those noted above as well as through a "private group for G&L Board Members only" on LinkedIn. G&L CEO Jeannie Caruso "created this private, no cost, easy to navigate group for our Board so that you can communicate freely on questions, best practices, and strategy etc."[66] Caruso told G&L Board Members that this group, "is your private forum to work with peer G&L Board Members to garner insights and collaborate together."[67] During the Class Period, G&L Board Members have included executives from MGM Resorts, Seminal Hard Rock, Caesar's Entertainment, and Hard Rock Casino, Atlantic City.

156.    The annual HSMAI ROC offers Defendants additional opportunities to conspire. "ROC convenes leaders of revenue optimization and pricing . . . who want to learn new ways of thinking about today's challenges, and gain insights into the short- and long-term trends that will impact hotel revenue optimization."[68]

---

[65] Gaming & Leisure, *2023 G&L Roundtable – October 8-9* (Jan. 23, 2022), https://mygamingandleisure.com/gl-roundtable/.
[66] https://www.linkedin.com/groups/12395008/
[67] Id.
[68] HSMAI, *HSMAI ROC* (2019), https://commercial.hsmai.org/schedules/roc/#:~:text=ROC%C2%A0convenes%20leaders,hotel%20revenue%20optimization.

157.    Rainmaker and Cendyn have had prominent sponsorship roles at HSMAI events over the years.  For example, Rainmaker's Tammy Farley and Dan Skodol were regular attendees at HSMAI ROCs.  Skodol led a session at the June 2016 conference and spoke at the June 2019 HSMAI ROC described above.  Both companies were "Platinum Partners" at the 2019 HSMAI ROC.[69]  Following the 2019 acquisition of Rainmaker, Cendyn continued to have a significant and prominent presence along with Casino-Hotel Defendants at the annual HSMAI ROC.

158.    Casino-Hotel Defendants' personnel also have sat on various HSMAI Boards. For example, Caesar Entertainment's Senior VP of Commercial Operations Pavan Kapur and MGM Resorts' Chief Sales Officer and Senior VP Stephanie Glanzer are current HSMAI Americas Board members. MGM Resorts' Executive Director of Revenue Optimization Michael Klein previously sat on HSMAI's Revenue Management Advisory Board.

159.    Finally, each Atlantic City-based Casino-Hotel Defendants is a member of and funds CANJ. CANJ consists of Atlantic City's nine casino-hotels, including each Casino-Defendant, and "is a trade organization that provides a collective voice for the Atlantic City casino industry by facilitating the exchange of information and ideas between our industry, small businesses, Atlantic City stakeholders and the general public."[70]

160.    CANJ's membership elects its President from among the executives of its member casino-hotels. Past Presidents of the group include Hard Rock Atlantic City President Joe Lupo,

---

[69] HSMAI, *HSMAI ROC* (2019), https://commercial.hsmai.org/schedules/roc/#:~:text=ROC%C2%A0convenes%20leaders,hotel%20revenue%20optimization.

[70] The Casino Association of New Jersey, https://casinosnj.org/page/2/about-canj#:~:text=is%20a%20trade%20organization%20that%20provides%20a%20collective%20voice%20for%20the%20Atlantic%20City%20casino%20industry%20by%20facilitating%20the%20exchange%20of%20information%20and%20ideas%20between%20our%20industry%2C%20small%20businesses%2C%20Atlantic%20City%20stakeholders%20and%20the%20general%20public (last visited July 20, 2023).

Caesars Entertainment Regional Presidents Kevin Ortzman and Steve Callender, and Borgata Vice President Joseph Corbo.

161.     CANJ does not make its agendas or meeting minutes public, restricting access to knowledge about its meetings' attendees or discussion topics.  But CANJ's "Media Releases" demonstrate that members regularly discuss issues like revenue trends.  CANJ's January 17, 2023 Media Release "reacted to the December 2022 Division of Gaming Enforcement revenue results report,"[71] and in December 2021, CANJ provided a "statement regarding the November 2021 Gaming Results"[72] that discussed total casino-hotel revenue for that month and compared to the same month from an earlier year.

