# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KAREN CORNISH-ADEBIYI, *et al.*, individually and on behalf of all others similarly situated, | No.: 1:23-cv-02536-KMW-EAP |
| Plaintiffs, | |
| v. | |
| CAESARS ENTERTAINMENT, INC., *et al.*, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Christopher J. Cormier (*pro hac vice*)
Spencer Cox (*pro hac vice*)
Matt Strauser (*pro hac vice* forthcoming)
**BURNS CHAREST LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
Telephone: (202) 577-3977

Vineet Bhatia (*pro hac vice*)
Shawn L. Raymond (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366

*Proposed Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

Joseph J. DePalma
Mindee J. Reuben
Catherine B. Derenze
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000

*Proposed Liaison Counsel for Plaintiffs and the Proposed Class*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................1
FACTUAL ALLEGATIONS ..............................................................7
LEGAL STANDARD .......................................................................11
ARGUMENT.....................................................................................12
I.      Plaintiffs Plead Defendants Engaged in an
        Anticompetitive Conspiracy. ...............................................12

        A. Plaintiffs Plausibly Allege An Anticompetitive
           Agreement. ......................................................................12

           1. Plaintiffs Plead Direct Evidence of a Conspiracy....................12

           2. Plaintiffs Plead Circumstantial Evidence of a
              Conspiracy. .................................................................15

              a.    Defendants Engaged in Parallel Conduct...........................15

              b.    Plaintiffs Allege Multiple "Plus Factors."..........................23

              c.    Defendants' scheme bears common conspiracy
                    hallmarks. .............................................................32

        B. Plaintiffs Plausibly Allege an Unreasonable Restraint
           of Trade. .........................................................................33

           1. Defendants' Conspiracy Is *Per Se* Illegal. ................................34

           2. Defendants' Conspiracy Is Anticompetitive Under
              the Rule of Reason. ....................................................36

        C. Plaintiffs Plead All Parent and Affiliate Defendants'
           Involvement.....................................................................37

II.     Plaintiffs' Claims Are Equitably Tolled. ........................................38

CONCLUSION..................................................................................40

986675.1

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010) ...................................................................................19

*Arizona v. Maricopa Cnty. Med. Soc'y*,
   457 U.S. 332 (1982) ............................................................................ 34, 35

*Atallah Group US Inc. v GMA Accessories, Inc.*,
   2023 WL 5803417 (S.D.N.Y. Sep. 7, 2023) ......................................37

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................. 11, 12, 15

*Brader v. Allegheny Gen. Hosp.*,
   64 F.3d 869 (3d Cir. 1995) .........................................................34

*Buck v. Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006) .........................................................30

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) .................................................... 16, 17

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988) .........................................................34

*City of Philadelphia v. Bank of Am. Corp.*,
   498 F. Supp. 3d 516 (S.D.N.Y. 2020) ........................................ 21, 29

*Concord Associates, L.P. v. Entertainment Properties Trust*,
   817 F.3d 46 (2d Cir. 2016) .........................................................25

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ............................................................ 11, 15

*CSR Ltd. v. Fed. Ins. Co.*,
   40 F. Supp. 2d 559 (D.N.J. 1998) .......................................................34

*Doe v. Princeton Univ.*,
   30 F.4th 335 (3d Cir. 2022) .........................................................11

*Fed. Trade Comm'n v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986) ............................................................ 29, 36

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) .........................................................36

*Gibson v. MGM Resorts Int'l,*
2023 WL 7025996 (D. Nev. Oct. 24, 2023) ........................................................3

*Graco Inc. v. PMC Global, Inc.,*
2012 WL 762448 (D.N.J. Mar. 6, 2012) ............................................................36

*Haas v. Pittsburgh Nat'l Bank,*
526 F.2d 1083 (3d Cir. 1975) ..........................................................................40

*In re Aetna UCR Litig.,*
2015 WL 3970168 (D.N.J. June 30, 2015) ........................................................33

*In re Aftermarket Filters Antitrust Litig.,*
2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) .......................................................20

*In re Automotive Parts Antitrust Litig.,*
2014 WL 1746579 (E.D. Mich. Apr. 30, 2014) ..................................................32

*In re Baby Food Antitrust Litig.,*
166 F.3d 112 (3d Cir. 1999) ............................................................................13

*In re Blood Reagents Antitrust Litig.,*
756 F. Supp. 2d 623 (E.D. Pa. 2010) ........................................................... 19, 20

*In re Broiler Chicken Antitrust Litig.,*
290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................................................31

*In re Chocolate Confectionary Antitrust Litig.,*
999 F. Supp. 2d 777 (E.D. Pa. 2014) ................................................................22

*In re Disposable Contact Lens Antitrust Litig.,*
215 F. Supp. 3d 1272 (N.D. Fla. 2016) .............................................................26

*In re Domestic Airline Travel Antitrust Litig.,*
221 F. Supp. 3d 46 (D.D.C. 2106) ............................................................. 13, 31

*In re Domestic Drywall Antitrust Litig.,*
2016 WL 3453147 (E.D. Pa. June 2, 2016) .......................................................26

*In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.,*
2013 WL 812143 (D.N.J. Mar. 5, 2013) ...................................................... 24, 25

*In re Flat Glass Antitrust Litig.,*
385 F.3d 350 (3d Cir. 2004) ...................................................... 18, 22, 23, 35

*In re Foreign Exchange Benchmark Rates Antitrust Litigation,*
74 F. Supp. 3d 581 (S.D.N.Y. 2015) .......................................................... 13, 31

iv

*In re Generic Pharmaceuticals Pricing Antitrust Litig.*,
    338 F. Supp. 3d 404 (E.D. Pa. 2018).................................................................27

*In re GSE Bonds Antitrust Litig.*,
    396 F. Supp. 3d 354 (S.D.N.Y. 2019)................................................................22

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002)...............................................................................18

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010).......................................................................... passim

*In re Magnesium Oxide Antitrust Litig.*,
    2012 WL 1150123 (D.N.J. Apr. 5, 2012)............................................................39

*In re Mercedes-Benz Anti-Trust Litig.*,
    157 F. Supp. 2d 355 (D.N.J. 2001)................................................................ 38, 39

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    42 F. Supp. 3d 231 (D. Mass. 2014)....................................................................17

*In re Processed Egg Prods. Antitrust Litig.*,
    2019 WL 5656101 (E.D. Pa. Oct. 31, 2019).............................................. passim

*In re RealPage, Inc., Rental Software Antitrust Litigation*,
    2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023)......................................... passim

*In re Sulfuric Acid Antitrust Litig.*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010)...................................................................14

*In re Travel Agent Commission Antitrust Litigation*,
    583 F.3d 896 (6th Cir. 2009)...............................................................................17

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939) ........................................................................... 12, 16, 26

*Lifewatch Servs. Inc. v. Highmark Inc.*,
    902 F.3d 323 (3d Cir. 2018)......................................................................... 23, 37

*Meyer v. Kalanick*,
    174 F. Supp. 3d 817 (S.D.N.Y. 2016).................................................................35

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ..................................................................................... 33, 37

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
    998 F.2d 1224 (3d Cir. 1993)..............................................................................23

v

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ................................................................ 11, 40

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) .................................................................24

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) .................................................................38

*Schultz v. Midland Credit Mgmt., Inc.*,
2019 WL 2083302 (D.N.J. May 13, 2019) .........................................40

*Standard Iron Works v. Arcelor Mittal*,
639 F. Supp. 2d 877 (N.D. Ill. 2009)...................................................24

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) .................................................................24

*Toys "R" Us v. Fed. Trade Comm'n*,
221 F.3d 928 (7th Cir. 2000) ...............................................................29

*United States v. Apple*,
791 F.3d 290 (2d Cir. 2015) .................................................................35

*United States v. Masonite Corp.*,
316 U.S. 265 (1942) .............................................................................16

*United States v. MMR Corp. (LA)*,
907 F.2d 489 (5th Cir. 1990) ...............................................................35

*United States v. Socony-Vacuum Oil Co., Inc.*,
310 U.S. 150 (1940) ................................................................ 14, 34, 36

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
873 F.3d 185 (3d Cir. 2017) .............................................................7, 12

*William Goldman Theaters v. Loew's, Inc.*,
150 F.2d 738 (3d Cir. 1945) .................................................................17

**Other Authorities**

Lina Khan, https://www.twitter.com/linakhanFTC/status/176336763273627 (Mar. 1, 2024)....................................................................................................2

Maureen Ohlhausen, *Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, Fed. Trade Comm'n (May 23, 2017) ...................2

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 305 (5th ed. Supp. 2022)...................................................................................................34

986675.1

# INTRODUCTION

Plaintiffs' Consolidated Amended Complaint ("CAC") pleads that Defendants have engaged in a horizontal "hub-and-spoke" price-fixing conspiracy to charge supra-competitive prices for Atlantic City casino-hotel rooms. The CAC details how Casino-Hotel Defendants,[1] with the coordination of Rainmaker, knowingly use the same pricing algorithm platform—which analyzes confidential pricing and supply data they each provide—to generate supra-competitive rates that they overwhelmingly adopt. The scheme's efficacy lies in its efficiency: Casino-Hotel Defendants need not directly coordinate on any given rates because the platform, acting as their shared pricing brain, does all the hard work for them.

