UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| CORNISH-ADEBIYI, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CAESARS ENTERTAINMENT, INC., *et al.*, <br><br> Defendants. | HONORABLE KAREN M. WILLIAMS <br><br> Civil Action <br> No. 1:23-CV-02536-KMW-EAP <br><br><br> **OPINION** |

**WILLIAMS, District Judge:**

## I. INTRODUCTION

Plaintiffs Karen Cornish-Adebiyi, Luis Santiago, Monica Blair-Smith, and Jacob Fabel (together, "Plaintiffs") bring this putative class action against the owners and operators of various casino-hotels, as well as a software company (together, "Defendants"), alleging that they have unlawfully conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] Before the Court is Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (the "Amended Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendants' Motion is granted.

## II. FACTUAL BACKGROUND

This case concerns the prices of hotel rooms at various Atlantic City casino-hotels, specifically those at Hard Rock Atlantic City, Borgata Hotel Casino & Spa, and three Caesars-

---

[1] Defendants in this case are Caesars Entertainment, Inc. ("Caesars"); Boardwalk Regency LLC; Harrah's Atlantic City Operating Company, LLC; Tropicana Atlantic City Corporation; MGM Resorts International; Marina District Development Company, LLC; Cendyn Group, LLC; Hard Rock International Inc.; Seminole Hard Rock Support Services, LLC; Boardwalk 1000, LLC.

1

affiliated properties—Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City (together, the "Casino-Hotels").[2] *See* Am. Compl. ¶¶ 37, 48, 55. In their Amended Complaint, Plaintiffs allege that the Casino-Hotels have unlawfully conspired to inflate and fix the price of their hotel rooms. *See id.* ¶ 1. That conspiracy, Plaintiffs maintain, has been achieved through pricing software sold and marketed by the same company, defendant Cendyn Group, LLC ("Cendyn"). *See id.*

The relevant software at issue was first developed and sold by The Rainmaker Group ("Rainmaker") in the late 1990s, until it was acquired by Cendyn in 2019. *See id.* ¶¶ 5, 113, 121, 126. Cendyn, and previously Rainmaker before its acquisition, offers two products licensed and used by all the Casino Hotels—GuestREV and GroupREV—both of which use one or more pricing algorithms to offer individualized recommendations to each Casino-Hotel as to how it should optimally price its hotel rooms. *See id.* ¶¶ 7, 11, 134, 153. GuestREV is used to price individual rooms, and GroupREV for group reservations (*e.g.*, blocks for conferences). *See id.* ¶¶ 151–58. Beginning in 2015, both products incorporated a feature called REVCaster, a "price comparison tool" that collects publicly available room prices from competing hotels. *See id.* ¶ 160.[3]

The Casino-Hotels began using the Rainmaker products "at various points in time" over a fourteen-year period, starting with a Caesars-affiliated Hotel using GuestREV around 2004 and

---

[2] For purposes of this Opinion, the Court also uses "Casino-Hotels" to refer to their affiliates who have been named as defendants in this case.

[3] Paragraph 160 of the Amended Complaint purports to quote an uncited source, but alleges in between those quotes that REVCaster collects and utilizes "a client's competitors' *non-public, real-time pricing and supply data*." Am. Compl. ¶ 160 (emphasis added). Plaintiffs have since conceded that the source they invoke contradicts what they allege. *See* Pls.' Opp. at 3 n.3. As Defendants' accurately point out, *see* Defs.' Br. at 26–27, that source is an online news article that states REVCaster "collects market-specific hotel price information from hundreds of branded sites and online travel agencies" (*i.e.*, publicly available information). *See* HNN Newswire, *The Rainmaker Group Acquires Revcaster*, May 21, 2015, *available at* https://www.costar.com/article/448134080/the-rainmaker-group-acquires-revcaster; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.13 (2007) (noting that "District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which [ ] truncated quotations were drawn").