162.     Casino-Hotel Defendants' membership and control over this organization provides them with additional regular and frequent opportunities to exchange competitively sensitive information and strategies and agree on common courses of anticompetitive conduct behind closed doors.

163.     **Information Exchange.** Cendyn encouraged and enabled Casino-Hotel Defendants to exchange competitively sensitive business information and strategies among themselves through their shared use of the Rainmaker platform and through its communication of

---

[71] Press Release, The Casino Ass'n of NJ, *As 2022 Marks a Year of Rebuilding for Atlantic City, Casinos are Making Significant Investments in Resort City in Year Ahead* (Jan. 17, 2023), https://casinosnj.org/news.show&nid=597#:~:text=reacted%20to%20the%20December%202022 %20Division%20of%20Gaming%20Enforcement%20(DGE)%20gaming%20revenue%20results %20report%2C%20which%20showed%20that%202022%20was%20a%20year%20of%20rebuil ding%20and%20recovery%20for%20the%20Atlantic%20City%20casino%20industry.

[72] Press Release, The Casino Ass'n of NJ, *Casino Association of New Jersey Statement on November 2021 Gaming Results* (Dec. 17, 2021), https://casinosnj.org/news.show&nid=552#:~:text=statement%20regarding%20the%20Novembe r%202021%20Gaming%20Results.

these purported competitors' respective pricing practices and strategies to each other during consulting services between Cendyn and Casino-Hotel Defendants.

164.    Casino-Hotel Defendants submit current non-public pricing and supply data to the Rainmaker platform, which uses this data along with other pieces of information to determine market demand and "recommend" optimal pricing and occupancy rates to each Casino-Hotel Defendant. This conduct constitutes improper information sharing among competitors that does not benefit members of the Class or competition as a whole.

165.    Also, Cendyn also led discussions at industry events involving hotel industry executives and managers, including personnel from Casino-Hotel Defendants, on the best practices for maximizing room revenue and profitability while avoiding price wars, including through use of the Rainmaker pricing algorithm platform.

166.    Cendyn also provided consulting services to Casino-Hotel Defendants in connection with the installation of the Rainmaker platform and on a prospective basis. During these one-on-one private meetings, some of which are discussed above, Cendyn relayed and discussed using the specific Casino-Hotel Defendant information on current best practices and pricing strategies it was observing and promoting in the market. It is reasonable to conclude that Cendyn based its best practices and strategies on the communications its personnel had with Casino-Hotel Defendants.

167.    This information exchange is anticompetitive and has caused Casino-Hotel Defendants' room rates to be artificially high during the Class Period and improved neither competition nor consumer welfare.

168.     **Change in Business Practice.** Historically, Casino-Hotels competed to put "heads on beds" so that their respective Casino-Hotels would derive increased room and gaming revenue, and the Atlantic City Casino-Hotel Market was no exception.

169.     But after the Great Recession, all the Casino-Hotel Defendants completely changed strategies.  By collectively using the Rainmaker pricing algorithm platform to "optimize" each property's occupancy and room rates and make "rate shopping" a futile endeavor, Casino-Hotel Defendants engaged in an anticompetitive cartel that has turned the industry's well-established business model on its head.

170.     In a competitive market, if one casino-hotel sought to charge supracompetitive prices, other casino-hotels would have offered cheaper room rates by cutting rates to increase occupancy rates, especially when they had an inventory of unrented rooms – that is, they would seek to put heads on beds. But this didn't happen when the Casino-Defendants increased their room rates pursuant to Rainmaker's "recommendations."  The most reasonable explanation for this failure to react as rational economic actors and resulting anticompetitive impact on the market is collusion.

171.     **Common Course of Conduct.** Each Casino-Hotel Defendant used the same algorithmic platform developed by Rainmaker to set their occupancy and room rates during the Class Period.