The 126-page CAC alleges well-pled facts that, when considered collectively and in the light most favorable to Plaintiffs, set forth sufficient direct and circumstantial evidence of collusion. This should come as no surprise. While the AI-driven technology at issue may be fairly novel, the underlying conduct is not.

Courts and regulators have concluded that Defendants' scheme violates antitrust law. In *In re RealPage, Inc., Rental Software Antitrust Litigation*, 2023 WL

---

[1] "Casino-Hotel Defendants" are Defendants Caesars Entertainment, MGM Resorts, Hard Rock International, and Seminole Hard Rock Support Services, and their respective Atlantic City casino-hotels, Caesars, Harrah's, Tropicana, Bally's, Borgata, and Hard Rock. "Rainmaker" refers to Defendant Cendyn Group and its predecessor The Rainmaker Group. CAC ¶ 1 n.2.

9004806, at *15 (M.D. Tenn. Dec. 28, 2023), the court upheld a complaint based on similar allegations of competitor submissions of confidential commercial information and delegation of pricing authority to another algorithm that Rainmaker developed. The DOJ considers such "joint delegation of pricing recommendations to a common algorithm" "*per se* unlawful." *See* DePalma Decl., Ex. 1 at 15; Ex. 2 at 6. The FTC agrees; the current Chair states that "price fixing through an algorithm is still price fixing," and a former Chair noted that "collect[ing] confidential price strategy information from all the participants in a market, and then tell[ing] everybody how they should price," whether from "a guy named Bob" or "an algorithm," is "familiar territory" called a "hub-and-spoke conspiracy."[2]

Confronted with these hard truths, Defendants resort to mischaracterizing or ignoring the many facts that do not fit their self-serving narrative. For example:

- Defendants argue that *RealPage* is "irrelevant" because Plaintiffs do not allege the platform "inputs a melting pot of confidential competitor information" and "spits out price recommendations based on that private competitor data." Mot. at 27 (quoting *RealPage*, 2023 WL 9004806, at *17). But this is <u>precisely</u> what Plaintiffs allege. CAC ¶¶ 6, 9, 22, 136, 139, 220-21, 224-27, 252, 358, 402.

- Defendants assert that Plaintiffs do not allege the platform receives or uses Casino-Hotel Defendants' confidential data. Mot. at 4-5, 24-27. But the CAC

---

[2] Lina Khan, https://www.twitter.com/linakhanFTC/status/176336763273627 (Mar. 1, 2024); Maureen Ohlhausen, *Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, Fed. Trade Comm'n (May 23, 2017).

expressly says otherwise, and no fair reading it suggests the platform uses only public data. CAC ¶¶ 122, 132, 140, 143, 147, 156, 159, 163, 166.[3]

- Defendants claim that Plaintiffs' allegations suggest Casino-Hotel Defendants "purportedly" use the platform for non-price purposes. Mot. at 8-9. But the CAC alleges that they all used the "indispensable" GuestREV and GroupREV products to "implement pricing decisions" and "optimize[] revenue." The CAC also pleads that these Defendants consulted with Rainmaker to "fine-tun[e]" their "revenue management program[s]" to "meet the latest price optimization business challenges." CAC ¶¶ 140, 179, 185, 187, 216-19.

- Defendants challenge Plaintiffs' market definition based on allegations supposedly indicating Casino-Hotel Defendants compete with traditional hotels in Atlantic City, casino-hotels elsewhere, and Online Travel Agencies. Mot. at 7-8, 28-29. But the CAC simply does not allege any of things, as a cursory review of the cited paragraphs confirms. CAC ¶¶ 82, 105 n.3.

Defendants commit these and other missteps in asserting the CAC suffers the same deficiencies that caused dismissal in *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996 (D. Nev. Oct. 24, 2023). Mot. at 1-3. But Defendants fail to note that the court dismissed that complaint without prejudice and that the plaintiffs have filed an amended complaint. Defendants also fail to critically compare the relevant allegations from the initial 27-page *Gibson* complaint with those in the CAC and the sustained *RealPage* complaint. Plaintiffs welcome the opportunity to do so:

---

[3] Plaintiffs concede that they mistakenly misquoted one CAC quote. *See* Mot. at 26 (citing CAC ¶ 160). While this quote's source does not state that an older version of REVCaster, one of the Rainmaker platform products, collected participants' non-public data, various other factual allegations in the CAC allege that the Rainmaker platform products, including GuestREV and GroupREV, do.

| *Gibson* Complaint (Dismissed) | *RealPage* Complaint (Sustained) | Plaintiffs' CAC |
|---|---|---|
| INFORMATION SHARING | | |
| "Plaintiffs **never quite allege**… Hotel Operators get nonpublic information from other Hotel Operators by virtue of using insufficiently specified algorithmic pricing software."<br><br>2023 WL 7025996, at *4. | "RealPage's revenue management software inputs a **melting pot of confidential competitor information** through its algorithm and spits out price recommendations **based on that private competitor data**."<br><br>"This **critical difference** between the *Gibson* complaint and the [RealPage] Complaint <u>destroys</u> the analogy."<br><br>2023 WL 9004806, at *17. | "**[E]ach casino-hotel provides its current, non-public room pricing and occupancy data to the Rainmaker platform on a continuous basis.**"<br><br>"[T]he algorithm continuously processes and analyzes **this non-public, real-time information**, along with the same type of **non-public, real-time data**…participating competitors also submit to the platform" and "**uses this information to generate 'optimal' room rates**."<br><br>CAC ¶¶ 6, 22, 358, 402. |
| PRICE ACCEPTANCE & ENFORCEMENT | | |
| *Unclear* how often recommendations accepted; only general 90% rate alleged. | Recommendations accepted **80-90%** of the time. | Recommendations accepted "**nearly all of the time**":<br>• GuestRev has "90% acceptance rate;" |

| | | |
|---|---|---|
| | | • GuestRev enables "pricing optimization" "with little need for human judgment" and "gives clients confidence to rely on "the unwavering accuracy of our algorithms…to provide precision pricing;"<br>• Price and supply data show parallel and supra-competitive movement by Casino-Hotel Defendants during class period. |
| 2023 WL 7025996, at *3. | 2023 WL 9004806, at *2. | CAC ¶¶ 15-16, 142, 150, 171, 205, 234-253. |
| *No enforcement tools alleged.* | **Enforcement tools** ensuring price recommendations accepted:<br>• Pricing advisors;<br>• Automatic compliance reports;<br>• Requiring justifications for price overrides;<br>• Quarterly performance-to-market meetings.<br><br>2023 WL 9004806, at *3-4. | **Enforcement tools** ensuring price recommendations accepted:<br><br>• Client liaison personnel;<br>• Automatic compliance reports;<br>• "Action index" scores showing lost revenue from any price overrides;<br>• Manual override permission for use only in "times of need and extreme circumstances."<br><br>CAC ¶¶ 138-39, 229. |