2

ending with Hard Rock using both GuestREV and GroupREV in 2018. *See id.* ¶¶ 175–76. The others began using some or all of the products at various points in between. *See id.* ¶¶ 178, 184, 193. However, by "no later than June 28, 2018," the Casino-Hotels allegedly entered into a conspiracy by which they would all use Rainmaker's product as part of an "anticompetitive scheme that has caused Plaintiffs and class members to pay supra-competitive prices for guest rooms." *See id.* ¶ 1. In other words, since 2018, the Casino-Hotels started charging higher prices for hotel rooms. *See id.* ¶ 7.

The function of the Rainmaker products is best understood from the perspective of one of the Casino-Hotels subscribed to them. As Plaintiffs describe it, a casino-hotel gives the Rainmaker products continuous access to certain data, at least some of which includes non-public proprietary data related to pricing and occupancy.[4] *See id.* ¶ 6. In turn, an algorithm "processes and analyzes" the input data of that specific casino-hotel—together with "other supply and demand data"—and recommends an "optimal" price for the casino-hotel's rooms, which it may then adopt or reject at its discretion. *Id.* This is how the Rainmaker products function for each of the Casino-Hotels named in this case, and they are alleged to accept those recommendations around 90% of the time. *See id.* ¶ 174.

The Amended Complaint does not allege that the Casino-Hotels' proprietary data are pooled or otherwise comingled into a common dataset against which an algorithm runs and returns

---

[4] In describing the three Rainmaker products at issue, the Amended Complaint describes them collectively as the "Rainmaker platform," but seems to equivocate in its use of the word "platform." The "platform" it describes initially is more akin to a "suite" of discreet but related products. *See, e.g.*, Am. Compl. ¶ 5 ("Rainmaker developed and marketed a platform of pricing algorithm products[.]"). However, it is around the sixth paragraph where the Amended Complaint appears to adopt an entirely different definition of platform, or at least one that implies a single, unified database into which all the Casino-Hotels' confidential pricing and occupancy data are pooled. *See id.* ¶ 6 (stating that "each casino-hotel provides its current, non-public room pricing and occupancy data to the Rainmaker platform"); *see also id.* ¶ 226 (alleging the Casino-Hotels "knowingly submitted their own real-time and non-public pricing and occupancy data to the same third-party algorithm platform to which their co-defendants were submitting their own respective real-time and non-public pricing and occupancy data."). To be clear, Plaintiffs have not pled that the Casino-Hotels' proprietary data were pooled in such a way.

to each Casino-Hotel individually with recommended prices. Even so, Plaintiffs allege that the Casino-Hotels have engaged in a conspiracy to artificially raise and fix the prices of their hotel rooms, and that their conspiracy is achieved through their "knowing and purposeful shared use" of the Rainmaker products. *Id.* ¶¶ 223–24.

### III.   LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is required to accept as true all factual allegations in the complaint and draw all reasonable inferences from those allegations in the light most favorable to the plaintiff, *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008), but need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A complaint need not contain "detailed factual allegations" to survive a motion to dismiss, but must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" and a complaint will not "suffice" if it provides only "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). A complaint that provides facts "merely consistent with" the defendant's liability "stops short of the line between possibility and plausibility" and will not survive review under Rule 12(b)(6). *Id.* (quoting *Twombly*, 555 U.S. at 557).

## IV. DISCUSSION

In their Motion, Defendants seek dismissal of the Amended Complaint, which asserts against each Defendant a single claim for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### A. Legal Framework

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *Id.* Thus, to successfully make out a Section 1 claim, a plaintiff must plead: (1) that the defendant was a party to a contract, combination, or conspiracy; and (2) that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). Here, Defendants' Motion implicates only the first prong.

The terms "contract," "combination," or "conspiracy" have not been assigned their own unique meanings but have rather been interpreted together "simply to mean an agreement." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 332 (3d Cir. 2018). They thus require "some form of concerted action, . . . a unity of purpose or a common design and understanding or a meeting of minds' or 'a conscious commitment to a common scheme." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (internal citations and quotation marks omitted). In any case, "Section 1 claims always require the existence of an agreement. Unilateral action, regardless of the motivation is not a violation of Section 1." *Burtch*, 662 F.3d at 221 (internal citations and quotation marks omitted); *see also West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) ("To prevail on a [S]ection 1 claim . . . a plaintiff must establish the existence of an agreement.").