172.     Rainmaker and Cendyn ensured that each Casino-Hotel Defendant knew what each of their erstwhile competitors were doing.  Rainmaker and Cendyn disseminated relevant information through marketing materials and industry publications to Casino-Hotel Defendants and at events attended by key Casino-Hotel Defendant executives. Certain Casino-Hotel Defendants also openly touted their use of the Rainmaker pricing algorithms through customer

testimonials that Rainmaker and Cendyn would then use to market the Rainmaker platform to other casino-hotels.

173.    Casino-Hotel Defendants knew that their shared use of the same pricing algorithm was effective. Each Casino-Hotel Defendant has had access to and reviewed other Casino-Hotel Defendants' financial filings with the NJDGE as well as the NJDGE's monthly and quarterly reports summarizing the data contained in these filings. Similarly, each Casino-Hotel Defendant has had access to and reviewed the NJCCC's annual report on the industry. All these filings and reports contained highly relevant information on individual casino-hotel's room rates, occupancy levels, and revenues. Casino-Hotels used that information to ensure that the conspiracy was effective and that each other Casino-Hotel was adhering to the conspiracy.

### G.  Defendants' Conduct Has No Pro-Competitive Benefits.

174.    Defendants' conspiracy did not benefit competition and did not produce pro-competitive effects in the Atlantic City Casino-Hotel Market.

175.    Defendants' conspiracy did benefit Defendants, however, by causing consumers to pay artificially inflated prices for Casino-Hotel Defendants' rooms.

176.    And if Defendants' conspiracy increased Defendants' operational efficiencies by saving them time, labor costs, and other resources, it has nonetheless made it more difficult and time-consuming for consumers to identify and secure meaningfully competitive rates for comparable rooms offered by their co-conspirators. Thus, any pro-competitive benefits resulting from Defendants' misconduct is outweighed the significant and ongoing anticompetitive effects of that misconduct.

### V.    FRAUDULENT CONCEALMENT AND TOLLING

177.     Plaintiff and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice of Defendants' conspiracy.

178.     The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, sharing non-public data via Rainmaker platform or in-person meetings at trade association meetings, industry events (and elsewhere) and consulting meetings.  The conspiracy was by its nature self-concealing.

179.     The Atlantic City Casino-Hotel Market is not exempt from antitrust regulation. Plaintiff and the other Class members thus reasonably assumed until shortly before the Complaint's filing that this market was behaving in a competitive manner.

180.     The earliest possible date on which Plaintiff and the other Class members arguably could have been placed on inquiry notice of Defendants' collusion would be October 15, 2022, the date of *ProPublica*'s first article discussing landlords' use of RealPage to set rents. The article, focused on a different market and did not mention the parties or anticompetitive practices that are the subject of this lawsuit.  An ordinary person acting reasonably diligently would not have had the time, resources, or specialized training to uncover the misconduct that Plaintiff, through counsel highly experienced in antitrust class action litigation, have alleged in this Complaint.

181.     Throughout the Class Period set forth in this Complaint, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination

and conspiracy from Plaintiff and Class members. Casino-Hotel Defendants did not inform guests that the price paid for hotel rooms was based on a "recommendation" from an algorithm incorporating pricing and occupancy information submitted by used by each Casino-Hotel Defendant, and that each Casino-Hotel Defendant also used the same platform for the same purpose. In fact, Casino-Hotel Defendants give guests the false and misleading impression that they receive the "best" and "lowest" rates and enjoy "competitive pricing" when they book rooms at any of their respective Atlantic City venues. These characterizations can be found on the online booking platforms of Casino-Hotel Defendants such as Caesars Entertainment, Hard Rock Atlantic City, and MGM Resorts.

182.    Although Plaintiff exercised reasonable diligence, such diligence would not have, and did not, reveal the Defendants' conspiracy because Defendants and their co-conspirators used deceptive practices to conceal their combination.