| CONSPIRACY PROFILE | | |
|---|---|---|
| Market share of **35-40%**<br><br>Am. Compl. ¶ 350. | Market share **below 30%**<br><br>2023 WL 9004806, at *28. | Market share of **72-80%**<br><br>CAC ¶ 304. |
| The Complaint "***does not say who*** entered into the purported agreement to use the same pricing algorithms ***beyond 'Hotel Operators.'***"<br><br>2023 WL 7025996, at *3-4. | **Detailed allegations** of RMS **Client Defendants** who used RealPage algorithm to fix prices.<br><br>2023 WL 9004806, at *9-11. | **Detailed allegations** identifying **Casino-Hotel Defendan**ts who used **specific** Rainmaker products to fix prices, and identifying **numerous specific employees** of **each Defendant** involved in scheme.<br><br>CAC ¶¶ 36–64, 229. |
| "Plaintiffs…***do not know*** when the purported conspiracy began" or when most Hotel Operators began using "any software that includes pricing algorithms."<br><br>2023 WL 7025996, at *4. | **Specific allegations** of class period from 2016 to 2023.<br><br>2023 WL 9004806, at *14. | **Specific allegations** of class period from June 28, 2018, to the present, along with detailed factual explanation for why period started then.<br><br>CAC ¶¶ 10, 230, 264-67, 303-04. |
| OPPORTUNITIES TO COLLUDE | | |

| **One paragraph** of general allegations of opportunities to collude. | **5 pages** of allegations relating to "motive, opportunities, and invitations to collude." | **13 pages** of allegations showing opportunities to collude, including Defendants' **communications** about Rainmaker pricing strategy, **bilateral meetings** between Rainmaker and Casino-Hotel Defendants, and **private forum** for pricing "collaboration." |
|---|---|---|
| Compl. ¶ 74. | Compl. ¶¶ 381–91. | CAC ¶¶ 318-356. |

The CAC, like the *RealPage* complaint, satisfies each concern raised in *Gibson*. It pleads Defendants' participation in "concerted action" long deemed a "threat to the central nervous system of the economy," *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017), and should be sustained.

## FACTUAL ALLEGATIONS

<u>The Backdrop</u>: The Great Recession hit Atlantic City hard. Its casino-hotels suffered a downturn in visitors and revenue for a decade, with multiple properties closing or declaring bankruptcy during this period. CAC ¶¶ 295-302. By Summer 2018, the casino-hotels were desperate for a change in fortune, and economic conditions were right for the Rainmaker platform, which all Casino-Hotel Defendants were now using, to generate supra-competitive prices. *Id*. ¶¶ 303-05.

The Conspiracy: The Rainmaker Group was founded to offer "profit optimization solutions for the Gaming & Hospitality and Multifamily Housing industries." *Id.* ¶ 113. The "solutions" were "pricing algorithm platforms." In the Multifamily Housing industry, it developed and sold a pricing algorithm to apartment owners that RealPage acquired in 2017—software which is the subject of substantially similar private antitrust claims and a DOJ investigation. *Id.* ¶¶ 364-72. In the Gaming & Hospitality industry, it developed and sold a pricing algorithm suite to casino-hotels which Cendyn acquired in 2019 and still operates. *Id.* ¶¶ 120-26.

The pricing algorithm platform that Rainmaker (the hub) operates works by receiving confidential, real-time price and occupancy data each Casino-Hotel Defendant (the spokes) feeds into the platform, analyzing that and other types of market data, and generating "optimal" room rates that each Casino-Hotel Defendant adopts "nearly all of the time," as shown by Defendants' statements, the platform's design and functionality, and actual pricing data. *Id.* ¶¶ 6, 15, 22, 136-39, 142, 174, 358, 402. Casino-Hotel Defendants knowingly provide their own sensitive data and delegate their pricing strategies to a common third-party because they know that the others, who collectively have market power over pricing, do the same thing. *Id.* ¶¶ 3, 13, 17, 204, 206, 223-28, 291, 304. Three Rainmaker products are at issue.

GuestREV, its flagship product, is "integrated directly into a casino-hotel's property management system" to "forecast and recommend the 'optimal' rates to charge guests 'in real time' on a guest-by-guest and day-by-day basis." *Id*. ¶ 137. "[T]he output pricing recommendations generated by the GuestREV algorithm," "up to 12%" higher than ordinary, "are directly and automatically uploaded into the casino-hotel's system" and can run "largely on autopilot." *Id*. ¶¶ 141, 150. GuestREV accomplishes this because it constantly collects "competitively sensitive information, including real-time room pricing and occupancy data," directly from Casino-Hotel Defendants. *Id*. ¶¶ 136, 227. It's no different than Rainmaker walking through the front door of Casino-Hotel Defendants' properties, accessing their proprietary computer system, *installing a cable into it that continuously extracts the data*, and analyzing this and other data to generate price outputs for their use.

To ensure its price outputs are accepted by Casino-Hotel Defendants, GuestREV includes multiple layers of enforcement. It generates "recommendation process summary reports" and "recommendation reports" monitoring all pricing actions and tracking whether its recommendations were "automatically approved," creates "action index" scores demonstrating the "revenue impact of the difference between [a user's] current control setting and recommended settings," and requires users to "specifically override the GuestREV pricing recommendations if they do

not want to use them." *Id.* ¶¶ 138-39. As Rainmaker explains, "overrid[ing] a pricing recommendation" can only be done manually "[i]n times of need and extreme circumstances" by a client's revenue manager who has "override permissions." *Id.*

GroupREV works similarly to GuestRev but for larger groups, "like blocks of individuals attending conferences, conventions, and trade shows." *Id.* ¶¶ 151-58. It "improve[s] Group Room Revenue by up to 8.4% or more." *Id.* ¶ 158.

REVCaster, the last addition to the platform, is a "price comparison tool" that "monitors rate parity" and "solves for competitive rate shopping." *Id.* ¶¶ 159, 163.

Defendants furthered the conspiracy by communicating on pricing and supply, often expressly in the context of the Rainmaker platform, during specific multi-Defendant industry events and bilateral meetings between Rainmaker and individual Casino-Hotel Defendants. *Id.* ¶¶ 318-56.

The Result: Defendants' plan worked. Public data shows that Casino-Hotel Defendants charged higher rates during the class period than before while their occupancy levels dropped. *Id.* ¶¶ 245-51. This data also shows that their room rates and occupancy levels moved in parallel to each other, but not to the non-conspirator properties (which moved dissimilarly from one another). *Id.* Although economic principles should have compelled Casino-Hotel Defendants to drop rates to compete for more guests and thus raise occupancy rates, this did not happen. *Id.* ¶ 250.

Defendants' scheme has caused Plaintiffs and class members to pay artificially inflated prices for rooms in the Atlantic City Casino-Hotel Market. *Id.* ¶¶ 243–53.

## LEGAL STANDARD

An antitrust complaint, like any other, simply must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314, 326 (3d Cir. 2010).

In doing so, courts should bear in mind that no heightened pleading standard applies in antitrust cases, *Twombly*, 550 U.S. at 556-57,[4] that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole," *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), and that it is generally improper to consider extraneous materials that are neither "integral to [n]or explicitly relied upon" in the complaint, *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022).

---

[4] "[T]he standard[] applicable to Rule 12(b)(6) remain[s] distinct," *Ins. Brokerage*, 618 F.3d at 323 n.21, and *Matsushita*'s "tends to exclude the possibility" standard does not apply at this stage. *Twombly*, 550 U.S. at 556-57.

986675.1

# ARGUMENT

## I.    Plaintiffs Plead Defendants Engaged in an Anticompetitive Conspiracy.

A claim under Section 1 of the Sherman Act requires (1) the existence of an agreement (2) that unreasonably restrains trade. *Valspar*, 873 F.3d at 191. On the first element, a plaintiff must allege "an agreement, tacit or express." *Twombly*, 550 U.S. at 553; *Valspar*, 873 F.3d at 191. On the second, some restraints "are reviewed for reasonableness" while "others have no possible competitive virtue" and thus are *per se* illegal. *Valspar*, 873 F.3d at 191. Among the latter category is "price fixing among competitors." *Id*. The CAC pleads a *per se* unlawful price-fixing agreement and an agreement unlawful under the rule of reason.

### A. Plaintiffs Plausibly Allege An Anticompetitive Agreement.

The CAC pleads "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Ins. Brokerage*, 618 F.3d at 331 ("an actionable horizontal conspiracy does not require direct communication among the competitors"); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939). Plaintiffs allege direct and circumstantial evidence of Defendants' arrangement.