The unlawful agreement alleged in this case is that of a hub-and-spoke conspiracy—a type of conspiratorial agreement comprised of a central actor (the "hub") with multiple competitors jetting out vertically therefrom (the "spokes"). The "rim" of this wheel represents the connecting agreements among the horizontal competitors that form the spokes. "In all hub-and-spoke conspiracies, the horizontal agreement among the spokes supports the agreements between the hub and each spoke, and vice versa." *Ins. Brokerage*, 618 F.3d at 347. Thus, the "critical issue" for establishing a hub-and-spoke conspiracy is determining "how the spokes are connected to each other." *Id.* at 327 (internal quotation marks omitted). The specific conspiracy alleged in this case is arranged with Cendyn and its Rainmaker products in the middle as the "hub," and the individual Casino-Hotels are the "spokes." Defendants' Motion here concerns only the "rim," the alleged horizontal agreements among the Casino-Hotels to fix the prices of their hotel rooms.

A plaintiff's pleading burden for demonstrating a horizontal agreement among direct competitors is the same for any unlawful agreement on the Sherman Act—it requires Plaintiffs to plead "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. A plausible agreement may be shown through "either direct evidence of an agreement or circumstantial evidence." *Burtch*, 662 F.3d at 225. A conspiracy based on direct evidence requires allegations of "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). When relying on circumstantial evidence, a plaintiff must plead evidence of "parallel conduct" that is further "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. That necessary context may be evinced through allegations of so-called "plus factors" that "serve as proxies for direct evidence of an agreement." *In re Flat Glass Antitrust*

*Litig.*, 385 F.3d 350, 360 (3d Cir. 2004). The Third Circuit has identified at least three such plus factors that "may" indicate the presence of an agreement: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Ins. Brokerage*, 618 F.3d at 322. However, these factors are neither exclusive nor conclusive; determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 664.

### B. **Horizontal Agreement**

As previously indicated, Plaintiffs have alleged a price-fixing agreement among the Casino-Hotels. Plaintiffs have offered no allegation that directly evinces an explicit price-fixing agreement, and they thus endeavor to infer a tacit agreement through the Casino-Hotels' parallel conduct, namely their "knowing use of the same Rainmaker software." Pls.' Opp. at 13.[5] The question thus before the Court is whether the Casino-Hotels' common use of the same pricing software is "plausibly suggest[ive of] (not merely consistent with) agreement." *Twombly*, 550 U.S. at 545. In their Motion, Defendants articulate various factual deficiencies plaguing the Amended Complaint, all of which they contend preclude a plausible inference of any alleged agreement.

At the outset, the Court observes that the purported hub-and-spoke conspiracy in this case is nearly identical to that pled in another case that recently concluded in Las Vegas, Nevada. In *Gibson v. MGM Resorts International* ("*Gibson I*"), the plaintiffs brought a putative class action

---

[5] As "direct evidence" of a price-fixing conspiracy, Plaintiffs point to specific portions of a blog post written by a Cendyn executive that broadly discusses the benefits available to hotels when they optimize revenue instead of occupancy. The Court declines to discuss this evidence at length. To conclude that a conspiratorial agreement was reached based on this evidence requires numerous inferential steps, which necessarily means that these statements, by definition, are not direct evidence. *See, e.g.*, *Burtch*, 662 F.3d 212, 225 (3d Cir. 2011) (rejecting proposed "direct evidence" because allegations did not "specify a time or place that any actual agreement . . . occurred" nor "indicate that any particular individuals . . . made such an agreement").

7

against Cendyn and various casino-hotels on the Las Vegas strip. *See* No. 2:23-CV-00140, 2023 WL 7025996 (D. Nev. Oct. 24, 2023). There too, the plaintiffs invoked the Sherman Act and alleged that a price-fixing conspiracy was achieved through the casino-hotels' common use of the very same Rainmaker products at issue in this case. On October 24, 2023, the Honorable Miranda M. Du, U.S.D.J., issued a written opinion setting forth a litany of reasons as to why the plaintiffs failed to allege a plausible agreement among the casino-hotels to raise the prices of their hotel rooms. Though the court dismissed the complaint, it initially did so without prejudice and granted plaintiffs leave to submit an amended pleading.