183.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiff and the Class as a result of Defendants' anticompetitive and unlawful conduct. Plaintiff and the other members of the Class were unaware of Defendants' unlawful conduct and did not know they were paying supra-competitive prices for guestrooms at Casino-Hotel properties during the Class Period. For these reasons, Plaintiffs claims are timely under the federal laws identified herein.

## VI.    CLASS ALLEGATIONS

184.    Plaintiff brings this action on behalf of himself, as representative of the class defined below, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> All persons who have directly purchased a guestroom for rent in
> Atlantic City, New Jersey, from one or more Casino-Hotel
> Defendants or co-conspirator casino-hotels, or from a division,
> subsidiary, predecessor, agent, or affiliate of such entity, from no

later than June 28, 2018, until Defendants' unlawful conduct and
its anticompetitive effects stop. Excluded from the class are federal
and state governmental entities and judicial officers presiding over
this case.

185.    The Class is so numerous that joinder of all members in this action is

impracticable. There are tens if not hundreds of thousands of geographically dispersed Class

members.

186.    The Class members, moreover, can be readily identified and notified in an

administratively feasible manner using, among other information, the electronic transactional

records of Casino-Hotel Defendants.

187.    Plaintiff's claims are typical of those of the Class. Plaintiff and all members of the

Class allege that Defendants' alleged misconduct violates Section 1 of the Sherman Act. Plaintiff

and all Class members also allege and will show that they were injured by the same

anticompetitive and unlawful conduct that resulted in them paying more for hotel rooms in the

Atlantic City Casino-Hotel market than they otherwise would have paid in the absence of their

collusive conduct.

188.    Plaintiff fairly and adequately will protect and represent the interests of Class

members. The interests of Plaintiff and Plaintiff's counsel are fully aligned with, and not

antagonistic to, the interests of the Class members. Plaintiff is willing and able to assume the duties

of a class representative to protect the interests of all Class members. In addition, Plaintiff's counsel

have significant experience successfully prosecuting complex antitrust class actions and possesses

the necessary resources to vigorously litigate the case on behalf of the Class.

189.    There are multiple questions of law and fact that are common to the Class,

including:

     a.      Whether Defendants entered into a formal or informal agreement, combination, conspiracy, or common understanding in which Casino-Hotel Defendants artificially raised prices for or artificially suppressed the supply of hotel rooms in the Atlantic City Casino-Hotel Market;

     b.      Whether Defendants' alleged misconduct constitutes a *per se* violation of Section 1 of the Sherman Act;

     c.      Whether Defendants' alleged misconduct, in the alternative, constitutes a violation of Section 1 of the Sherman Act pursuant to a quick look analysis or a rule of reason analysis;

     d.      Whether Defendants' alleged misconduct in fact caused Class members to pay artificially high hotel room prices to Casino-Hotel Defendants in the Atlantic City Casino-Hotel Market;

     e.      The proper measure of Class-wide damages;

     f.      The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendants' alleged conduct going forward; and

     g.      Whether Defendants fraudulently concealed the existence of the alleged conspiracy such that the statute of limitations is tolled.

190.    Questions of law and fact common to the members of the Class will predominate over any individualized questions of law or fact. Defendants have acted and refused to act on grounds generally applicable to the Class.

191.    In cases like this one that allege price-fixing among competitors, including those with a hub-and-spoke component, the common question of law and fact regarding the existence

of the alleged conspiracy by itself has been held to predominate over any possible individualized issues, thus warranting certification. The same holds true here.

192.    Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow the scores of Class members to prosecute their common claims, and for Defendants to defend themselves against these claims, in front of a single court simultaneously and efficiently before ultimately reaching resolution without unnecessary duplication of effort and expense that separate actions would present. The benefits of proceeding with this procedural mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## VII.    CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### FOR AGREEMENT IN RESTRAINT OF TRADE 15 U.S.C. § 1

193.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

194.    Beginning at least as early as June 28, 2018, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

195.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants for Casino-Hotel Defendants to knowingly and collectively use the Rainmaker pricing algorithm platform and engage in other related types of reinforcing conduct to fix, stabilize, and artificially increase the price of rooms rented directly to guests.