### 1. Plaintiffs Plead Direct Evidence of a Conspiracy.

"Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate," *Ins. Brokerage*, 618 F.3d at 323, and reveal a "conspiracy with no further extrapolation." *In re Processed Egg Prods. Antitrust Litig.*, 2019 WL

5656101, at *5 (E.D. Pa. Oct. 31, 2019); *see In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) ("reciprocal exchange of price information pursuant to an agreement" deemed direct evidence). In one instructive case, *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015), the alleged use of chat rooms to share "market-sensitive information," including "price information," constituted direct evidence of collusion. *Id.* at 591.

Similarly, the CAC alleges facts supporting Defendants' knowing use of the same Rainmaker software to collect and utilize their sensitive price information to generate supra-competitive rates that they overwhelmingly adopted. Rainmaker executives exhorted clients like Casino-Hotel Defendants to adhere to the algorithm's pricing recommendations, using buzzwords that other courts hold constitute direct allegations of price-fixing. *See In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 66-67 (D.D.C. 2106) (ruling defendants' advocacy of exercising "capacity discipline" constituted direct evidence).

For example, in May 2018, Rainmaker's Dan Skodol emphasized that clients' "revenue managers must recognize the ultimate goal is not chasing after occupancy growth, but instead maximizing profits across all revenue streams," "best achieved through optimal pricing strategies" like Rainmaker's. CAC ¶ 173. And in May 2020, he touted the Rainmaker pricing algorithm tools in demanding "hotels avoid the

infamous 'race to the bottom' when competition inevitably becomes fierce within a market." *Id.* Elsewhere, the CAC alleges Rainmaker statements discussing the unique data-sharing opportunities it provided to clients that allowed Casino-Hotel Defendants to "drive higher returns" and optimize profits by not "pricing too far below competitors[.]" *Id.* ¶¶ 122-24, 132, 146. These facts "evidence a commonly held agreement between co-conspirators." *Processed Egg*, 2019 WL 5656101, at *5.

That Skodol's 2020 statement was made during the pandemic, Mot. at 15, does not make it ok because "an unforgiving market offers no excuse for violating antitrust laws." *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 870 (N.D. Ill. 2010); *see United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 221 (1940) (Sherman Act does "not permit[] the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies"). Defendants' claim that the Rainmaker statements are merely "one way" communications, Mot. at 15, also fails because the CAC alleges facts showing Casino-Hotel Defendants accepted Rainmaker's anticompetitive invitation through words and deeds. CAC ¶¶ 185, 243-53. These and other facts expressly allege that each Casino-Hotel Defendant supplies its confidential data to Rainmaker and receives optimal price recommendations based on this and *other* Casino-Hotel Defendants' data in return in order to charge supra-competitive prices. *Id.* ¶¶ 6, 22, 358, 402. This makes perfect sense, as the

scheme is a classic hub-and-spoke arrangement that inherently relies on effective two-way communication and benefit, and the CAC directly alleges facts evincing this common understanding.

### 2. Plaintiffs Plead Circumstantial Evidence of a Conspiracy.

The CAC also alleges circumstantial evidence by pleading parallel conduct and multiple "plus factors" that, when considered "holistically," allows the reasonable inference of coordination. *Twombly*, 50 U.S. at 553, 557; *see Cont'l Ore Co.*, 370 U.S. at 698-99; *RealPage*, 2023 WL 9004806, at *15.

#### a. *Defendants Engaged in Parallel Conduct.*

Standing alone, Casino-Hotel Defendants' knowing use and implementation of a shared pricing strategy through the Rainmaker pricing algorithm plausibly alleges parallel conduct. *See RealPage*, 2023 WL 9004806, at *11-13. Defendants' resulting parallel movement of pricing and occupancy, CAC ¶ 245–50, further underscores this parallelism. In arguing that Plaintiffs do not plead parallel conduct, Defendants distort the governing law and alleged facts.

Conspirator Conduct Need Not Be Simultaneous. Defendants wrongly claim that Plaintiffs must allege simultaneous conduct to plead a horizontal conspiracy. Plaintiffs "need *not* allege that Defendants simultaneously adopted this new pricing strategy for it to be considered parallel conduct." *RealPage*, 2023 WL 9004806, at *13. Indeed, "[i]t is elementary that an unlawful conspiracy may be and often is

formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227. Hub-and-spoke conspiracies like this one can be pled when some conspirators act independently of other conspirators, deal only with the hub, and do not condition their participation on the involvement of or coordinate directly with others. *United States v. Masonite Corp*., 316 U.S. 265, 274-75 (1942). Therefore, it does not matter if the allegations leave unclear "at what precise point of time each appellee became aware of the fact that its contract was not an isolated transaction but part of a larger arrangement." *Id*. As long as the allegations state that "as the arrangement continued each [conspirator] became familiar with its purpose and scope," which the CAC does, CAC ¶¶ 6, 22, 358, 402, parallel conduct is met. *Masonite*, 316 U.S. at 274-75.

To bolster the import of the timeline showing when they each started using the Rainmaker platform, Mot. at 18, Casino-Hotel Defendants rely on *Burtch v. Milberg Factors, Inc*., 662 F.3d 212 (3d Cir. 2011). But that case simply held that the plaintiff did not plead parallel conduct where the defendants each acted differently towards the plaintiff—some stopped all dealings, some reduced business, and some increased business—during the alleged boycott period. *Id*. at 228–29.

*Burtch* does not, as Defendants claim, set forth any rule that conspiratorial conduct more than three months apart cannot be parallel.[5]

Nor could it, given well-established law rejecting such an approach and finding the same type of parallel conduct alleged here sufficient under analogous circumstances. *See RealPage*, 2023 WL 9004806, at *1, 13 (finding parallel conduct where competitors began using algorithm over ten-year period).[6] That the first Casino-Hotel Defendant adopted Rainmaker years before the last does not negate the fact that each Casino-Hotel Defendant acted in parallel to its co-conspirators upon joining the scheme. *Id.*; *see Processed Egg*, 2019 WL 5656101, at *7 (finding "stage for the conspiracy set long before it was alleged to have officially hatched" over 20 years). Indeed, "every year each [Casino-Hotel Defendant] renews its license with" Rainmaker, it "re-affirm[s] its commitment to the data-sharing agreement." *RealPage*, 2023 WL 9004806, at *19.

<u>Conspirators Need Not Always Adopt Pricing Recommendations</u>. Defendants also insist that Plaintiffs must show 100% acceptance of the Rainmaker rate

---

[5] Nor does *In re Travel Agent Commission Antitrust Litigation*, 583 F.3d 896 (6th Cir. 2009), help Defendants. There, a clearinghouse did not suggest collusion where defendants could not access its information before setting rates. *Id.* at 906-07. The platform here enables collusion by setting the very rates its participants then charge.
[6] *See In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 254, 247 (D. Mass. 2014) (noting it is not "necessary for the agreements to have occurred close in time" to state a hub-and-spoke claim); *see also William Goldman Theaters v. Loew's, Inc.*, 150 F.2d 738, 743 (3d Cir. 1945).

recommendations to allege parallel conduct. Mot. at 19-21. But this argument "fail[s] to distinguish between the existence of a conspiracy and its efficacy." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002). Plaintiffs need not plead that the conspiracy affected the price of *all* transactions.

In *RealPage*, the court rejected the same argument, reasoning that allegations that recommendations were accepted most of the time sufficed. *RealPage*, 2023 WL 9004806, at *11, 16, 24, 35 n.26 (further noting it was "baseless" to assume that even when a defendant did "depart[]" from the recommended price that "it adopted a price consistent with ordinary market conditions"). This comports with the DOJ's position that horizontal price-fixing is pled when defendants' use of recommended prices "as a starting point" "disrupted the competitive process." *See* DePalma Decl. Ex. 1 at 22; Ex. 2 at 5-6. Indeed, "a horizontal agreement to fix prices need not succeed" perfectly for "sellers to be liable under the Sherman Act; it is the *attempt* that the Sherman Act proscribes." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362-63 (3d Cir. 2004).

Defendants cannot seriously dispute that Plaintiffs' allegations are substantially identical to those held sufficient in *RealPage*, including those alleging that Casino-Hotel Defendants adopted Rainmaker price recommendations "nearly all of the time," that Rainmaker applied specific mechanisms and procedures with

986675.1

each Casino-Hotel Defendant to ensure high acceptance rates, and that Casino-Hotel Defendants' pricing and supply moved in parallel (and anticompetitive) fashion during the class period. CAC ¶¶ 174, 243, 247.