Plaintiffs here acknowledge the factual and theoretical similarities between this case and *Gibson*, but maintain that the Amended Complaint here "satisfies each concern" expressed by Judge Du. Pls.' Opp. at 7. However, while Defendants' Motion to Dismiss was pending in this case, Judge Du had the opportunity to consider the Las Vegas plaintiffs' amended pleading. *See Gibson v. Cendyn Grp., LLC* ("*Gibson II*"), No. 2:23-CV-00140, 2024 WL 2060260 (D. Nev. May 8, 2024). In another detailed, written opinion, Judge Du found that many of the previously identified factual deficiencies persisted, and that the plaintiffs had, once again, failed to plead parallel conduct from which a plausible, horizontal price-fixing conspiracy could be inferred. *See id.* at *8.

It can hardly be disputed that the same factual deficiencies identified in *Gibson I* and *Gibson II* are present in the Amended Complaint here. Indeed, most of the arguments offered in this case have likewise been presented to and considered by Judge Du. Having considered those arguments, this Court also concludes that Plaintiffs have failed to establish a plausible price-fixing conspiracy among the Casino-Hotels in Atlantic City.

8

One particular issue with the Amended Complaint here is the timing of the parallel conduct which, as Defendants point out, was not quite "parallel." As previously mentioned, the Casino-Hotels' subscriptions to the Rainmaker product occurred over a fourteen-year period, starting with a Caesars-affiliated hotel in 2004 and ending with Hard Rock in 2018. The Borgata and Harrah's first subscribed in 2009—five years after Caesars, and nine years before Hard Rock. The penultimate was Tropicana, two years before Hard Rock. In their Opposition, Plaintiffs submit that they are not required to demonstrate "simultaneous" parallel conduct, and that "it does not matter if the allegations leave unclear 'at what precise point of time each [Casino-Hotel] became aware' of the unlawful agreement." Pls.' Opp. at 15–16 (quoting *United States v. Masonite Corp.*, 316 U.S. 265, 274–75 (1942)). While it is true that Plaintiffs need not allege parallel conduct that is strictly simultaneous or conclusively identify a conspiratorial "start date," they must nevertheless place the Casino Hotels' software use "in a context that raises a suggestion of a *preceding agreement*." *Twombly*, 550 U.S. at 557 (emphasis added); *see also Baby Food Antitrust Litig.*, 166 F.3d at 117 ("The existence of an agreement is the hallmark of a Section 1 claim."). Judge Du confronted a similar ten-year gap in *Gibson II*:

> [G]iven the allegations in the [amended complaint] . . . that Hotel Defendants began licensing GuestRev and GroupRev at different times over an approximately 10-year period and never agreed to charge the prices GuestRev and GroupRev recommended to them, the only plausible inference that the Court can draw is that the timing does not raise the specter of collusion. Instead, and even drawing all inferences in Plaintiffs' favor, the allegations to the effect that Hotel Defendants agreed to license GuestRev and GroupRev . . . over the course of some 10 years merely suggest that Hotel Defendants had a similar reaction to similar pressures within an interdependent market, or conscious parallelism. This contrasts with the implausible inference of a tacit agreement between Hotel Defendants that Plaintiffs would like the Court to draw. And the allegations about Defendants' parallel use of GuestRev starting in 2015 do not plausibly allow for such an inference either because, as Defendants pointed out, GuestRev and GroupRev merely integrated public competitor prices through RevCaster starting in 2015. That technical change does not speak to any agreement between Hotel Defendants. The Court thus again

>finds that the gaps in time between when Hotel Defendants agreed to license GuestRev and GroupRev suggest a tacit agreement between them is implausible.