196.     This conspiracy caused Plaintiff and the other Class members to pay artificially inflated prices directly to Casino-Hotel Defendants and their co-conspirators for room rentals in the Atlantic City Casino-Hotel Market during the Class Period.

197.     The contract, combination, or conspiracy alleged herein is a hub-and-spoke conspiracy in which Rainmaker, and later Cendyn, served as the hub and the individual Casino-Hotel Defendants served as spokes.

198.     In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including the acts discussed above and those that follow:

> a.     Casino-Hotel Defendants provided current internal pricing and supply data to a single third-party (first Rainmaker and then Cendyn) for use in the Rainmaker pricing algorithm platform;
>
> b.     Rainmaker, and later Cendyn, sold and operated the Rainmaker pricing algorithm platform that provided room pricing recommendations to Casino-Hotel Defendants;
>
> c.     Casino-Hotel Defendants knowingly used the same pricing algorithm platform that incorporated pricing and supply data from other Casino-Hotel Defendants in recommending optimal room rates for each Casino-Hotel Defendant to charge guests;
>
> d.     Casino-Hotel Defendants priced their rooms pursuant to the optimal rates the Rainmaker pricing algorithm platform recommended;

      e.      Defendants exchanged competitively sensitive pricing and supply information with each other, including through use of the Rainmaker pricing algorithm platform; and

      f.      Defendants engaged in various forms and methods of bilateral and multilateral communication across various settings and venues concerning room pricing, supply and revenue, including their use of the Rainmaker pricing algorithm platform to set and monitor room rates, that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

199.     Casino-Hotel Defendants possess market power in the relevant antitrust market: the Atlantic City Casino-Hotel Market. The relevant product market is the market for the rental of guest rooms in casino-hotels, and the relevant geographic market is Atlantic City, New Jersey.

200.     Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of supra-competitive prices Plaintiff and the other Class members have paid directly to Casino-Hotel Defendants for room rentals in the Atlantic City Casino-Hotel Market.

201.     As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for hotel rooms than they would have paid in the absence of the conspiracy.

202.     Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act. In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Act under either a quick look or rule of reason analysis.

203.    There are no procompetitive justifications for Defendants' conspiracy, and any proffered procompetitive justifications could have been achieved through less restrictive means.

204.    Plaintiff seeks monetary and injunctive relief on behalf of himself and all other members of the Class under Section 4 of the Clayton Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and a Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B.    The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate of Section 1 of the Sherman Act;

C.    Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled under applicable law;

D.    Defendants, their affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained

from continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.   Plaintiff and the members of the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law;

F.   Plaintiff and the members of the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law; and Plaintiff and the members of the Class be awarded any other relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

Dated: August 21, 2023

SCHNADER HARRISON SEGAL & LEWIS LLP

/s/*Lisa J. Rodriguez*

Lisa J. Rodriguez
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ  08002
Telephone: 856-482-5222
Fax: 856-482-5754
LRodriguez@schnader.com

SCHNADER HARRISON SEGAL & LEWIS LLP
Ira Richards (pro hac vice to be filed)
1600 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:  215-751-2503
irichards@schnader.com

53

REINHARDT WENDORF &
BLANCHFIELD
Garrett D. Blanchfield (#209855) (pro hac
vice to be filed)
Brant D. Penney (#316878) (pro hac vice to
be filed)
332 Minnesota Street, Suite W1050
St. Paul, MN 55101
Telephone: (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penny@rbwlawfirm.com

DILWORTH PAXSON LLP
Catherine Pratsinakis (pro hac vice to be
filed)
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215)575-7013
Fax: (215) 575-7200
cpratsinakis@dilworthlaw.com

***Counsel for Plaintiff and
the Proposed Class***