Defendants' argument that "the CAC does not identify any instance when any Casino-Hotel Defendant adopted a price recommended by a Revenue Management Product," Mot. at 9, is also meritless. Plaintiffs need not make such granular allegations, *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010), particularly since Defendants allegedly adopted the recommendations nearly all of the time. *RealPage*, 2023 WL 9004806, at *28.

Defendants Mischaracterize the CAC's Pricing and Supply Allegations. The CAC's pricing and occupancy allegations plausibly suggest parallel conduct. CAC ¶¶ 230-53. Defendants' argument to the contrary, Mot. at 2, 21-22, is meritless.

*First*, Defendants' self-serving interpretations of Plaintiffs' pricing and occupancy allegations rest on a foundation of bad math and faulty logic. On pricing, Defendants improperly combine into one "several separate economic actors," *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010)— Harrah's, Tropicana, Caesars, and Bally's—that each raised prices. CAC ¶¶193-95. Defendants also ignore that Casino-Hotel Defendants' rates rose in parallel from the last year of the pre-class period (2017) through the class period's first year (2018):



*Compare* CAC ¶ 247 (relevant period highlighted above) *with* Mot. at 22 (bar graph omitting highlighted data). Movement during this key timeframe shows that their prices increased in parallel during the class period. Defendants' attempt to dismember the allegations "in order to show how each allegation, in isolation, fails to sufficiently aver" parallel conduct falters. *Blood Reagents*, 756 F. Supp. 2d at 630-31; *accord In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, *3 (N.D. Ill. Nov. 5, 2009) ("defendants may not 'cherry-pick' specific allegations" that "might be insufficient standing alone"). But even if one (improperly) ignored prices from this early phase, Casino-Hotel Defendants' subsequent prices and correlated movement still plausibly suggest parallel conduct.

Defendants similarly mischaracterize Plaintiffs' alleged facts on occupancy. At base, they claim they could not have conspired because the *occupancy* levels of one Defendant, Hard Rock, increased during the class period. But Plaintiffs explain how this conduct, in accord with economic theory, comports with the purpose and effect of the conspiracy: for all Casino-Hotel Defendants to charge supra-competitive *prices* by delegating *pricing* strategy to a common entity, while exercising "discipline" and avoiding the "inevitable race to the bottom" on *price*, that would not have occurred otherwise. CAC ¶¶ 250-51.[7] Defendants' reliance on "cherry-picked" occupancy rates for part, but not all, of the class period, fails for the same reason as their misplaced reliance on pricing for only part of the class period.

When Casino-Hotel Defendants' pricing and occupancy allegations for the entire class period are considered under the proper standard, the Court "must[] accept as true Plaintiffs' factual assertions" of parallel conduct. *City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 527-28 (S.D.N.Y. 2020) (sustaining plaintiffs' "statistical pleadings" where defendants offered countervailing interpretation). "At this stage, a statistical analysis, like any other allegation, need only be plausible." *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 364

---

[7] Given Hard Rock joined the conspiracy upon market entry, it is not surprising that filling its rooms at higher levels than its more established conspirators would align with Rainmaker's optimal pricing strategy for all Casino-Hotel Defendants.

986675.1

(S.D.N.Y. 2019) ("Merely pointing out that there are problems with the analysis, or that a better method is available, will not suffice."). Plaintiffs' allegations are.

*Second*, Plaintiffs need not prove let alone plead that Casino-Hotel Defendants' prices increased to show parallel conduct, contrary to Defendants' insinuation. "The Third Circuit has squarely addressed, and rejected, this theory." *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 788 (E.D. Pa. 2014). A conspiracy that stabilizes prices or prevents prices from dropping further, even if not effectuated uniformly across defendants, violates the Sherman Act no less than one that raises prices. *Id.*; *Flat Glass*, 385 F.3d at 362 (calling defendants' contention that declining pricing during conspiracy precluded antitrust liability "simply wrong"). Plaintiffs' factual allegations regarding Defendants' pricing and supply behavior certainly meet this threshold.

*Finally*, and fundamentally, Defendants' focus on disputed pricing and occupancy data in arguing the sufficiency of Plaintiffs' parallel conduct allegations misses the point. Allegations that defendants' pricing decisions "were made with awareness of their competitors' pricing decisions, and that their competitors' actions influenced or motivated defendants' individual pricing decisions" "are all that is required" to satisfy "the conscious parallelism element." *Chocolate*, 999 F. Supp. 2d at 788 (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998

F.2d 1224, 1243 (3d Cir. 1993)). The core conduct here—Defendants' knowing use of a shared "brain" to implement pricing strategy—is quintessential parallelism.

> b. *Plaintiffs Allege Multiple "Plus Factors."*

Three "plus factors" are repeatedly held to plausibly suggest the inference of conspiracy: (1) evidence that the defendant had a motive to collude; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy. *Ins. Brokerage*, 618 F.3d at 322. The CAC alleges each.

<u>Motive to Conspire</u>. Defendants incorrectly argue that this plus factor simply addresses the "understandable motive to increase profits." Mot. at 29. It instead provides "evidence that the structure of the market was such to make . . . price-fixing feasible" in light of (a) the market's structural features and (b) incentives to collude. *Flat Glass*, 385 F.3d at 360-61; *Lifewatch Servs. Inc. v. Highmark Inc*., 902 F.3d 323, 333 (3d Cir. 2018). Plaintiffs allege detailed facts showing both factors.

*Market Structure*: The CAC alleges that the structure of the Atlantic City Casino-Hotel Market contains multiple characteristics that make it ripe for collusion. These include: (i) high entry barriers to entry, including significant "[c]apital expenditures" and a "rigorous governmental approval process;" (ii) a "highly concentrated" market and dominant market share of "between 72% and 80%;" (iii) "no reasonable substitutes," thus making demand "relatively inelastic;" and (iv) a "relatively interchangeable" product. CAC ¶¶ 284-307. "[C]ourts, antitrust experts,

and economics agree" that these features "make an industry conducive to collusion" and support an inference of collusion. *Standard Iron Works v. Arcelor Mittal*, 639 F. Supp. 2d 877, 883 (N.D. Ill. 2009); *In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*, 2013 WL 812143, at *13 (D.N.J. Mar. 5, 2013).

*Market Definition*: Defendants' attack on Plaintiffs' market definition, Mot. at 28-29, fails for various reasons. To start, this dispute requires "a deeply fact-intensive inquiry" that cannot be resolved at this stage. *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001); *see Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("In most cases, proper market definition can be determined only after a factual inquiry."). This is particularly true here, as Plaintiffs' definition is informed by industry economic principles, rulings from courts and regulators, and Casino-Hotel Defendants' admissions. CAC ¶¶ 71-96.

Defendants incorrectly claim the CAC "acknowledges" that Casino-Hotel Defendants "compete directly with other casino[s] in the . . . surrounding areas." Mot. at 28. The cited paragraph, quoting Caesars' 2021 Annual Report to show casino-hotels are the relevant *product* market, says nothing about Atlantic City or Casino-Hotel Defendants competing with casino-hotels elsewhere. CAC ¶ 82.

Defendants also argue that the CAC alleges Casino-Hotel Defendants compete with merchant model-based OTAs for room sales but does not account for

these OTAs in the alleged market. Mot. at 28. Again, zero allegations support this assertion. What Plaintiffs actually allege, in connection with class definition, is that Casino-Hotel Defendants sell rooms to guests directly themselves and via OTAs using an agency model, where "the guest reserves the room on [a casino-hotel's] website at the rate set by the casino-hotel, and the guest pays the casino-hotel directly at the time of checkout." CAC ¶ 105. Plaintiffs do not allege that either Casino-Hotel Defendants use merchant model-based OTAs to sell rooms, *id.* ¶ 105 n.3., or anything else that fairly can be read to support Defendants' baseless claim.