2024 WL 2060260, at *4. (citations and quotation marks omitted). This Court likewise finds that even when considering the Amended Complaint as a whole in the light most favorable to Plaintiffs, the fourteen-year gap, coupled with the pricing authority the Casino-Hotels' continued to retain and exercise, makes it quite implausible that they tacitly agreed to anything, much less to fix the prices of their hotel rooms. *See also Burtch*, 662 F.3d at 228 (holding plaintiff failed to plead plausible agreement where individual conduct occurred months apart).

Another significant gap in the Amended Complaint lies in the unique antitrust theory Plaintiffs have proposed. The parallel conduct from which Plaintiffs ask this Court to infer an illegal price-fixing agreement is the Casino-Hotels' "knowing" and "purposeful" use of the Rainmaker products. But how is their mere use of the specific software here suggestive of culpable conspiracy? Plaintiffs repeatedly and emphatically emphasize that the Casino-Hotels "knowingly provided" their "non-public room pricing and occupancy data" to the Rainmaker products. *See* Am. Compl. ¶¶ 6, 9, 22, 24, 136, 139, 160, 205, 220–21, 224–26. As to how this data is used once it is handed over, Plaintiffs do not say. But that is precisely what appears to be missing. Without it, their antitrust theory is factually and legally incomplete.

The Court reiterates that the Amended Complaint does not allege that the Casino-Hotels' proprietary data are pooled or otherwise comingled into a common dataset against which the algorithm runs. Stated differently, the pricing recommendations offered to each Casino-Hotel individually are not based on a pool of confidential competitor data. The Amended Complaint goes to rather extraordinary lengths to dance around that allegation with linguistic equivocation in an obvious attempt to imply it, but it never unambiguously alleges as much. What is more, the specific sources quoted by the Amended Complaint seem to confirm that the pricing recommendations at

10

issue were never based on the confidential, proprietary data of their competitors. And the Casino-Hotels' "supply and demand data" to which Plaintiffs allude appears to be publicly available information.

In their Motion, Defendants highlight the Amended Complaint's ambiguity on this issue. And as they have correctly pointed out, Plaintiffs do not allege that the Casino-Hotels receive or directly benefit from the non-public pricing and occupancy data they individually place into the Rainmaker products. Plaintiffs appear to concede that their particular antitrust theory depends on some improper exchange or use of that data. Yet, their Opposition claims that "this is <u>precisely</u> what Plaintiffs allege." Pls.' Br. at 2 (emphasis in original). That is simply not true. What is more, Judge Du confronted these same tactics in *Gibson I*:

> Plaintiffs [ ] allege a hub and spoke conspiracy in their Complaint, but their allegations do not support such a theory because **Plaintiffs never quite allege (though they suggest by implication) that Hotel Operators get nonpublic information from other Hotel Operators by virtue of using insufficiently specified algorithmic pricing software**. Indeed, as [FTC] Commissioner Ohlhausen described it, a successful hub and spoke theory of Sherman Act liability based on the use of algorithmic pricing depends in part on the exchange of nonpublic information between competitors through the algorithm. And as Defendants' counsel argued at the Hearing, **Plaintiffs attempt to create an inference of the exchange of nonpublic information in their Complaint without actually alleging such an exchange.**
> 
> . . . .
> 
> Plaintiffs do not allege that . . . Hotel Operators exchange nonpublic information with each other through their use of that same software. Accordingly, Plaintiffs have not sufficiently alleged a hub and spoke theory in their Complaint consistent with the theory described[.]

2023 WL 7025996, at *6 (emphasis added) (citations and quotation marks omitted). The same is true of the Amended Complaint here.

Undeterred, Plaintiffs insist that their allegations are "closely analogous" to those successfully alleged in *In re RealPage, Inc.* ("*RealPage*")—a multidistrict litigation involving another algorithm-software provider (RealPage) in the apartment-rentals industry. *See* 709 F.