Defendants pin their hopes on *Concord Associates, L.P. v. Entertainment Properties Trust*, 817 F.3d 46 (2d Cir. 2016). But this case *supports* Plaintiffs' position, recognizing that Atlantic City constitutes a relevant antitrust market. *Id*. at 53-55 (noting "Atlantic City gambling market" has been "implicitly recognized as [a] valid market definition[] in antitrust suits"). At any rate, "Defendants' arguments are more appropriately made at the summary judgment stage," and "Plaintiffs have adequately pled . . . the relevant market." *DIPF*, 2013 WL 812143, at *16.

*Incentive to Collude*. Defendants do not contest the allegations that they had a particularly powerful incentive to collude, given the prior sustained industry downturn and the newfound ability to make up for lost ground by using the algorithm. Mot. at 29; CAC ¶¶ 294-305.

Actions Against Interest: Plaintiffs also plausibly allege that a Casino-Hotel Defendant would not have independently used the Rainmaker platform to execute its pricing strategy unless the others did the same, particularly given the unique industry economics. CAC ¶¶ 6, 18, 306-09; *see Ins. Brokerage*, 618 F.3d at 332 (noting that where "defendants would not have undertaken their common action without reasonable assurances that all would act in concert," plaintiffs allege action against interest sufficient to connect the conspiracy's spokes). Simply put, "[n]o single reasonable [property] would drastically increase its prices and restrict its available sales without assurances that others would follow suit." *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1297 (N.D. Fla. 2016).

That certain Casino-Hotel Defendants began using the Rainmaker platform earlier than others before the class period, Mot. at 30-31, does not negate this factor. As discussed above, antitrust conspiracies can and often do occur when conspirators join at different points in time. *Interstate Circuit*, 306 U.S. at 227. Moreover, Defendants improperly conflate the period when the conspiratorial conduct may have begun with the period for which Plaintiffs allege Defendants' conspiracy began producing anticompetitive effects, *i.e.*, the class period. CAC ¶ 1; *see In re Domestic Drywall Antitrust Litig.*, 2016 WL 3453147, *4 n.5 (E.D. Pa. June 2, 2016) (distinguishing conspiracy period "window" and "different time period for the

calculation of damages"). Alleging prices were supra-competitive during the class period, even if some collusive behavior occurred leading up to its start, suffices.

Defendants again offer disputed factual spin. For example, they claim that non-defendant Ocean Casino had the highest room rates and non-defendant Golden Nugget the lowest occupancy rates during the class period somehow disproves this plus factor. Mot. at 31. Not only do these properties occupy different places in the market that render these facts unsurprising (Ocean is a new ultra-luxury resort, while Golden Nugget is an older, cheaper venue), what matters is how price and occupancy for those properties *moved in relation* to that of Casino-Hotel Defendants. Plaintiffs allege that the non-defendant properties' pricing and occupancy rates did not move similarly over time like Defendants' rates did to each other. CAC ¶¶ 244-49.

Traditional Conspiracy Evidence. "Evidence implying a traditional conspiracy," typically considered the most important plus factor, "consists of non-economic evidence that there was an actual, manifest agreement not to compete." *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 449 (E.D. Pa. 2018). Plaintiffs plead multiple types of traditional conspiracy evidence.

*Common Course of Conduct*: Plaintiffs plausibly allege that Defendants adopted a "common course of conduct" when they "all used the same pricing algorithm from the same company" while knowing "that the others were doing the

same thing as well." CAC ¶¶ 315-17. Facts like these are a recognized form of traditional conspiracy evidence. *Ins. Brokerage*, 618 F.3d at 322.

Indeed, Plaintiffs expressly allege that Casino-Hotel Defendants, like their counterparts in *RealPage*, knowingly used a shared algorithm that "inputs a melting pot of confidential competitor information . . . and spits out price recommendations based on that private competitor data." For example:

- Casino-Hotel Defendants submit their real-time, non-public pricing and supply data to a common pricing algorithm, or hub, which uses it and other types of information to derive true market demand and recommend optimal pricing to each Casino-Hotel Defendant. CAC ¶ 358.

- Defendants' misconduct—centered on coordination and setting of "optimal" pricing through a shared, centralized decisionmaker—reflects a hub-and-spoke price-fixing conspiracy. Each Casino-Hotel Defendant, acting as a spoke, provided real-time, non-public pricing and occupancy data directly to Rainmaker. Rainmaker, in turn, acts as a hub, analyzing this data to generate room rates each Casino-Hotel adopts nearly all of the time. *Id*. ¶ 22.

- Casino-Hotel Defendants provided real-time, non-public internal pricing and supply data to a single third-party for use in the pricing algorithm. *Id.* ¶ 402.

The clear overlap between the functionality of the RealPage and Rainmaker algorithms, coupled with various facts alleging Casino-Hotel Defendants know each other used it, suffice to plead Defendants' adoption of a common plan.

*Related Government Investigation*: Federal regulators are currently investigating virtually identical conduct in the apartment rental market involving a nearly indistinguishable pricing algorithm that Rainmaker itself developed and sold.

CAC ¶¶ 364-72; *RealPage*, 2023 WL 9004806, at *16. Defendants overplay their hand in arguing the DOJ's investigation in *RealPage* is "irrelevant because that case has no connection to Casino-Hotel Defendants" or the Rainmaker platform. Mot. at 27. Plaintiffs' allegations, detailing the common genesis, purpose and functionality of the two platforms, plausibly suggest otherwise.

*Information Exchange*: Plaintiffs also allege that the Rainmaker platform continuously collects contemporaneous confidential pricing and supply data directly from each Casino-Hotel Defendant and utilizes this data in setting recommended room rates. CAC ¶¶ 6, 22, 358, 402. This functionality makes the platform more effective in producing anticompetitive effects than a traditional information exchange in which participants still maintain and act pursuant to their own independent business strategies. *See generally Toys "R" Us v. Fed. Trade Comm'n*, 221 F.3d 928 (7th Cir. 2000). Indeed, the information is exchanged pursuant to a common scheme whose purpose and effect is to delegate each Casino-Hotel Defendants' pricing strategy to a common entity. *See RealPage*, 2023 WL 99004806, at *10 (crediting substantively identical allegations of information exchange and pricing authority delegation to similar shared algorithm). This type of "forward-looking, price-bearing communications that can support an inference that there was a conspiracy to fix prices." *Bank of Am.*, 498 F. Supp. 3d at 529.

Not only do Defendants fail to engage with the above allegations, they also improperly tout a small number of purported source materials to dispute the entirety of allegations detailing specific Rainmaker products' receipt and use of Casino-Hotel Defendants' non-public data. Mot. at 25-26. Consideration of such materials is improper at this stage because they are not "integral to the claim[s]" and Plaintiffs have not "incorporated [them] by reference." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). But even if the Court were to consider these materials, it would recognize that they do not help Defendants. One source only concerns an earlier version of one product, REVCaster, that was replaced by a "next generation" in 2017, while the other source, which actually discusses the platform's flagship product, GuestREV, does not reference public data whatsoever in discussing the competitor rate data it receives. CAC ¶¶ 146, 164. Moreover, Defendants cannot refute various other allegations (or underlying sources) plausibly suggesting the Rainmaker products indeed use Casino-Hotel Defendants' relevant data.[8]

Finally, Defendants do not dispute that Plaintiffs plausibly allege an information exchange through, among other avenues, regular and ad hoc discussions

---

[8] *See id.* ¶ 146 (Rainmaker material claiming that with GuestREV, "[c]ompetitor rates can be used to influence the final price recommendations"); ¶ 156 (Rainmaker advertisement stating that GroupREV "dynamically adjust[s] rates based on actionable market data that incorporates factors like your competitive set" and "real-time market conditions"); ¶¶ 164-165 (release noting 2017 "next generation" REVCaster offered clients "data transparency" and "monitor[ing]" of "rate parity").

between Rainmaker and individual Casino-Hotel Defendants regarding "best practices for maximizing room revenues." CAC ¶¶ 333, 360; *accord Foreign Exchange*, 74 F. Supp. 3d at 591-92 (finding defendants' use of chat rooms to share confidential pricing information pleaded Section 1 violation). These allegations independently support the information sharing "plus factor."