11

Supp. 3d 478 (M.D. Tenn. 2023). As described by the Honorable Waverly D. Crenshaw, Jr., U.S.D.J., the antitrust claims in *RealPage* involved allegations that

> RealPage and RMS Client Defendants [ ] formed an illegal price-fixing cartel by jointly using RealPage's RMS software. As the cartel leader or the "hub" of the conspiracy, RealPage serves as an intermediary between horizontal competitors in the multifamily and student housing markets. **It takes its clients commercially sensitive pricing and supply data, runs its RMS algorithm against that collective data pool, and then spits out rental pricing recommendations for each of its clients' properties. RMS Client Defendants agree to set prices based on a pool of their horizontal competitors' proprietary data and reasonably believe that their competitors are using the same data and methods to price their properties**.

*Id.* at 494 (emphasis added) (citations omitted). Critically, Judge Crenshaw rejected the very analogy Plaintiffs attempt to draw here:

> Gibson concerned a revenue management system that the plaintiffs alleged was used by hotels on the Las Vegas Strip to increase nightly room rates. **On their face, these allegations appear to offer a close analogy to this case, but the devil is in the details**. In granting the defendant hotels' motion to dismiss, the court found that "it is unclear whether the pricing recommendations generated to Hotel Operators include [competitors'] confidential information fed in; perhaps they only get their own confidential information back, mixed with public information from other sources." **Here, the Multifamily Complaint unequivocally alleges that RealPage's revenue management software inputs a melting pot of confidential competitor information through its algorithm and spits out price recommendations based on that private competitor data[.]** . . . **This critical difference between the Gibson complaint and the Multifamily Complaint destroys the analogy**. As the Gibson court acknowledged, "a successful hub and spoke theory of Sherman Act liability based on the use of algorithmic pricing depends in part on the exchange of nonpublic information between competitors through the algorithm." That is what the Multifamily Plaintiffs have alleged here.

*Id.* at 512 (citations omitted).

Notwithstanding the obvious factual dissimilarities, Plaintiffs state that "Defendants cannot seriously dispute that Plaintiffs' allegations are substantially identical to those held sufficient in *RealPage*." Pls.' Opp. at 18. But even that suggestion was offered by the plaintiffs in *Gibson II* and was swiftly rejected:

12

> Plaintiffs state that "Defendants make no serious attempt to distinguish this case from *RealPage*[,]" and hold that case up as an analogue the Court should consider[.] [B]ut the *RealPage* court distinguished that case from this one precisely because the complaint in that case included allegations of the exchange of otherwise confidential information between competitors through the algorithm, while this case did not.

2024 WL 2060260, at *4. Lest there by any doubt, Judge Du further noted:

> To the extent it is not obvious, the Court distinguishes *RealPage* . . . for the same reason that the *RealPage* court distinguished this case. This case does not involve allegations of competitors pooling their confidential or proprietary information in the dataset that the pertinent algorithm runs on, while that case did.

*Id.* at *4 n.7. Here, Plaintiffs' "failure to plausibly allege the exchange of confidential information from one of the spokes to the other through the hub's algorithms is another fatal defect . . . [and] it too compels the conclusion that there is no rim." *Id.* at *4.

Like the Las Vegas plaintiffs, Plaintiffs here have premised their case on a rather novel antitrust theory that is simply "in search of factual allegations that could support it." *Id.* *3. The Court cannot infer a plausible price-fixing agreement between the Casino-Hotels from the mere fact that they all use the same pricing software. Simply stated, the hub-and-spoke conspiracy they articulate lacks a rim. Plaintiffs have not pled any facts that places that behavior in "a context that raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557. Without such context, the Casino-Hotels' use of the same pricing software evinces "nothing more than a series of vertical relationships." *Ins. Brokerage*, 618 F.3d at 327. "*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior." *Id.* Both considerations warrant dismissal of the Amended Complaint here. The Court accordingly holds that Plaintiffs have failed to state a claim under Section 1 of the Sherman Act.

## V.   CONCLUSION

For all of the reasons set forth above, Defendants' Motion to Dismiss the Amended Complaint is granted.[6]

Dated: September 30, 2024

*/s/ Karen M. Williams*
KAREN M. WILLIAMS
U.S. DISTRICT COURT JUDGE

---

[6] Following the publication of *Gibson II*, Plaintiffs gave no indication that they wish to further amend their pleading (ECF No. 114.) As such, the Court's dismissal of the Amended Complaint is with prejudice.