*Change in Business Practice*: Casino-Hotel Defendants' use of the platform to price rooms at "optimal" rates while leaving more rooms vacant constitutes a "stark change" to an "industry's well-established business model" that plausibly suggests collusion. CAC ¶¶ 311-14. Defendants discount these allegations, arguing that no "radical" change could occur given the time gap between when the first and last Casino-Hotel Defendant adopted the platform. Mot. at 32. But when each Casino-Hotel Defendant joined the scheme, it replaced its own historical pricing strategy with a radically new one, "represent[ing] a stark change from how they independently priced rooms for years beforehand." CAC ¶ 311. This significant change in strategy to "previous business models" satisfies this factor. *In re Domestic Airline Travel Antitrust Litig.*, --- F. Supp. 3d ---, 2023 WL 5930973, *17 (D.D.C. 2023) (allegation that defendants' "capacity discipline was a strategy that differed from past practice" was fact issue); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 798 (N.D. Ill. 2017) (break from past practice suggests collusion).

*Opportunities to Conspire*: The CAC documents specific opportunities to conspire, including Rainmaker's "annual user conferences;" Gaming & Leisure Roundtable events; Hospitality Sales and Marketing Association International (HSMAI) Revenue Optimization Conferences that included "actionable" presentations by the Rainmaker executive who previously oversaw the *RealPage* algorithm; and Casino Association of New Jersey meetings. CAC ¶¶ 318-56.

While "mere participation in [trade associations]" may not support an inference of conspiracy, Mot. at 32-33, Plaintiffs allege much more. Many meetings expressly concerned Casino-Hotel Defendants' use of the platform and featured Rainmaker's hands-on assistance, while others took the form of bilateral meetings between Rainmaker and Casino-Hotel Defendants related to the platform's operation and best pricing practices. CAC ¶¶ 321, 341. Still others featured invitation-only fora enabling Defendants to "collaborate together" on "best practices" and "forward strategy" with the comfort that participants would "not share content from this group in any other manner[.]" *Id*. ¶ 333. These particularized allegations "demonstrat[e] Defendants' opportunity to meet and collude." *In re Automotive Parts Antitrust Litig*., 2014 WL 1746579, at *5 (E.D. Mich. Apr. 30, 2014).

    c.  *Defendants' scheme bears common conspiracy hallmarks.*

Finally, Defendants falsely claim the CAC "does not identify when or how the supposed agreement was formed, which employees reached it, or how it was supposedly enforced." Mot. at 10, 33-35. In reality, the CAC specifically alleges:

- <u>when</u> and <u>how</u> each Casino-Hotel Defendant joined the scheme and it began yielding sustained anticompetitive results, CAC ¶¶ 295-305;

- numerous <u>employees</u> of each Defendant involved in the scheme, by name, title, duties, and date range, *id.* ¶ 229; and

- effective <u>enforcement</u> through the generation of "recommendation reports," and "action index scores" to target anyone who does not sufficiently adhere to recommendations, and the granting of manual override permissions to limited personnel for use only in exceptional situations. *Id.* ¶¶ 138-39, 150.

These allegations constitute "traditional hallmarks of a conspiracy," *In re Aetna UCR Litig.*, 2015 WL 3970168, *22 (D.N.J. June 30, 2015), and were upheld in the highly similar *RealPage* case. 2023 WL 9004806, at *2-4, 9-11.

Rather than concede this point, Defendants again distort Plaintiffs' allegations and offer self-serving interpretations of supposed facts from outside sources. Defendants even rehash arguments about the conspiracy's "timeline" and irrelevant OTAs and non-conspirator properties. These tactics fare no better here.

**B. Plaintiffs Plausibly Allege an Unreasonable Restraint of Trade.**

Courts assess whether an agreement constitutes an unreasonable restraint on trade under the *per se* rule or the rule of reason. *Ohio v. Am. Express Co.*, 585 U.S. 529, 540-41 (2018). The rule of reason applies to all restraints that are not *per se*

illegal and requires a balancing test of the anticompetitive effects against any pro-competitive justifications. *Id.* at 541. Often, "the decision about which rule is to be employed will await facts that are developed only in discovery." Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 305 (5th ed. Supp. 2022); *CSR Ltd. v. Fed. Ins. Co.*, 40 F. Supp. 2d 559, 564 (D.N.J. 1998) (noting on motion to dismiss that "the court does not find it necessary to determine which mode of analysis it will ultimately employ in evaluating the defendants' activities"); *accord Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995).

1. Defendants' Conspiracy Is *Per Se* Illegal.

*Per se* treatment is justified. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints[.]"). Here, the agreement was formed and operated specifically to set prices according to a common formula, making it a price-fixing conspiracy. CAC ¶¶ 1, 222-23. Price-fixing is the textbook example of conduct to which *per se* treatment applies. *See Socony-Vacuum*, 310 U.S. at 223 (holding any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity" *per se* unlawful); *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 348 (1982).

That prices were fixed by an algorithm instead of "a guy named Bob" makes no difference because "the machinery employed by a combination for price-fixing

is immaterial." *Socony-Vacuum*, 310 U.S. at 223; *see Meyer v. Kalanick*, 174 F. Supp. 3d 817, 824-26 (S.D.N.Y. 2016) (applying longstanding antitrust principles to alleged price-fixing by "algorithm"). It also does not matter that the scheme was organized by a non-competing intermediary. If "there is a horizontal agreement between [competitors], there is no reason why others joining that conspiracy must be competitors." *United States v. MMR Corp. (LA)*, 907 F.2d 489, 498 (5th Cir. 1990); *accord United States v. Apple*, 791 F.3d 290 (2d Cir. 2015). Nor does it matter that the fixed prices were non-mandatory. *See Flat Glass*, 385 F.3d at 369 ("An agreement to fix list prices is . . . a *per se* violation of the Sherman Act even if most or for that matter all transactions occurred at lower prices.").

For these reasons, the DOJ states that delegating pricing authority to an algorithm in the manner alleged here warrants *per se* treatment. CAC ¶¶ 269-81; *see* DePalma Decl., Ex. 1 at 15 ("[p]rice fixing, one of the supreme evil[s] of antitrust, is the prototypical example of per se unlawful conduct;" "analysis is no different simply because a software algorithm is involved"); Ex. 2 at 6 (same). Additionally, the *RealPage* court left open the potential to apply the *per se* standard as the evidentiary record developed in that case. 2023 WL 9004806, at *23.

Defendants' claim that "no cases" have applied the *per se* rule to "revenue management software" fails. That rule need not be "rejustified for every industry

that has not been subject to significant antitrust litigation." *Maricopa*, 457 U.S. at 348-51; *see Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) ("unfamiliar context of" claim "provides no basis to disturb application of the *per se* rule"). All price fixing can be euphemistically described as "revenue management," and price-fixing via formula—which is what an algorithm is—has long been *per se* illegal. *Socony-Vacuum*, 310 U.S. at 224-226 n.59. And computer assistance changes nothing about the nature of the conspiracy or the substance of the *per se* rule.

2. Defendants' Conspiracy Is Anticompetitive Under the Rule of Reason.

Alternatively, Plaintiffs properly allege a claim under the rule of reason. A rule of reason claim requires an allegation that a challenged restraint is unreasonable. That, in turn, requires plausible allegations of market power, which can be done through direct allegations of actual anticompetitive effects or indirect allegations of a high market share in a plausibly defined antitrust market. *Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986); *Graco Inc. v. PMC Global, Inc.*, 2012 WL 762448, at *8 (D.N.J. Mar. 6, 2012).

The CAC meets this standard. *First*, as described above, its allegations satisfy any requirement for alleging market power indirectly through Defendants' substantial share of a properly defined market. CAC ¶¶ 3, 98, 291, 304 (Casino-Hotel Defendants had 72%-80% market share during class period). *Second*, the CAC alleges various detailed facts yielding the plausible inference that Defendants' use

986675.1

of a common pricing algorithm caused room prices to be higher and occupancy rates to be lower than would have occurred in a competitive market. *Id*. ¶¶ 235-36, 242-48. Such allegations of increased prices and decreased output are classic examples of anticompetitive effects. *See Am. Express*, 585 U.S. at 542 (listing "reduced output" and "increased prices" as "actual detrimental effects" on competition); *accord Lifewatch*, 902 F.3d at 340. Defendants' failure to offer any pro-competitive justification is telling, even if it would not help them at this point. *See Atallah Group US Inc. v GMA Accessories, Inc.*, 2023 WL 5803417, at *4 (S.D.N.Y. Sep. 7, 2023) (accepting such justification premature on motion to dismiss).

### C. Plaintiffs Plead All Parent and Affiliate Defendants' Involvement.

The CAC pleads the parent and affiliate Defendants' participation in the scheme. Plaintiffs point to various Rainmaker promotional materials, trade articles, and employee statements confirming that Caesars Entertainment, MGM Resorts, and Hard Rock International are all clients of Rainmaker who use the relevant products. CAC ¶¶ 43, 53, 58, 179-80, 187-90, 197, 201. Plaintiffs also note that Hard Rock International "coordinates Hard Rock-branded casino-hotels' use of IT and revenue management systems, including the Rainmaker pricing algorithm platform," through its IT business partner, Seminole Hard Rock Support Service." *Id.* ¶ 198.

Moreover, Plaintiffs allege that relevant employees of the parent Defendants, and their co-Defendants, (a) attended numerous events where the Rainmaker

products and related pricing practices expressly were discussed, and (b) sat on the boards of industry trade associations like HSMAI. In particular, Plaintiffs allege that the parent Defendants' executives and managers attended the HSMAI's annual Revenue Optimization Conference, an event that "convenes leaders of revenue optimization and pricing" to collaborate on these topics. *Id.* ¶¶ 215, 331-44.

In arguing the CAC does not plausibly implicate the parent and affiliate Defendants, Mot. at 37-38, Defendants gloss over these facts in parroting they cannot be liable "simply by the dint of the corporate relationship" with their affiliated casino-hotels. Mot. at 38. And the case Defendants cite is inapposite, as the plaintiffs there "allege[d] no other basis for imputing § 1 liability to defendant entities" besides this "dint." *Ins. Brokerage*, 618 F.3d at 341 n.44.

## II.   Plaintiffs' Claims Are Equitably Tolled.

Plaintiffs' claims are not barred by the statute of limitations. Mot. at 38-40. They plead fraudulent concealment by alleging (1) an "act of concealment" (2) that "misleads or relaxes [their] inquiry," and that they (3) "exercised due diligence" in investigating their claims. *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 368 (D.N.J. 2001); *see Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014) (noting courts generally do not resolve this fact-intensive inquiry on the pleadings).

986675.1

*First*, Plaintiffs allege that the conspiracy was self-concealing and that Defendants falsely told customers that their "best" and "lowest" rates were based on "competitive pricing" without noting the "imperceptible" misconduct "behind the rate." CAC ¶¶ 374-76, 379-81; *see Mercedes*, 157 F. Supp. 2d at 370, 372-73 ("numerous courts have found that a price-fixing conspiracy is self-concealing"); *In re Magnesium Oxide Antitrust Litig.*, 2012 WL 1150123, at *6 (D.N.J. Apr. 5, 2012) (concealment alleged where "pretextual justifications" given "for price increases"). Defendants' sole case, *In re Processed Egg Products Antitrust Litigation*, 2013 WL 4504768 (E.D. Pa. Aug. 23, 2013), Mot. at 39, does not even address this element.

*Second*, Defendants' conduct did not put Plaintiffs on inquiry notice. CAC ¶ 384. The Rainmaker statements Defendants highlight could not have prompted Plaintiffs to investigate potential collusion because they were made (a) on an industry blog post Plaintiffs had no reason to know about, (b) before Plaintiffs rented Defendants' rooms for which they supposedly received "competitive pricing," and (c) before Defendants' "act[s]" started to "injure" them. *Processed Egg*, 2013 WL 4504768, at *1; CAC ¶¶ 27-35; ¶¶ 382-83.

*Finally*, Plaintiffs plead that they "exercised reasonable diligence" in investigating the facts that led to this action. They also allege they could not have uncovered the misconduct through reasonable diligence before similar conduct in

986675.1

another industry surfaced. CAC ¶¶ 365, 384-85; *see Mercedes*, 157 F. Supp. 2d at 374 ("normal consumers exercising reasonable diligence in the circumstances" would have "no reason to inquire further"). *Processed Egg* is inapposite. Mot. at 38-40. The plaintiffs there, unlike here, were bulk purchasers who knew enough to ask why "prices were increasing" but stopped there. 2013 WL 4504768, at *5-6.[9]

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss in its entirety. If the Court grants any part of the Motion, it should do so without prejudice so Plaintiffs can amend to cure any identified deficiencies. *See Phillips,* 515 F.3d at 245.

---

[9] Plaintiffs' allegations do indeed relate back to the original complaint. Mot. at 38 n. 11; *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1098 (3d Cir. 1975); *see Schultz v. Midland Credit Mgmt., Inc.*, 2019 WL 2083302, at *10 (D.N.J. May 13, 2019) (permitting "addition or substitution of a named plaintiff" in ongoing class action *even after* statute of limitations expired).

986675.1

Dated:  March 21, 2024          Respectfully submitted,

/s/ Joseph J. DePalma
Joseph J. DePalma
Catherine B. Derenze
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

Mindee J. Reuben
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Telephone: (215) 854-4060
mreuben@litedepalma.com

***Proposed Liaison Counsel for Plaintiffs and the Proposed Class***

Christopher J. Cormier (*pro hac vice*)
Spencer Cox (*pro hac vice*)
Matt Strauser (*pro hac vice* forthcoming)
**BURNS CHAREST LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202) 577-3977
ccormier@burnscharest.com
scox@burnscharest.com
mstrauser@burnscharest.com

41

Warren T. Burns (*pro hac vice*)
Daniel H. Charest (*pro hac vice*)
Matthew Tripolitsiotis (*pro hac vice*)
Hannah M. Crowe (*pro hac vice*)
Quinn Burns (*pro hac vice*)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
wburns@burnscharest.com
dcharest@burnscharest.com
mtripolitsiotis@burnscharest.com
hcrowe@burnscharest.com
qburns@burnscharest.com

Vineet Bhatia (*pro hac vice*)
Shawn L. Raymond (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com

Stephen E. Morrissey (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
smorrissey@susmangodfrey.com

42

Lisa X. Jing (*pro hac vice*)
Zach Fields (*pro hac vice* forthcoming)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, Floor 32
New York, NY 10019
Telephone: (212) 336-8330
ljing@susmangodfrey.com
zfields@susmangodfrey.com

***Proposed Co-Lead Counsel for Plaintiffs
and the Proposed Class***

William Gerald Caldes
Jeffrey L. Spector
Icee N. Etheridge
**SPECTOR ROSEMAN & KODROFF P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (212) 496-0300
bcaldes@srkattorneys.com
jspector@srkattorneys.com
ietheridge@srkattorneys.com

Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
**REINHARDT WENDORF & BLANCHFIELD**
222 South 9th Street, Suite 1600
Minneapolis, MN 55402
Telephone (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penny@rbwlawfirm.com

***Proposed Executive Committee for Plaintiffs and
the Proposed Class***

43

Stanley O. King
**JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS, P.C.**
231 S. Broad Street
Woodbury, NJ 08096
Telephone: (856) 845-3001
stan@kingslaw.com

Lisa J. Rodriguez
Ira Richards (*pro hac vice* forthcoming)
**DILWORTH PAXSON L.L.P.**
457 Haddonfield Road, Suite 700
Cherry Hill, NJ 08002
Telephone: (856) 675-1926
lrodriguez@dilworthlaw.com

Jonathan M. Jagher (*pro hac vice* forthcoming)
**FREED KANNER LONDON AND MILLEN, LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6486
jjagher@fklmlaw.com

**FREED KANNER LONDON AND MILLEN, LLC**
Michael E. Moskovitz (*pro hac vice* forthcoming)
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mmoskovitz@fklmlaw.com

**MCLAFFERTY LAW FIRM, P.C.**
David P. McLafferty (*pro hac vice* forthcoming)
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 940-4000
dmclafferty@mclaffertylaw.com
***Additional Counsel for Plaintiffs***
***and the Proposed Class***

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (and accompanying exhibits) dated March 21, 2024, was filed electronically with the United States District Court for the District of New Jersey through the Court's ECF System on this date. The Notice of Electronic Filing constitutes service on all parties under Rule 14(b)(1) of this Court's ECF Policies and Procedures listed in Local Civil Rule 5.2.

Dated: March 21, 2024

*/s/ Joseph J. DePalma*
Joseph J. DePalma

45

986675.1